**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| ALPHONSO WHIPPER, | ) | 3:23-CV-27 (SVN) |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| GREEN, *et al.*, | ) | |
| *Defendants*. | ) | July 1, 2024 |

<u>**ORDER DENYING MOTIONS TO DISMISS**</u>

Sarala V. Nagala, United States District Judge.

As of September of 2022, incarcerated Plaintiff Alphonso Whipper had participated in the Wesleyan University Center for Prison Education ("CPE" or "CPE Program") at Cheshire Correctional Institution for a decade and was one-half credit short of graduating with a Wesleyan degree. On September 8, 2022, he was told to sign a form that was allegedly required for him to continue participating in the Program. He refused to the sign the form, triggering a series of what he deems retaliatory events that resulted in his removal from the Program and his ultimate transfer to another prison entirely.

Plaintiff has sued Defendants Correctional Officer Kenneth Green, Counselor Supervisor Mercilla Roach, Counselor Supervisor Melissa Santiago, Reentry Director and Counselor Supervisor Elisha Chornobry, Deputy Warden Carlos Nunez, and State School Department Head Daniel Cambra, all of whom are employed by the Connecticut Department of Correction at Cheshire Correctional Institution (collectively, the "DOC Defendants"), and Defendant Dan McGloin, who was formerly employed as an administrator for the CPE Program, alleging that Defendants retaliated and conspired to retaliate against Plaintiff after he exercised his First Amendment rights by refusing to sign the form. Am. Compl., ECF No. 111.

Plaintiff asserts two causes of action under 42 U.S.C. sec. 1983: (1) First Amendment retaliation against the DOC Defendants alone[1] and (2) conspiracy to commit First Amendment retaliation against all Defendants. Defendants have filed motions to dismiss Plaintiff's amended complaint. The parties primarily dispute whether Plaintiff's refusal to sign the form constitutes protected speech under the First Amendment, whether Plaintiff has sufficiently stated a causal connection between his First Amendment rights and the allegedly retaliatory acts, and whether Plaintiff has adequately stated a conspiracy between the DOC Defendants and Defendant McGloin. *See* DOC Defs.' Mot. Dismiss, ECF No. 119; McGloin Mot. Dismiss, ECF No. 116. The DOC Defendants also argue they are entitled to Eleventh Amendment immunity and qualified immunity. ECF No. 119.

For the reasons described below, the Court DENIES IN PART the DOC Defendants' motion to dismiss except as explained herein with respect to Eleventh Amendment immunity and DENIES IN FULL Defendant McGloin's motion to dismiss.

I.    BACKGROUND[2]

The following facts are taken from Plaintiff's amended complaint and assumed to be true for purposes of this ruling. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

___

[1] While the amended complaint frames this count as brought against all Defendants, Plaintiff's counsel clarified at oral argument that it is directed solely at the DOC Defendants. Mot. to Dismiss Hr'g Tr., ECF No. 149, at 203.

[2] Defendants encourage the Court to rely on material outside of the four corners of the amended complaint in evaluating Plaintiff's claims. *See* ECF No. 116-1 at 3 n.2 (urging the Court to consider Wesleyan and DOC's memorandum of understanding and amendment); *e.g.*, ECF No. 119-1 at 12 (citing DOC records of disciplinary reports). "A complaint is deemed to include any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are 'integral' to the complaint." *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004) (cleaned up) (collecting cases). Plaintiff concedes that parts of the memorandum of understanding and amendment between DOC and Wesleyan are integral to the complaint. ECF No. 123 at 8. Further, Plaintiff concedes that an October 11, 2022, incident report authored by Defendant Santiago is attached to the amended complaint, and therefore incorporated by reference. ECF No. 124 at 2. Beyond these documents, however, the Court will not consider material outside of the complaint for purposes of assessing Defendants' motions to dismiss.

Plaintiff has been incarcerated since 1996. Am. Compl. ¶¶ 2–3. Plaintiff previously resided at Cheshire Correctional Institution ("CI"), where he participated in Wesleyan's CPE Program between 2013 and 2022. *Id.* ¶¶ 3, 15. At the time of the relevant events, Plaintiff needed only one-half of one credit to graduate from the CPE Program with a degree from Wesleyan University. *Id.* ¶ 24.

### A. The September 8, 2022, Incident and Aftermath

On September 8, 2022, the inmate-students of the CPE Program assembled in Cheshire CI's auditorium in advance of the fall semester. *Id.* ¶ 17. Before the meeting began, Plaintiff asked Defendant McGloin about the subject matter of the meeting, but McGloin declined to respond. *Id.* ¶ 18. Instead of McGloin or one of the Wesleyan Volunteers—nonparties Allie Cislo and Victoria Justice, *id.* ¶ 88—leading the meeting, Defendant Green led the meeting and explained to the inmates that they would be unable to participate in the CPE Program unless they signed a form that Plaintiff says "purported to repeat rules that were already in place to govern inmates' conduct." *Id.* ¶¶ 19, 39. In Plaintiff's ten years of participation in the CPE Program, the inmate-students had never been required to sign such a form. *Id.* ¶ 26.

Plaintiff approached this meeting and proposed form with skepticism. *Id.* ¶ 16. Beginning in July of 2022, before the beginning of the CPE Program's fall semester, DOC officials had engaged in a practice of implementing punitive practices against inmates in response to the restrictions placed on DOC personnel by the passage of the Connecticut Protect Act, Public Act 22-18, on May 10, 2022. *Id.* It is within this context that Plaintiff viewed as unreasonable the DOC Defendants' insistence that CPE participants sign a new form governing participation in the Program. *See id.*

During the meeting, Plaintiff expressed unspecified concerns about the form to Defendants Roach and Chornobry. *Id.* ¶¶ 22–23. The Wesleyan Volunteers also expressed their disapproval of the form requirement. *Id.* ¶ 26. The DOC Defendants responded that Plaintiff could not participate in the CPE Program if he refused to sign the form. *Id.* ¶¶ 22–23. After the meeting, Plaintiff implored Defendant McGloin, Wesleyan Volunteer Cislo, and CPE inmate-student volunteer James Davis to assist Plaintiff in convincing the DOC Defendants that they should not implement the form requirement. *Id.* ¶ 27. In a report dated October 11, 2022, Defendant Santiago noted that the Wesleyan Volunteers voiced their displeasure with the form. *Id.* ¶ 28. Cislo, specifically, stated that "she would not be part of it." *Id.* ¶ 29. By the end of the meeting, only three inmates signed the form—all others, including Plaintiff, refused to sign. *Id.* ¶ 30. Defendant Chornobry wanted a list of those inmates who refused to sign the form. *Id.* ¶ 25.

On September 20, 2022, DOC officials explained that CPE students were being called to sign a form entitled "School Unit Rules." *Id.* ¶ 31. The DOC Defendants inconsistently described the form as an "agreement," an "acknowledgment," and a "waiver." *Id.* ¶ 38. Plaintiff approached Defendant Roach to explain that he and the fellow inmate-students were hesitant to sign the form on the belief that they would be "waiving" something by doing so. *Id.* ¶ 31. Defendant Roach then referred Plaintiff to Defendant Cambra and told Plaintiff that he would be called to sign the form separately from the other students. *Id.*

On September 21, 2022, Plaintiff met with Defendant Nunez. *Id.* ¶ 32. Defendant Nunez explained that the form was being enforced by the new Principal, Defendant Cambra, and that the DOC Defendants had changed the form in response to student complaints. *Id.* Plaintiff reiterated his concern that the form would involve waiving certain rights, to which Defendant Nunez responded that the form was only an agreement to follow existing rules. *Id.* After Plaintiff

continued to voice his concerns, Defendant Nunez warned Plaintiff "to weigh *graduating now* over waiting years for a court decision." *Id.* ¶ 33 (emphasis in original).  Plaintiff responded:  "Some hills you gotta die on." *Id.*  During Plaintiff's conversation with Defendant Nunez, two prison captains approached other students in the facility and threatened to kick them out of the CPE Program unless they signed the form. *Id.* ¶ 34.

On September 22, 2022, Defendant Roach informed Plaintiff that he would be removed from the CPE Program based on his failure to sign the form. *Id.* ¶ 37.  Sometime in late September of 2022, Defendant McGloin and non-party Professor Courtney Weis-Smith held a meeting with Plaintiff to close out Plaintiff's participation in the program. *Id.* ¶ 36.  Plaintiff alleges that Defendant McGloin was aware of the DOC Defendants' plan to pressure students to sign the form, and that McGloin agreed to remove any student who did not sign. *Id.* ¶ 35.

During this period, Plaintiff had contemplated satisfying his final half-credit through a submission of a paper without completion of a class credit. *Id.* ¶ 44.  However, after he refused to sign the form, Plaintiff was removed from the program by the DOC Defendants. *Id.* ¶ 43.  The DOC Defendants then shut down the CPE Program for two weeks while the Wesleyan Volunteers underwent additional training; the semester commenced, without Plaintiff, in the first week of October of 2022. *Id.* ¶ 45.

### B.  Events Preceding Plaintiff's Transfer

A few months later, in January of 2023, Plaintiff filed the instant lawsuit. *Id.* ¶ 46.  Plaintiff's original *pro se* complaint sought reinstatement into the CPE Program. *Id.*  Along with the original complaint, Plaintiff also filed a motion for a preliminary injunction, seeking "to stop his suffering of the defendants' retaliation" and requesting that he be reinstated to the CPE Program.  Mot. for Prelim. Inj., ECF No. 6 at 1.

Before the complaint proceeded to service, in April of 2023, Plaintiff was transferred out of Cheshire CI to MacDougall-Walker CI, allegedly because of a disciplinary incident and security concerns implicated by the incident. *Id.* ¶¶ 47, 49–60. Plaintiff alleges this transfer was pretextual, and that the real reasons for the transfer were his refusal to sign the form, his filing of this lawsuit, and his petitioning of Defendant Roach through informal means about an "honor board" that Roach supported. *Id.* ¶¶ 59–60.

Plaintiff alleges that the DOC Defendants manufactured the rationale to justify his transfer. Sometime before April 6, 2023, Defendant Roach asked non-party Correctional Supervisor Scott Lang to investigate Plaintiff in retaliation for Plaintiff's continued protest of the disputed form. *Id.* ¶ 54. In a disciplinary report dated April 6, 2023, Correctional Supervisor Lang reported that Defendant Roach had received a letter written by Plaintiff, and that Lang was to investigate whether Plaintiff had impermissibly used a state computer for personal use in drafting the letter. *Id.* ¶ 53. As part of the scheme to concoct pretext, Plaintiff was accused of obstructing Lang's investigation, despite the fact that Plaintiff had been placed in restrictive housing the day of the alleged obstruction. *Id.* ¶ 59. On April 17, 2023, during the pendency of the investigation and before the hearing to adjudicate the disciplinary charge, non-party Counselor Supervisor Kelly Ciarlo prepared an order to transfer Plaintiff out of Cheshire CI. *Id.* ¶ 58. Plaintiff was ultimately found not guilty of the disciplinary charge on April 19, 2023, *id.* ¶ 56, but was nevertheless transferred to MacDougall-Walker CI on April 25, 2023, *id.* ¶ 57.

The DOC Defendants then relied on Plaintiff's transfer in opposing Plaintiff's complaint and motion for preliminary injunction. *Id.* ¶¶ 47–48. Specifically, the DOC Defendants argued that Plaintiff's transfer mooted his claims because Plaintiff could not complete his degree from outside of Cheshire CI, so the Court could not grant the requested relief to reinstate him to the

Program.  *See* DOC Defs.' Opp. Prelim. Inj., ECF No. 67-1 at 7.  Plaintiff explains, however, that the memorandum of understanding between DOC and Wesleyan provided the ability to transfer Plaintiff back to Cheshire CI to complete his studies.  *Id.* ¶ 65.

C.  <u>Procedural Background</u>

The Court appointed *pro bono* counsel to represent Plaintiff for purposes of a preliminary injunction hearing.  Order, ECF No. 79.  Shortly before a scheduled hearing on the preliminary injunction motion in February of 2024, Defendants notified the Court that DOC and the CPE Program had agreed to allow Plaintiff to complete his remaining degree requirements remotely through the mail from MacDougall-Walker CI, without signing the form that was at issue in this litigation.  *See* Order, ECF No. 95.  As the majority of the relief Plaintiff originally sought— reinstatement into the CPE Program—was provided to him through this turn of events, the Court found the then-pending motion for preliminary injunction moot, but allowed Plaintiff to file an amended complaint and to renew the preliminary injunction motion, if appropriate.  *See* Order, ECF No. 106.

Plaintiff, assisted by counsel, filed an amended complaint and renewed his motion for a preliminary injunction.  *See* ECF No. 111; Renewed Mot. Prelim. Inj., ECF No. 112.  In the amended complaint, Plaintiff alleges two causes of action under 42 U.S.C. § 1983:  (1) First Amendment retaliation (Count One) against the DOC Defendants and (2) conspiracy to retaliate (Count Two) against all Defendants.  Am. Compl. ¶¶ 78–92.

Plaintiff seeks compensatory and punitive damages, as well as injunctive relief to restore the *status quo ante*, including "all the rights and privileges he had enjoyed prior to the wrongful acts of removing" him from the CPE Program and the Honor Block at Cheshire CI.  Prayer for Relief, Am. Compl. at 14; ECF No. 112-1 at 12.  He claims the retaliation against him is ongoing,

insofar as he cannot fully participate in the CPE Program; will be denied the opportunity to continue in the Program as a mentor or teaching assistant following graduation; and "continues to lack the job status, privileges, and academic community previously available to him at Cheshire CI." Am. Compl. ¶ 84. He further alleges that his application for commutation of his sentence has been delayed and placed in jeopardy because of his transfer and removal from the CPE Program. *Id.* ¶ 85.

## II.    LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss a case or cause of action for failure to state a claim upon which relief can be granted. When determining whether a complaint states a claim upon which relief can be granted, highly detailed allegations are not required, but the complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. This plausibility standard is not a "probability requirement," but imposes a standard higher than "a sheer possibility that a defendant has acted unlawfully." *Id.* In undertaking this analysis, the Court must "draw all reasonable inferences in the plaintiff's favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (cleaned up) (quoting *Selevan v. N.Y. Thruway Auth.*, 584 F.3d 82, 88 (2d Cir. 2009) and *Iqbal*, 556 U.S. at 679).

The Court is not "bound to accept 'conclusory allegations or legal conclusions masquerading as factual conclusions,'" *Rolon v. Henneman*, 517 F.3d 140, 149 (2d Cir. 2008)

(Sotomayor, J.), (quoting *Smith v. Local 819 I.B.T. Pension Plan*, 291 F.3d 236, 240 (2d Cir. 2002)), and "a formulaic recitation of the elements of a cause of action will not do," *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).   Consequently, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).   Ultimately, "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

## III.     COUNT ONE:  FIRST AMENDMENT RETLIATION

Section 1983 creates a private cause of action against any person who, acting under color of state law, deprives an individual of his federally protected rights.  *Rehberg v. Paulk*, 566 U.S. 356, 361 (2012).  A section 1983 claim contains two elements:   "(1) the conduct complained of was committed by a person acting under color of state law; and (2) this conduct deprived a person of rights, privileges or immunities secured by the Constitution or laws of the United States." *Greenwich Citizens Comm., Inc. v. Cntys. of Warren & Washington Indus. Dev. Agency*, 77 F.3d 26, 29–30 (2d Cir. 1996) (cleaned up) (quoting *Parratt v. Taylor*, 451 U.S. 527, 535 (1981)).

The DOC Defendants do not dispute that, as DOC employees, they acted under the color of state law.  Thus, the Court only addresses the merits of Plaintiff's First Amendment retaliation claim.  For the reasons described below, Court finds that Plaintiff has stated a plausible claim for First Amendment retaliation against the DOC Defendants.

### A.  Legal Standard

To plead a First Amendment retaliation claim, a plaintiff must plausibly allege:  "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse

action." *Brandon v. Kinter*, 938 F.3d 21, 40 (2d Cir. 2019) (quoting *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004)).  The Second Circuit has "instructed district courts to 'approach prisoner retaliation claims with skepticism and particular care, because virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act.'" *Dolan v. Connolly*, 794 F.3d 290, 295 (2d Cir. 2015) (quoting *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003)).

### B.  Protected Speech:  Refusing to Sign

First, the Court must examine whether Plaintiff has a First Amendment interest in refusing to sign the disputed form.  *See Burns v. Martuscello*, 890 F.3d 77, 83–94 (2d Cir. 2018) (concluding that inmate's decision to withhold speech constitutes protected First Amendment activity).  This is a two-part inquiry.  *See id.*  The Court must first consider whether Plaintiff had the right, even without consideration of his status as a prisoner, to refuse to sign the form.  *See id.* at 84–86 (addressing the scope of protected speech outside of the prison context).  Second, the Court must consider whether Plaintiff retained that right as a prisoner.  *See id.* at 86–93 (analyzing whether an inmate retained the right to protected speech within the prison environment).

For the reasons that follow, the Court finds that Plaintiff's conduct was protected speech and that he retained a right to that speech as a prisoner.

#### 1.  A Right to Refuse to Sign

The Court finds that Plaintiff's refusal to sign his name to a form he believed conveyed misleading information for the purpose of inducing him to forfeit his rights is protected expressive conduct.

The Court starts with first principles.  The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech . . . ."  U.S. Const. amend. I.  "As a general matter, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content."  *Ashcroft v. ACLU*, 535 U.S. 564, 573 (2002) (cleaned up) (quoting *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 65 (1983)).  "While there may exist some categories of speech that have been historically unprotected but have not yet been specifically identified or discussed in our case law, the First Amendment stands against any freewheeling authority to declare new categories of speech outside the scope of the First Amendment."  *Friend v. Gasparino*, 61 F. 4th 77, 87–88 (2d Cir. 2023) (cleaned up) (quoting *United States v. Alvarez*, 567 U.S. 709, 722 (2012) (plurality op.)).  These rights include "both the right to speak freely and the right to refrain from speaking at all."  *Wooley v. Maynard*, 430 U.S. 705, 714 (1977).  As the Second Circuit has explained, "[t]o force a person to speak, and compel participation, is a severe intrusion on the liberty and intellectual privacy of the individual."  *Burns*, 890 F.3d at 84 (internal citation omitted).  It aptly noted:  "compelled speech presents a unique affront to personal dignity.  The decision to withhold speech depends on views and calculations known only to the individual."  *Id.* at 85.

Refusing to sign a document is not literally speech, of course.  But "[t]he First Amendment affords protection to symbolic or expressive conduct as well as to actual speech."  *Virginia v. Black*, 538 U.S. 343, 358 (2003) (collecting cases).  The extension of the freedom of speech to certain forms of expressive conduct is not without limits, however.  The Supreme Court has cautioned that courts "cannot accept the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea."  *United States v. O'Brien*, 391 U.S. 367, 376 (1968).

The issue confronting the Court is that neither party has identified a case in which a court has found that an individual has (or does not have) a First Amendment right to give or withhold his or her signature in all contexts.  Plaintiff is correct that a signature on a political petition—and the corresponding right to collect signatures as part of the political process—is protected as expressive conduct under the First Amendment.  *See* ECF No. 123 at 3–4 (citing *John Doe No. 1 v. Reed*, 561 U.S. 186, 194–95 (2010) (finding that a signature on a political petition within the context of Washington State's referendum procedure is "the expression of a political view implicat[ing] a First Amendment right.")); *see also Meyer v. Grant*, 486 U.S. 414, 421–22 (1988) ("Thus, the circulation of a petition involves the type of interactive communication concerning political change that is appropriately described as 'core political speech.'").  That the cases hold as much is unsurprising because political speech is at the core of the First Amendment.  *Meyer*, 486 U.S. at 425 (citing *Buckley v. Valeo*, 424 U.S. 1, 39 (1976)).

But Plaintiff's reliance on this line of core political rights cases is not directly on point. Plaintiff did not refuse his signature on a document implicating political speech; rather, he refused to sign a form he believed would have waived certain of his rights.  The Court agrees with the DOC Defendants that—notwithstanding Plaintiff's authorities to the contrary in the context of political speech—not all instances of providing (or withholding) a signature are protected.  *See* ECF No. 119-1 at 8–9.  Thus, the Court must address, in the first instance, whether withholding one's signature from a document like the disputed form constitutes expressive conduct.

Addressing this as a matter of first impression, the Court elucidates the following guiding principles.  Whether conduct is sufficiently expressive to implicate the First Amendment depends on whether "[a]n intent to convey a particularized message was present, and [whether] the likelihood was great that the message would be understood by those who viewed it." *Texas v.*

*Johnson*, 491 U.S. 397, 404 (1989) (alterations in original) (quoting *Spence v. Washington*, 418 U.S. 405, 410–11 (1974) (*per curiam*)).  The First Amendment "extends only to conduct motivated by an intent to convey a particularized message, such as:  burning the American flag in political protest, wearing black armbands to protest American involvement in the Vietnam War, and conducting a sit-in to protest racial segregation." *Jacoby & Meyers, LLP v. Presiding Justs. of the First, Second, Third & Fourth Dep'ts, App. Div. of the S. Ct. of the State of N.Y.*, 118 F. Supp. 3d 554, 570 (S.D.N.Y. 2015) (cleaned up) (collecting cases), *aff'd sub nom.* 852 F.3d 178 (2d Cir. 2017).  However, expressing a political point of view is not the only touchstone of the First Amendment.  "At the heart of the First Amendment lies the principle that each person should decide for himself or herself the ideas and beliefs deserving of expression, consideration, and adherence.  Our political system and cultural life rest upon this ideal." *Turner Brod. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 641 (1994).  Ultimately, in assessing whether conduct rises to the level of protected speech, courts consider whether the message conveyed is "overtly political" or touches on "matters of broad public concern," or, instead, is "purely personal." *Burns*, 890 F.3d at 90; *accord Jacoby & Meyers*, 118 F. Supp. 3d at 570–71.

With these principles in mind, the Court finds that Plaintiff has plausibly alleged his refusal to sign the form, while not overtly political, is a form of expression touching on a matter of concern to him and his fellow inmates that warrants First Amendment protection.  Plaintiff's conduct was not devoid of expression.  Had Plaintiff done nothing more than lift his hand from the page "without expressing any message" whatsoever, perhaps his conduct could not be construed as expressive. *Hurley v. Irish-Am. Gay, Lesbian and Bisexual Grp. of Boston*, 515 U.S. 557, 568 (1995).  Reading Plaintiff's complaint, however, one would be hard-pressed to not understand the expressive meaning behind Plaintiff's refusal to sign.

Plaintiff's refusal to sign the form expressed his concern that DOC was attempting to induce Plaintiff and his fellow inmates to waive their rights in a manner they had never previously been required to do during Plaintiff's ten-year tenure in the Program.  *See* Am. Compl. ¶¶ 16, 22, 26, 31–33.  As Plaintiff explains, starting in July of 2022, DOC staff engaged in a variety of harsh or punitive acts directed at inmates, which caused inmates to be skeptical of new initiatives spearheaded by DOC.  *Id.* ¶ 16.  After the DOC Defendants stated that all CPE participants would be required to sign the form, Plaintiff explained that he was concerned about the requirement.  *Id.* ¶ 22.  In particular, Plaintiff was concerned that DOC was inducing CPE participants to sign a waiver of their rights, which he explained to the DOC Defendants on September 20, 2022.  *Id.* ¶ 31.  When DOC approached Plaintiff again on September 21, 2022, with a version of the form addressing his complaints, he once again inquired as to whether signing the form would involve a waiver of any of his rights to which he was otherwise entitled.  *Id.* ¶¶ 32–33.  Thus, Plaintiff's conduct was not mere action divorced from expressive content:  his refusal to sign was coupled with speech that explained the message inherent in his conduct.

That Plaintiff's conduct was not overtly political is not fatal to his claim.  While Plaintiff's allegations do not necessarily implicate core political speech, Plaintiff alleges that the ability of DOC to exercise control over Plaintiff's education was (and still is) a matter of deep concern to Plaintiff and his fellow inmates.  Even after the DOC Defendants warned Plaintiff that refusing to sign the form would lead Plaintiff to being kicked out of the CPE Program, Plaintiff responded: "Some hills you gotta die on."  Am. Compl. ¶ 33.  This underscores the expressive content behind Plaintiff's conduct.  He was not just refusing to sign a form.  Plaintiff risked his ability to complete his degree on the principle that he should not be expected to sign a form that implicates his rights without some reason justifying that potential waiver.  Through his conduct, Plaintiff was

14

effectively protesting DOC activities and policies that he deemed unjust. This is the proper lens through which to understand the right at issue here—the DOC Defendants' references to an individual's lack of a right to secondary education is immaterial to whether the content of Plaintiff's conduct was expressive and thus protected by the First Amendment. ECF No. 119-1 at 8. The DOC Defendants could not seriously dispute that they did not understand the message conveyed through Plaintiff's conduct. *See id.* at 7 ("Here, the plaintiff made complaints, and aired his grievances. The plaintiff did so not only on September 8, 2022, but in the days and weeks following, through discussions with the DOC defendants and officials. The plaintiff also utilized the DOC procedures for informal resolutions and grievances, and eventually filed this action.").

Accordingly, the Court finds that Plaintiff's conduct was expressive and would have fallen within the ambit of First Amendment protection if engaged in by a non-incarcerated person.

### 2.  *An Inmate's Right to Refuse to Sign*

Finding that Plaintiff's conduct was expressive and warrants First Amendment protection, the Court must consider whether Plaintiff relinquished that right because of the needs of the prison environment or based on his status as an inmate. *See Burns*, 890 F.3d at 86–88. For the reasons that follow, the Court finds that, based on these particular allegations, Plaintiff retained his right to withhold his signature.

While "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution," *Turner v. Safley*, 482 U.S. 78, 84 (1987), it is well-established that a prisoner does not retain the full panoply of rights afforded to a citizen. Rather, an inmate holds "those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Shakur v. Selsky*, 391 F.3d 106, 113 (2d Cir. 2004) (quoting *Giano v. Senkowski*, 54 F.3d 1050, 1053 (2d Cir. 1995)). In the context of

withholding speech, inmates "generally retain a First Amendment interest in declining to speak." *Burns*, 890 F.3d at 88.  At least one court to address a similar issue has found that this right extends to withholding a signature on certain documents.  *See Whitfield v. Spiller*, 76 F.4th 698, 708–09 (7th Cir. 2023) (finding that an inmate had a First Amendment right to refuse to sign an incomplete form that he believed did not legally apply to him).

Generally, courts rely on the factors described by the Supreme Court in *Turner* to evaluate whether a prison policy or regulation validly limits an inmate's First Amendment rights.  *E.g.*, *Burns*, 890 F.3d at 86–87 (applying the *Turner* framework) (citing 482 U.S. at 89–91).  The *Turner* factors include:   (1) whether the policy or regulation is "reasonably related to legitimate penological interests"; (2) whether "there are alternative means of exercising the right that remain open"; (3) "the impact accommodation of the asserted constitutional right will have on guards and other inmates"; and (4) whether "ready alternatives" in prison policy that would accommodate the right exist, indicating that the policy is "an exaggerated response to [prison officials'] rehabilitation and security concerns."  482 U.S. at 89–91.

The Court finds that, under the *Turner* factors, Plaintiff has adequately alleged that he retained his First Amendment right to protest the DOC Defendants' policy that all CPE Program participants must sign the disputed form by withholding his signature.

Under the first factor, the amended complaint sufficiently alleges that the DOC Defendants' interest in Plaintiff's withholding of his signature is not reasonably related to a legitimate penological interest.  While the DOC Defendants discuss at length in their motion the prison officials' safety concerns with the conduct of CPE Program participants prior to September 8, 2022, ECF No. 119-1 at 6–9—which they say motivated the form requirement—these arguments require the Court to look beyond the four corners of the complaint.  Moreover, as

Plaintiff points out, DOC already required inmates to abide by all DOC regulations, regardless of whether an inmate acknowledged DOC's authority in writing.  ECF No. 123 at 4.  This distinguishes Plaintiff from that of a hypothetical non-incarcerated student who may be required to agree to abide by a student handbook or code of conduct in order matriculate into a college or university.  *See* ECF No. 119-1 at 8.  At this juncture, Plaintiff has adequately alleged that there is no rational connection between requiring an inmate to acknowledge the authority of DOC to enforce its rules where DOC already has authority to act regardless of any purported acknowledgement.  Indeed, Plaintiff alleges he participated in the CPE Program for several years without having to sign a form like the one presented to him in September of 2022.  It may be the case that discovery will support the DOC Defendants' argument that CPE Program participants had been especially disruptive in the months leading up to the September 2022 meeting, which prompted them to require the form.  However, the Court is not prepared to find at the motion to dismiss stage that the form requirement was reasonably related to legitimate penological interests.

Second, Plaintiff had no alternative between speaking and not speaking.  In the context of the decision to sign the form, Plaintiff was left with no alternative means of exercising his right to not speak.  In Plaintiff's mind, the alternative meant agreeing to relinquish his rights.  The DOC Defendants respond that Plaintiff continued to complain about the form after he initially refused to sign, showing that Plaintiff in fact had alternatives to voice his concerns about the form.  That Plaintiff may have filed grievances and voiced his opposition to the signature requirement through other avenues does not alter the fact that Plaintiff had no alternative within the context of the signature requirement itself.  Plaintiff's choice to not sign was expressive conduct for which he had no alternative.  Accordingly, this factor also weighs in Plaintiff's favor.

Third, it is not clear that accommodating Plaintiff's right to refuse to sign would have had an impact on the guards or other inmates.  As the Court has already explained, DOC's authority over Plaintiff and the other CPE Program students did not rest on their agreeing through the disputed form to abide by DOC directives; DOC had other means to enforce its rules and policies. Accordingly, if DOC had allowed Plaintiff to remain in the Program despite his protest, the Court cannot discern any particular impact that accommodation would have had on guards and inmates. While this analysis could change after discovery, at this stage this factor also weighs in favor of Plaintiff.

Finally, for the same reasons that the third factor weighs in favor of Plaintiff, so too does the fourth factor.  The DOC Defendants' alternative to requiring Plaintiff's signature was exercising the same authority Defendants already had over Plaintiff.

For these reasons, the Court concludes Plaintiff engaged in protected speech when he refused to sign the form.

### C.  Protected Speech:  Filing Suit and Exhausting Grievances

Plaintiff has also sufficiently alleged that he engaged in protected speech as he continued to protest the disputed form through filing grievances and the instant lawsuit.  *See* ECF No. 123 at 7 (arguing that Plaintiff's transfer was, in part, retaliation for filing the instant suit).

It is well-established that prisoners engage in a First Amendment protected activity by filing a lawsuit.  *See Espinal v. Goord*, 558 F.3d 119, 128–29 (2d Cir. 2009) (citing *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995)).  The same is true when a prisoner engages the prison grievance system.  *Dolan*, 794 F.3d at 294 ("it is well established that 'retaliation against a prisoner for pursuing a grievance violates the right to petition government for the redress of grievances

guaranteed by the First and Fourteenth Amendments and is actionable under § 1983.'" (quoting *Graham v. Henderson*, 89 F.3d 75, 80 (2d Cir. 1996))).

By filing grievances about the signature requirement, *see* Am. Compl. ¶ 14, and filing the instant suit after exhausting his administrative remedies, Plaintiff has sufficiently alleged that he engaged in these protected activities that he alleges was the final catalyst for the retaliatory transfer. In fact, Plaintiff's theory directly asserts that the DOC Defendants transferred Plaintiff in retaliation for exhausting his administrative remedies as well as filing this suit and his original motion for a preliminary injunction. *E.g.*, *id.* ¶ 47. Furthermore, the DOC Defendants do not dispute that Plaintiff continued to protest the signature requirement through these First Amendment protected activities.

Thus, Plaintiff may also rely on his filing suit and grievances related to his refusal to sign as additional constitutionally protected activities in which he engaged.

### D.  Adverse Action

Plaintiff has also adequately alleged the adverse action element of a retaliation claim.

The Second Circuit has held that "only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action." *Wrobel v. Cnty. of Erie*, 692 F.3d 22, 31 (2d Cir. 2012) (quoting *Zelink v. Fashion Inst. of Tech.*, 464 F.3d 217, 225 (2d Cir. 2006)). Although a heading in the DOC Defendants' briefing suggests that they are challenging whether Plaintiff has adequately alleged an adverse action, *see* ECF No. 119-1 at 9 ("Defendants took no adverse action against the Plaintiff"), the substance of their briefing makes clear that they are actually challenging whether Plaintiff has sufficiently alleged his removal from the CPE Program was causally connected to his refusal to sign the form. *Id.* ("Removal from the CPE Program was not adverse action taken

against the Plaintiff for any protected speech, but instead for his failure to meet an institutional prerequisite.").  Indeed, in the DOC Defendants' original motion to dismiss, they conceded that removal from the CPE Program is "sufficiently adverse to deter an inmate of ordinary firmness from exercising his First Amendment rights" because Plaintiff had alleged that removal from the Program jeopardized his ability to obtain a commutation.  *See* ECF No. 74-1 at 5.  In his amended complaint, Plaintiff reiterates the allegation that the DOC Defendants' retaliation has delayed and jeopardized his application for commutation.  Am. Compl. ¶ 85.  The Court therefore concludes that removal from the CPE Program is an adverse action for purposes of the DOC Defendants' motion to dismiss.

This remains the case even though Plaintiff will be allowed to complete his remaining half-credit from his new institution, as Plaintiff adequately alleges that he is deprived of certain benefits of the Program because he now resides in another facility—including the opportunity to participate in a course in lieu of writing a paper for his final half-credit and the opportunity to benefit from the academic environment Cheshire CI provides to CPE Program students.  Am. Compl. ¶¶ 74–75.  While an inmate of ordinary firmness may be *less* deterred from exercising their First Amendment rights if the consequence were only removal of the opportunities to participate in a course and in the academic environment of the Program than if it were removal from the Program entirely, the Court is convinced there is a sufficient deterrent effect to constitute an adverse action here.

As to Plaintiff's protected activities related to filing the instant suit and grievances, the DOC Defendants do not appear to dispute that Plaintiff's transfer to MacDougall-Walker CI could constitute an adverse action.  In any event, transfer of a prisoner to another prison facility—even to another prison facility with comparable conditions—can rise to the level of an adverse action

for purposes of a First Amendment retaliation claim. *See Smith v. Levine*, 510 F. App'x 17, 21 (2d Cir. 2013) (summary order) (collecting cases). Plaintiff's transfer out of Cheshire CI has meant that Plaintiff has been unable to participate in his education in-person with his classmates, volunteers, and faculty. Am. Compl. ¶ 75. Accordingly, Plaintiff's transfer has had a measurable negative impact on his education, and it was not until roughly one-and-a-half years after Plaintiff was originally removed from the Program that he was allowed to rejoin through a mail-in program. Further, Plaintiff has lost access to certain privileges he held at Cheshire CI. Plaintiff lived on the "Honor Block" at Cheshire CI, and his seniority earned him a job as a graphic designer (which earned him $30 per week). *Id.* ¶¶ 76–77. At MacDougall-Walker, he now works as a cart server, for which he is paid less than $30 per month. *Id.* Drawing all inferences in Plaintiff's favor—as the Court must at this stage—the consequences that attended Plaintiff's transfer between institutions would deter a prisoner of ordinary firmness from exercising his or her First Amendment rights and therefore suffice to allege an adverse action.

E. Causation

On the final element of causation, the parties primarily dispute whether Plaintiff has alleged causation between the exercise of his rights on September 8, 2022, and his removal from the CPE Program and ultimate transfer on April 25, 2023. The Court finds that Plaintiff has alleged enough factual information to support an inference of retaliatory animus, especially in light of the Court's findings related to Plaintiff's continued protest through exhausting his administrative remedies and filing the instant suit.

To plead causation in the First Amendment retaliation context, a plaintiff must allege "but-for" causation. *Nieves v. Bartlett*, 587 U.S. 391, 399 (2019) (finding that causation in a First Amendment retaliation claim "must be a 'but-for' cause, meaning that the adverse action against

the plaintiff would not have been taken absent the retaliatory motive") (citing *Hartman v. Moore*, 547 U.S. 250, 260 (2006)); *accord Handsome, Inc. v. Town of Monroe*, No. 23-711, 2024 WL 2747142, at \*5 (2d Cir. May 29, 2024) (summary order); *Burden v. Inc. Vill. of Port Jefferson*, 664 F. Supp. 3d 276, 283 (E.D.N.Y. 2023).[3]

"Causation may be shown '(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of [others] who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant.'" *A.S. City Sch. Dist. of Albany*, 585 F. Supp. 3d 246, 269–70 (N.D.N.Y. 2022) (alterations in original) (quoting *Gordon v. N.Y. City Bd. Of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000)).

Temporal proximity between the adverse action and the protected activity may be sufficient on its own to establish a causal connection. *See Espinal*, 558 F.3d at 129 (concluding that six-month period between dismissal of a lawsuit and alleged retaliatory beating was sufficient to infer causal connection). "[T]here is no hard and fast rule for the amount of time that must pass before a causal connection is necessarily broken . . . ." *Birch v. City of N.Y.*, 184 F. Supp. 3d 21, 32 (E.D.N.Y. 2016). The Second Circuit has "previously found the passage of up to six months

---

[3] The Court notes that, prior to the Supreme Court's decision in *Nieves*, there were diverging views as to whether the causation standard for a First Amendment retaliation claim was "but-for" or "substantial motivating factor." *See Rivers v. N.Y. City Housing Auth.*, 176 F. Supp. 3d 229, 245–47 (E.D.N.Y. 2016) (collecting cases and applying the substantial motivating factor test). The Court believes that *Nieves* has settled the debate and has effectively abrogated Second Circuit precedent describing the causation standard as substantial motivating factor. *Compare Handsome,* 2024 WL 2747142, at \*5 (applying but-for causation test) with *Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999) (applying the substantial motivating factor test for section 1983 First Amendment employment retaliation case); *but see Specht v. City of N.Y.*, 15 F.4th 594, 605 (2d Cir. 2021) (citing *Morris*, 196 F.3d at 110, and applying substantial motivating factor test even after *Nieves*). Other circuit courts of appeal that have addressed *Nieves* have held that but-for causation is applicable standard. *See, e.g.*, *Lemaster v. Lawerence Cnty., Ky.*, 65 F.4th 302, 309 (6th Cir. 2023) (applying but-for causation after *Nieves*); *Turner v. Williams*, 65 F.4th 564, 581 (11th Cir. 2023) (same); *Sanimax USA, LLC v. City of S. St. Paul*, 95 F.4th 551, 558–59 (8th Cir. 2024) (same); *Thompson v. Ragland*, 23 F.4th 1252, 1259 (10th Cir. 2022) (same); *Comm. on Ways & Means, U.S. House of Representatives v. U.S. Dep't of Treasury*, 45 F.4th 324, 340 (D.C. Cir. 2022) (same). In any event, given the particular facts of this case, Plaintiff's allegations satisfy both standards.

between an adverse action and protected activity sufficient to permit an inference of causation." *Specht*, 15 F.4th at 605 (citing *Espinal*, 558 F.3d at 129). Specifically, in *Espinal*, the passage of only six months between the dismissal of the plaintiff's lawsuit and an allegedly retaliatory beating by officers, one of whom was a defendant in the prior lawsuit, was sufficient to support an inference of a causal connection because "[i]t [wa]s plausible that the officers waited to exact their retaliation at an opportune time . . . in order to have a ready explanation for any injuries suffered by [plaintiff-appellant]." 558 F.3d at 129.

Ultimately, "to survive a motion to dismiss for lack of causation, 'the plaintiff's pleading need not clearly establish that the defendant harbored retaliatory intent. It is sufficient to allege facts which could reasonably support an inference to that effect.'" *Stajic v. City of N.Y.*, 214 F.Supp.3d 230, 235 (S.D.N.Y. 2016) (quoting *Posr v. Ct. Officer Shield No. 207*, 180 F.3d 409, 418 (2d Cir. 1999)). To that end, "[c]ausation generally is a question for the finder of fact" and, on a motion to dismiss, "the role of the Court is to determine whether [a plaintiff] has alleged facts that could support a reasonable finding of a causal connection . . . ." *DePace v. Flaherty*, 183 F. Supp. 2d 633, 638 (S.D.N.Y. 2002).

As an initial matter, the DOC Defendants' argument that Plaintiff was removed from the CPE Program because of his failure to fulfill a program prerequisite, in the way a non-prisoner student might be removed from an educational program for a similar lapse, is unavailing. ECF No. 119-1 at 9. As the Court has already explained at length, the crux of Plaintiff's theory is that his refusal to sign the disputed form was protected speech—and the Court has already found he has adequately pleaded as much. The Court has also already found that, for purposes of this motion, DOC's signature requirement lacked a rational connection to prison rules because inmates are not generally required to sign a form agreeing to abide by DOC rules already in force. Thus,

by acknowledging that they removed Plaintiff from the CPE program based on his refusal to sign the form—which Plaintiff has sufficiently alleged was protected activity—the DOC Defendants have effectively conceded causation with respect to removal from the Program.

Moreover, the DOC Defendants' actions culminated in the transfer of Plaintiff from Cheshire CI in April of 2023.  If Plaintiff's retaliation claim rested solely on the causal connection between his refusal to sign the form and his transfer, there may not be sufficient temporal proximity for an inference of causation, as there were seven months between September 8, 2022 (the date Plaintiff refused to sign the agreement) and April 17, 2023 (the date the order to transfer Plaintiff was finalized), and the alleged disciplinary incident occurred between these events.  Am. Compl. ¶¶ 54, 58.  Plaintiff has, however, sufficiently described a "drumbeat" of retaliation that explains the connection between his protected speech and Defendants' adverse actions.  *Duplan v. City of N.Y.*, 888 F.3d 612, 626 (2d Cir. 2018) (Title VII retaliation).  At the event where Plaintiff first raised his objections to signing the form, Defendant Chornobry responded that "it would be a shame" if Plaintiff were not able to graduate because of Plaintiff's refusal to sign the form.  *Id.* ¶ 23.  Then, on September 21, 2022, Plaintiff refused to sign a revised document written to address student complaints.  *Id.* ¶ 32.  Plaintiff was this time warned by Defendant Nunez "to weigh *graduating now* over waiting years for a court decision."  *Id.* ¶ 33 (emphasis in original).  Both statements support the inference that Defendants intended to keep Plaintiff out of the program based on his refusal to sign the form, even if it meant that Plaintiff would have had to later file a lawsuit to vindicate his rights.

The series of events Plaintiff has alleged leading to his transfer out of Cheshire CI further supports the theory that the DOC Defendants seized on an opportune moment to retaliate against Plaintiff.  *See Espinal*, 558 F.3d at 129.  After months of protesting the form requirement, Plaintiff

filed the instant suit seeking readmission to the CPE Program on January 9, 2023,. *Id.* ¶ 46. Sometime thereafter, Defendant Roach asked Correctional Supervisor Lang to investigate Plaintiff after she received a letter written by Plaintiff; Plaintiff alleges she did this in retaliation for his filing this suit. *Id.* ¶¶ 53–54. As part of this alleged plan of retaliation, on April 6, 2023, Lang prepared a disciplinary report accusing Plaintiff of using a state computer for personal use. *Id.* ¶ 53. Plaintiff alleges that the disciplinary report was purposefully vague so as to justify Plaintiff's transfer. In support of this claim, Plaintiff explains that he was accused of obstructing Lang's investigation, despite the fact that Plaintiff was placed in restrictive housing the day of the alleged obstruction—the inference being that Plaintiff physically could not obstruct an investigation from his placement in restrictive housing. *Id.* ¶ 59. Underscoring Plaintiff's theory about the pretextual nature of the report, the order transferring Plaintiff from Cheshire CI was prepared two days *before* the hearing adjudicating the incident. *Id.* ¶ 58. Then, despite the fact Plaintiff was ultimately found not guilty on April 19, 2023, *id.* ¶ 56, he was nevertheless transferred on April 25, 2023, *id.* ¶ 57. Plaintiff alleges that the real reasons for his transfer were his protest related to the form and his petitioning of Roach through an informal document raising concerns about an "honor board" Roach supported at Cheshire CI. *Id.* ¶ 60.

Drawing all reasonable inferences in favor of Plaintiff at this stage, the Court finds that Plaintiff has alleged a pattern of retaliatory activity related to the transfer that begins with DOC's investigation into the disciplinary incident, to Plaintiff lodging of informal grievances about the form, to the filing of this lawsuit, and to his eventual transfer, to reasonably allow an inference of retaliatory animus. A little more than three months passed between Plaintiff's filing of this lawsuit and the transfer; the events are not so far removed as to defeat an inference of retaliation by temporal proximity alone. In addition, Plaintiff has alleged facts in addition to temporal proximity.

For instance, Plaintiff alleges that Defendants concocted pretext to justify his transfer out of Cheshire CI as retaliation for his refusal to sign the form, his filing of the present lawsuit, and for his petitioning Defendant Roach informally about the Honor Board.  In this context, Plaintiff has sufficiently alleged a pattern of increasingly retaliatory activity against Plaintiff for his continued crusade to be allowed to participate in the CPE Program without signing the disputed form.

Of course, discovery may support the DOC Defendants' beyond-the-pleadings argument that Plaintiff's transfer was effected for security purposes (including Plaintiff's own safety).  At this stage, however, Plaintiff has alleged sufficient factual information to survive a motion to dismiss on his section 1983 claim based on the DOC Defendants' alleged retaliatory actions.

## IV.    COUNT TWO:  CONSPIRACY TO COMMIT FIRST AMENDMENT RETALIATION

The Court next finds that Plaintiff has sufficiently alleged a conspiracy to commit First Amendment retaliation by the DOC Defendants and Defendant McGloin.

### A.  Legal Standard

To survive a motion to dismiss a § 1983 conspiracy claim, a plaintiff must allege:  "(1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages."  *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999) (collecting cases).  "'[C]onspiracies are by their very nature secretive operations,' and may have to be proven by circumstantial, rather than direct, evidence."  *Id.* (quoting *Rounseville v. Zahl*, 13 F.3d 625, 632 (2d Cir. 1994)).  That said, "complaints containing only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights are properly dismissed; diffuse and expansive allegations are insufficient, unless amplified by specific instances of misconduct."  *Ciambriello v. Cnty. Nassau*, 292 F.3d 307, 325 (2d Cir. 2002)

(quoting *Dwares v. City of N.Y.*, 985 F.2d 94, 100 (2d Cir. 1993)).  And even specific allegations of conspiracy are insufficient to state a claim for conspiratorial violation of a plaintiff's rights, if the allegations are conclusory.  *Morales v. City of N.Y.*, 752 F.3d 234, 237 (2d Cir. 2014) (*per curiam*) (collecting cases).

To advance a section 1983 conspiracy claim against state actors and a private actor, the complaint must allege facts demonstrating that the private actor "acted in concert with the state actor to commit an unconstitutional act."  *Spear v. Town of West Hartford*, 954 F.2d 63, 68 (2d Cir. 1992).  "Put differently, a private actor acts under color of state law when the private actor 'is a willful participant in joint activity with the State or its agents.'"  *Ciambriello*, 292 F.3d at 324 (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152 (1970)).

B.  Discussion

The Court finds that Plaintiff has sufficiently alleged that the DOC Defendants and Defendant McGloin conspired to retaliate against him for exercising his First Amendment rights.

First, Plaintiff has alleged an agreement between two or more state actors and a non-state private actor, Defendant McGloin.  Plaintiff alleges that the DOC Defendants and Defendant McGloin agreed to remove Plaintiff from the CPE Program when he refused to sign the form.  Am. Compl. ¶¶ 87–89.  Plaintiff may rely on actions alone in evidencing a tacit agreement to conspire.  *See Anilao v. Spota*, 340 F. Supp. 3d 224, 255 (E.D.N.Y. 2018) ("A plaintiff is not required to list the place and date of defendants['] meetings and the summary of their conversations when he pleads conspiracy, but the pleadings must present facts tending to show agreement and concerted action." (alterations in original) (quoting *Fisk v. Letterman*, 401 F. Supp. 2d 362, 376 (S.D.N.Y. 2005))).  Plaintiff's allegations satisfy this standard.

Plaintiff has alleged that Defendant McGloin was aware that the DOC Defendants intended to pressure students into signing the form and that he agreed to remove any students who refused. Am. Compl. ¶ 35.  In concert with the DOC Defendants' decision to remove Plaintiff from the program on September 22, 2022, Defendant McGloin "close[d] out" Plaintiff from the CPE Program. *Id.* ¶ 36.  The Court is unconvinced that Defendant McGloin's "displeasure" with DOC's decision regarding the form disproves Plaintiff's circumstantial evidence of agreement.  ECF No. 116-1 at 11.  Plaintiff's theory is that Defendant McGloin agreed to the conspiracy not necessarily because he agreed with the DOC Defendants' objectives, but because CPE Program officials wished to avoid upsetting their relationship with Cheshire CI officials.  Am. Compl. ¶ 83.  Drawing all inferences in Plaintiff's favor, this is neither coercion nor mere acquiescence, but, rather, voluntary agreement and participation.  Moreover, DOC's unilateral authority to remove an inmate from the Program under its MOU with Wesleyan does not necessarily mean that Defendant McGloin could not have agreed to the conspiracy.  ECF No. 116-1 at 15.  Defendant McGloin could have participated in the conspiracy precisely because he ultimately agreed with it, even if he voiced initial displeasure and respected DOC's unilateral authority to remove an inmate.

Drawing all inferences in Plaintiff's favor, as the Court must, Defendant McGloin's displeasure with the form is consistent with Plaintiff's theory that Defendant McGloin voluntarily agreed to participate in the conspiracy despite his misgivings.  That Defendant McGloin sometime thereafter left Wesleyan does not sufficiently cast doubt on Plaintiff's proposed conspiracy. Defendant McGloin could have participated in the alleged conspiracy and then left his position at Wesleyan for any number of reasons.  For these reasons, the Court finds that Plaintiff has adequately alleged that Defendant McGloin's concerted actions with the DOC Defendants is circumstantial evidence of his voluntary agreement to the conspiracy.

While the Court finds that Plaintiff has adequately alleged agreement for purposes of a motion to dismiss, the Court further addresses Defendants' arguments that Plaintiff cannot rely on an "acquiescence" theory of conspiracy.  *See* ECF No. 116-1 at 12; ECF No. 119-1 at 17.  Neither *Ciambriello* nor *Ginsberg*—the two Second Circuit cases cited by McGloin in support of his argument—stand for the proposition that a Plaintiff may not rely on an acquiescence theory of conspiracy.  *See* ECF No. 116-1 at 12 (citing *Ciambriello*, 292 F.3d at 324–25; *Ginsberg v. Healey Car & Truck Leasing, Inc.*, 189 F.3d 268, 272 (2d Cir. 1999)).  *Ciambriello* merely recites the uncontroverted elements of a conspiracy claim, including an overt act, but does not stand for the additional proposition that a Plaintiff may not allege a conspiracy by virtue of an acquiesce to a conspiracy.  *See Ciambriello*, 292 F.3d at 324–25.

*Ginsberg*, too, is inapposite.  *Ginsberg* elaborates when a private actor acts under the color of state law for purposes of establishing the state actor requirement of a § 1983 suit.  189 F.3d at 272–73.  As the Second Circuit explained, failing to ask a state actor to cease to act—in other words, acquiescing to state conduct through silence or inaction—is not enough to make a private individual liable under § 1983 "*absent* any evidence of a 'plan, prearrangement, conspiracy, custom, or policy.'"  *Id.* at 272 (emphasis added) (quoting *Alexis v. McDonald's Rests. of Mass.,*

*Inc.*, 67 F.3d 341, 351 (1st Cir. 1995)). In this instance, as the Court has already explained, Plaintiff has alleged sufficient factual information in support of a conspiracy.[4]

Second, Plaintiff has alleged that the DOC Defendants and Defendant McGloin acted in concert to inflict the unconstitutional injury. Plaintiff alleges that sometime before the September 8, 2022, meeting concerning the form, the DOC Defendants and Defendant McGloin discussed the purpose of that meeting. *See* Am. Compl. ¶ 18 (indicating McGloin's prior knowledge of the meeting's purpose). Defendant McGloin and the other CPE officials then allowed the DOC Defendants to run the meeting about the form. *Id.* ¶ 19. Then, the DOC Defendants and Defendant McGloin worked in concert to remove Plaintiff. *Id.* ¶¶ 35–38. Ultimately, the DOC Defendants made the decision to remove Plaintiff from the Program, and Defendant McGloin effected that decision. *Id.* This adequately states actions in concert.

Third, Plaintiff has adequately alleged overt acts. McGloin is not correct that Plaintiff has to allege an overt act undertaken by him specifically; an overt act by any co-conspirator will do. Plaintiff has alleged the DOC Defendants implemented the form requirement, Defendant McGloin helped remove Plaintiff from the CPE Program, and the DOC Defendants set up the scheme to transfer Plaintiff from Cheshire CI. These all constitute overt acts in furtherance of the conspiracy.

---

[4] McGloin's citations to out-of-circuit cases are not authoritative and are also unpersuasive. Primarily, McGloin cites Ninth Circuit authority for his argument that "[a]cquiescence is insufficient to create a conspiracy, at least in a conspiracy claim against a private actor." ECF No. 116-1 at 10 (citing *Taylor v. List*, 880 F.2d 1040, 1048 (9th Cir. 1989); *Fonda v. Gray*, 707 F.2d 435, 438 (9th Cir. 1983)). Citing *Fonda, Taylor* noted that "[m]ere passive acquiescence in the direction of state officials generally is not sufficient." *Taylor*, 880 F.2d at 1048. But where a private person "share[s] the common objective of the conspiracy," he may be liable. *Id.* Here, Plaintiff has alleged that McGloin did more than sit idly by as the DOC Defendants removed Plaintiff from the CPE Program. According to the complaint, McGloin was actively involved in the implementation of the signature requirement policy and in Plaintiff's eventual removal from the program. Thus, on the facts alleged in the complaint, McGloin *agreed* to engage in removing Plaintiff from the program, even if he might have *disagreed* with the DOC Defendants' rationale for doing so. Again, the Court acknowledges that discovery may reveal otherwise. At this stage, however, the conspiracy claim survives.

Rather than vague accusations untethered to time, place, or intent, Plaintiff has sufficiently forwarded factual allegations in support of his proposed conspiracy.

Finally, the Court rejects the parties' remaining arguments against Plaintiff's conspiracy claim. Both the DOC Defendants and Defendant McGloin argue that Plaintiff cannot state a retaliation claim, which is a necessary predicate to his conspiracy claim against McGloin. ECF No. 116-1 at 15–19; ECF No 119-1 at 14–15. The Court has already found that Plaintiff has adequately stated a retaliation claim above.

The Court also rejects the DOC Defendants' intracorporate conspiracy argument, as it has found Plaintiff has sufficiently alleged a conspiracy between the DOC Defendants and McGloin. The intracorporate conspiracy doctrine "provides that 'officers, agents and employees of a single corporate entity are legally incapable of conspiring together and thus cannot be held liable for conspiracy under § 1985(3) or § 1983.'" *McDaniel v. City of N.Y.*, 585 F. Supp. 3d 503, 522 (S.D.N.Y. 2022), *report and recommendation adopted*, No. 19 Civ. 11265 (AT) (RWL), 2022 WL 874769 (S.D.N.Y. Mar. 24, 2022) (quoting *Blue v. City of N.Y.*, No. 16-CV-9990 (VSB), 2018 WL 2561023, at *9 (S.D.N.Y. June 4, 2018)). While the Second Circuit has yet to clarify whether the doctrine applies to conspiracy claims under § 1983, *see McDaniel*, 585 F. Supp. 3d at 522 n.6, even if it had, the doctrine would be inapplicable given the Court's findings that Plaintiff has adequately alleged that the DOC Defendants and Defendant McGloin conspired together. For these reasons, the conspiracy is not limited to a single corporate entity.

Thus, the Court does not dismiss Plaintiff's conspiracy claim for these reasons.

## V.    ELEVENTH AMENDMENT IMMUNITY AND QUALIFIED IMMUNITY

Finally, the DOC Defendants argue they are entitled to Eleventh Amendment immunity and qualified immunity. ECF No. 119-1 at 18, 21. The Court grants the DOC Defendants' motion

to dismiss in part, insofar as Plaintiff seeks damages from them in their official capacities and injunctive relief from them in their individual capacities.  The Court rejects the remainder of the DOC Defendants' immunity arguments.

### A.  Eleventh Amendment Immunity

The Eleventh Amendment provides:  "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."  This provision generally bars private individuals from suing states—and state agents acting in their official capacities—unless one of a few specific exceptions to the rule applies.  *Kentucky v. Graham*, 473 U.S. 159, 167 (1985); *Tonina v. Conn. Dep't of Revenue Servs.*, 851 F. App'x 273, 274 (2d Cir. 2021) (summary order) (collecting cases).[5]  There are three recognized exceptions to Eleventh Amendment immunity:  (1) when a state consents to a lawsuit; (2) when Congress revokes a state's Eleventh Amendment immunity under the enforcement provision of the Fourteenth Amendment, *see Tonina*, 851 F. App'x at 274; or (3) when the lawsuit seeks prospective injunctive relief against state officials—otherwise known as the *Ex parte Young* exception.  *W. Mohegan Tribe & Nation v. Orange Cnty.*, 395 F.3d 18, 21 (2d Cir. 2004) (*per curiam*) (quoting *CSX Trans., Inc. v. N.Y. St. Off. of Real Prop. Servs.*, 306 F.3d 87, 98 (2d Cir. 2002)); *see also Ex parte Young*, 209 U.S. 123 (1908).

As an initial matter, Plaintiff's amended complaint does not specify whether the DOC Defendants are being sued in their individual or official capacities.  The capacity in which the state

---

[5] Neither the Second Circuit nor the Supreme Court has definitively determined whether the Eleventh Amendment is to be understood as a bar to subject matter jurisdiction or is "more appropriately viewed as an affirmative defense." *Allco Fin. Ltd. v. Roisman*, No. 22-2726, 2023 WL 4571965, at *1 (2d Cir. 2023) (summary order) (quoting *Carver v. Nassau Cnty. Interim Fin. Auth.*, 730 F.3d 150, 156 (2d Cir. 2013)); *see also Aldridge v. Lamont*, No. 3:20-cv-924 (KAD), 2020 WL 7773415, at *4 n.6 (D. Conn. Dec. 30, 2020) (collecting cases).  As the DOC Defendants have not framed their motion as one to dismiss for lack of subject matter jurisdiction, the Court need not address this issue here.

officials are sued is relevant, insofar as it determines what types of relief are available to Plaintiff. *Ying Jing Gan v. City of N.Y.*, 996 F.2d 522, 529 (2d Cir. 1993). The Court construes the amended complaint as suing the DOC Defendants in both their official and individual capacities.

The DOC Defendants are correct that they are immune from this suit insofar as it seeks damages against them in their official capacities, as Plaintiff has not suggested that the State has consented to this suit or that Congress has abrogated the immunity. *See id.* ("To the extent that a state official is sued for damages in his official capacity, such a suit is deemed to be a suit against the state, and the official is entitled to invoke the Eleventh Amendment immunity belonging to the state.").

But Plaintiff can pursue his request for prospective injunctive relief against the DOC Defendants sued in their official capacities. To determine if the *Ex parte Young* exception to Eleventh Amendment immunity applies, the court "need only conduct a 'straightforward inquiry' into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002) (quoting *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 296, 298–99 (1997) (O'Connor, J., concurring in part)).

First, Plaintiff alleges ongoing violations of federal law. According to the amended complaint, the ongoing consequence of Defendants' retaliation and conspiracy is that Plaintiff has been denied the full benefits of his education and former status at Cheshire CI. Indeed, as Plaintiff explains, Plaintiff's loss of privileges, employment, and the CPE Program community are ongoing deprivations resulting from Defendants' violations of federal law. ECF No. 123 at 8 (citing *Rounds v. Clements*, 495 F. App'x 938, 940 (10th Cir. 2012) (Gorsuch, J.)); *accord St. Emps. Bargaining Agent Coal. v. Rowland*, 494 F.3d 71, 96 (2d Cir. 2007) ("Every Circuit to have considered the

issue, including our own, has held that claims for reinstatement to previous employment satisfy the *Ex parte Young* exception to the Eleventh Amendment's sovereign immunity bar.") (collecting cases). The DOC Defendants' argument that Plaintiff's losses—such as the loss of the opportunity to become a mentor after graduation from the CPE Program—are speculative ignores the concrete losses he has alleged, including the loss of participation in the academic community of the Program, the loss of higher-paying employment that was available to him at Cheshire CI, and the delay in his commutation application.

Second, Plaintiff seeks prospective injunctive relief to cure the injuries: transfer back to Cheshire CI to rejoin the CPE Program, regain his position in the Honor Block, and be reinstated into his previous employment position. Thus, Plaintiff can pursue his requests for injunctive relief against the DOC Defendants in their official capacities.

Insofar as Plaintiff has sued the DOC Defendants in their individual capacities, he may only pursue damages, not injunctive relief. *See Graham*, 473 U.S. at 165; *Kuck v. Danaher*, 822 F. Supp. 2d 109, 143 (D. Conn. 2011) (recognizing that requests for injunctive relief cannot be directed to state officials sued in their individual capacities, as they would not have authority to provide such relief in those capacities). Thus, Plaintiff cannot proceed with a request for injunctive relief from the DOC Defendants in their individual or personal capacities.

Thus, the Court grants the DOC Defendants' motion to dismiss on Eleventh Amendment immunity grounds, insofar as the amended complaint seeks damages against them in their official capacities and injunctive relief against them in their individual capacities.

### B. Qualified Immunity

Finally, the Court will not dismiss Plaintiff's complaint for qualified immunity at this early stage of the litigation.

The doctrine of qualified immunity shields government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

The United States Supreme Court has set forth a two-pronged test governing the qualified immunity defense. "First, a court must decide whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right." *Id.* at 232 (internal citations omitted). Second, "the court must decide whether the right at issue was 'clearly established' at the time of [the] defendant's alleged misconduct." *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). Thus, qualified immunity "bars a plaintiff's claim unless (1) the official violated a statutory or constitutional right, and (2) that right was clearly established at the time of the challenged conduct." *Matzell v. Annucci*, 64 F.4th 425, 434 (2d Cir. 2023). Courts have discretion to decide which of the two prongs to address first. *Pearson*, 555 U.S. at 236.

Relevant to the second prong, "whether a right was clearly established at the pertinent time is a question of law." *Kerman v. City of N.Y.*, 374 F.3d 93, 108 (2d Cir. 2004). An officer's "conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (cleaned up) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

Although qualified immunity defenses are often decided on motions for summary judgment, if appropriate, a district court may address qualified immunity at the pleadings stage if the "defense is based on facts appearing on the face of the complaint." *McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004); *see also Matzell*, 64 F.4th at 434. When a defendant presents a qualified immunity defense on a motion to dismiss, "the plaintiff is entitled to all reasonable inferences from the facts alleged, not only those that support [the] claim, but also those that defeat the immunity defense." *Id.* (quoting *McKenna*, 386 F.3d at 436). The Second Circuit has recognized that "a qualified immunity defense 'faces a formidable hurdle' at the motion to dismiss stage 'and is usually not successful.'" *Id.* (quoting *Sabir v. Williams*, 52 F.4th 51, 64 (2d Cir. 2022)). Nonetheless, the Supreme Court has "repeatedly 'stressed the importance of resolving immunity questions at the earliest possible stage [of the] litigation.'" *Wood v. Moss*, 572 U.S. 744, 755 n.4 (2014) (alterations in original) (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (*per curiam*)).

The DOC Defendants' qualified immunity argument consists of several paragraphs of a boilerplate legal standard and very little analysis. They do not address the fact that the Second Circuit has unequivocally stated that an inmate generally retains the First Amendment right to not speak, *Burns*, 890 F.3d at 83–93, and that the right to speak unequivocally extends to expressive conduct, *Virginia*, 538 U.S. at 358. Rather, the DOC Defendants have only cursorily asserted that the caselaw "does not clearly establish that the Plaintiff's First Amendment rights extend to the act of refusing to sign a DOC document required for participation in the CPE program." ECF No. 119-1 at 23. This raises the question of what level of generality the Court should use to define Plaintiff's right—an issue the parties have not endeavored to brief. The clearly established law must not be defined "at a high level of generality." *See Jones v. Treubig*, 963 F.3d 214, 227 (2d

Cir. 2020).  While it is plain that the First Amendment protects both a right not to speak (for prisoners and non-prisoners alike) and expressive conduct that is not itself speech, the Court acknowledges these constitutional principles are relatively high-level.  At the same time, however, there need not be a case "directly on point for a right to be clearly established . . . ."  *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (*per curiam*) (quoting *White v. Pauly*, 580 U.S. 73, 79 (2017) (*per curiam*)).

On balance, it is not clear from the face of the amended complaint itself—when all reasonable inferences are drawn in Plaintiff's favor—that qualified immunity should apply at this stage.  *See McKenna*, 386 F.3d at 436.  Under Plaintiff's theory of the case, the DOC Defendants knew his refusal to sign was a form of protest against what he believed was an unnecessary form that might waive certain of his rights, that was required by the DOC Defendants without any legitimate penological justification.  The DOC Defendants then allegedly retaliated against him because of this protest.  Given the "formidable hurdle" defendants face in asserting qualified immunity on a motion to dismiss, *McKenna*, 386 F.3d at 434, and the lack of briefing from the parties as to the appropriate level of generality to use here, the Court cannot find that they are entitled to qualified immunity at this stage as to Plaintiff's theory that withholding his signature from the form was protected activity under the First Amendment.  The DOC Defendants remain free to raise the issue at a later stage in the case, ideally with more analysis.

The Court also notes that, to the extent that Plaintiff's theory is based on his being transferred from Cheshire CI because of his filing of grievances and this lawsuit, qualified immunity would clearly be inappropriate in these circumstances.  It is well-established that the filing of a lawsuit is activity protected by the First Amendment, *Espinal*, 558 F.3d at 128–29, and that prison officials may not transfer an inmate in retaliation for the exercise of their constitutional

rights, *see Parks v. Blanchette*, 144 F. Supp. 3d 282, 300 (D. Conn. 2015) ("it was well-established before 2006 that prison authorities could not transfer an inmate in retaliation for the exercise of constitutionally protected rights.").   Retaliatory transfers have long been deemed illegal.  *See Meriwether v. Coughlin*, 879 F.2d 1037, 1046 (2d Cir. 1989).  Thus, granting the DOC Defendants' motion to dismiss on the qualified immunity defense at this early stage of the litigation would be inappropriate because they are not entitled to qualified immunity as to Plaintiff's theory that they retaliated against him by transferring him because he filed grievances and this suit.

As a final note, in the event that the DOC Defendants re-raise the issue of qualified immunity at a later point in this litigation, they should be aware that qualified immunity would shield them "only from claims for monetary damages and does not bar actions for declaratory or injunctive relief." *Adler v. Pataki*, 185 F.3d 35, 48 (2d Cir. 1999).

Accordingly, the Court declines to find that the DOC Defendants are entitled to qualified immunity at this stage of the litigation.

## VI.    CONCLUSION

For the reasons described herein, the DOC Defendants' motion to dismiss is DENIED IN PART, except as explained herein with respect to Eleventh Amendment immunity.  Additionally, Defendant McGloin's motion to dismiss is DENIED IN FULL.

**SO ORDERED** at Hartford, Connecticut, this 1st day of July, 2024.

 */s/ Sarala V. Nagala*
SARALA V. NAGALA
UNITED STATES DISTRICT JUDGE