### UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ALPHONSO WHIPPER, | ) | 3:23-CV-27 (SVN) |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| GREEN, *et al.*, | ) | |
| *Defendants*. | ) | August 13, 2024 |

### ORDER ON RENEWED MOTION FOR PRELIMINARY INJUNCTION

Sarala V. Nagala, United States District Judge.

As the Court explained in its recent order on Defendants' motions to dismiss, incarcerated Plaintiff Alphonso Whipper has sued Defendants Correctional Officer Kenneth Green, Counselor Supervisor Mercilla Roach, Counselor Supervisor Melissa Santiago, Reentry Director and Counselor Supervisor Elisha Chornobry, Deputy Warden Carlos Nunez, and State School Department Head Daniel Cambra, all of whom are employed by the Connecticut Department of Correction at Cheshire Correctional Institution (collectively, the "DOC Defendants"), and Defendant Dan McGloin, who was formerly employed as an administrator for the Wesleyan Center for Prison Education ("CPE") Program. Plaintiff claims he was retaliated against in violation of his First Amendment rights after he was removed from the CPE Program and eventually transferred out of Cheshire Correctional Institution ("CI") to MacDougall-Walker CI. *Whipper v. Green*, No. 3:23-CV-27 (SVN), 2024 WL 3252333 (D. Conn. July 1, 2024).

Plaintiff has filed this renewed motion for preliminary injunction against the DOC Defendants based on (1) his protests against the DOC Defendants' policy of requiring inmates to sign a form in order to participate in the CPE Program; and (2) his alleged retaliatory transfer for continuing to protest his removal. *See* Pl.'s Renewed Mot. Prelim. Inj., ECF No. 112. The DOC Defendants have opposed the motion on the grounds that Plaintiff was transferred not because of

his protests against the form signature requirement, but because he had drafted a letter disparaging fellow inmates, necessitating his transfer for safety and security reasons. Defs.' Opp., ECF No. 118. On May 23, 2024, the Court held an evidentiary hearing, took the motion under advisement, and ordered additional briefing from the parties. *See* Order, ECF No. 145; Pl.'s Supp. Mem., ECF No. 153; Defs.' Supp. Obj., ECF No. 152.

For the reasons described below, the Court DENIES WITHOUT PREJUDICE Plaintiff's renewed motion for preliminary injunction. While Plaintiff has demonstrated that he is entitled to preliminary injunctive relief with respect to his removal from the CPE Program, the Court exercises its discretion to decline to direct the DOC Defendants to transfer Plaintiff back to Cheshire CI so that he may fully participate in that Program, in light of the separation of powers concerns posed by intruding into the day-to-day operations of the prison. The Court will instead afford the DOC Defendants the opportunity to rectify the injury before the Court will take additional steps in tailoring appropriate relief.

## I.      FACTUAL BACKGROUND

The Court assumes the parties' familiarity with Plaintiff's theory of the case, factual allegations, and procedural background as described in the Court's order on Defendants' motions to dismiss. *Whipper*, 2024 WL 3252333, at *1–4.

At the evidentiary hearing, the Court heard from seven witnesses: Plaintiff, Defendant Roach, Correctional Supervisor Scott Lang, Defendant Nunez, Wesleyan Volunteer Alexandera Cislo, Defendant McGloin, and Director of Offender Classification/Population Management David Snyder. Marked Ex. & Witness List, ECF No. 147. Plaintiff and Defendant Roach testified in person, while the remaining witnesses testified over Zoom. *See* Prelim. Inj. Hearing Tr., ECF No. 149 at 8, 84, 139, 146 152, 164, 173.

The Court summarizes the relevant testimony and documentary evidence to the extent they are relevant to the present motion.

      A.    <u>Plaintiff's Testimony</u>

Plaintiff's testimony spanned a wide range of topics related to his claims for constitutional injury.

Plaintiff was first imprisoned in the DOC in 1996 at twenty-three years old to serve a sixty-year sentence.  ECF No. 149 at 8–9.  He is now fifty-one years old.  *Id.* at 9.  Plaintiff first learned about the CPE Program some time in 2012 through a prison flyer; he wanted to join to better himself and because he looked up to the participants in the Program as men of "greater integrity." *Id.* at 9–10.  He participated in the Program from 2012 to 2022, when he was removed from the Program with only one-half of one credit remaining in order to graduate.  *Id.* at 10.

The CPE Program aimed to create a campus-like learning environment as closely as possible.  *Id.* at 21–22.  Plaintiff had a faculty advisor and a program advisor, and the Program students often discussed classes together, mentored one another, and acted as teaching assistants in class.  *Id.* at 11–14.  The campus-like atmosphere was an important part of the Program for Plaintiff.  *Id.*  He was an active participant in class, achieved good grades, and wished to become a mentor or teaching assistant for other students so he could show younger prisoners how to be a model, rehabilitated prisoner.  *Id.* at 11, 14–15.  Plaintiff testified that becoming a mentor or a teaching assistant was important to him not only for personal gratification, but also because he planned on highlighting his leadership role in the Program in his anticipated application for commutation of his sentence.  *See id.* at 16.  Plaintiff was considering writing a paper to fulfill his final half-credit, rather than taking a full courseload, so that he could spend time preparing his commutation application.  *See id.* at 15–16.

*1.  The September 8 Incident*

On September 8, 2022, Plaintiff and the other CPE Program participants gathered in the Cheshire CI auditorium for a pre-semester orientation.  *Id.* at 16–17.  This was only the second semester that the Program was back in person after COVID-19 restrictions imposed a virtual educational environment.  *Id.* at 64.  Where pre-semester orientations in the past had been social and logistical in nature, this semester started "[v]ery different."  *Id.* at 17.  Defendant Green interrupted the meeting to explain that he had a "contract" that inmates were required to sign if they wished to remain enrolled in the Program.  *Id.*  Plaintiff inquired as to why DOC was imposing rules for the CPE Program for the first time in Plaintiff's ten years of participation.  *Id.* at 18.  Plaintiff was not alone in his protest of the requirement.  *Id.*  Plaintiff and his fellow participants were wary of DOC staff inserting themselves into the educational components of the Program given the sometimes-hostile relationship between prison staff and prisoners.  *Id.* at 18–19; *id.* at 22.  According to Plaintiff, the CPE Program is "a process of unbecoming, unlearning in order to create the space to learn and to become," which is at odds with the prisoner-officer relationship.  *Id.* at 18.  At the conclusion of this meeting, only three students signed the form.  *Id.* at 19.

Because Plaintiff was the focal point of the inmates' vocal resistance to signing the form, Defendant Roach was called to the meeting to discuss with Plaintiff his concerns about the form, one-on-one.  *Id.* at 19–20.  During this conversation, Plaintiff explained that he was confused as to why DOC staff were requiring students to sign a "contract" to follow rules and regulations.  *Id.* at 20–21.  Plaintiff's concern was that, by signing the contract, he would be giving up due process rights that would otherwise be afforded if he was accused of violating a DOC rule or regulation.  *Id.* at 21.  He also voiced his concern that, as inmates, they were legally incapable of signing a contract to abide by rules and regulations.  *Id.* at 61.  In response to Plaintiff's concerns, Defendant

Roach said that the document was not a contract but, rather, a waiver. *Id.* at 21. This did not assuage Plaintiff's concerns. *Id.* Unable to resolve Plaintiff's protests, Defendant Roach exited the auditorium. *Id.* at 22. After Defendant Roach left, Plaintiff continued to express his concerns to Defendant Chornobry, who told Plaintiff that it would be a shame that he would not be able to graduate because he refused to sign the document. *Id.* at 22–23. Ultimately, the DOC Defendants revised the document three times. *Id.* at 62; *see also* Cheshire CI Forms, Pl.'s Ex. 27.

The Program ceased operations for approximately two weeks while the DOC Defendants workshopped the disputed document and encouraged inmates to sign the document. ECF No. 149 at 23. During this time, Plaintiff was pulled from his graphic design job to discuss the document with Defendant Nunez separately, away from the other inmates. *Id.* at 23–25. This conversation convinced Plaintiff that he was correct in thinking that signing the document meant waiving his constitutional rights to due process. *Id.* at 23–24. After Defendant Nunez told Plaintiff to sign the document—as opposed to fighting for his constitutional rights— Plaintiff told him: "some hills you got to die on." *Id.* at 24. It was Plaintiff's belief that regardless of whether he signed the document, he was required to abide by DOC rules and regulations, and it "disgusted" him that his education hinged on waiving his rights. *Id.*

Eventually, Plaintiff was removed from the CPE Program for his protest of the signature requirement. This did not spell the end of Plaintiff's protest of the changes to the Program, however: Plaintiff turned to the prison grievance procedures. *Id.* at 27. Plaintiff's grievance appeal was received on November 23, 2022, and denied on December 9, 2022. *Id.* at 29; *see also* Inmate Grievance Appeal Form – Level 2, Defs.' Ex. 9 at 12. Shortly thereafter, in January of 2023, Plaintiff filed the instant suit and his original motion for preliminary injunction seeking reinstatement into the CPE Program. ECF No. 149 at 29–30.

## 2. *Events Leading to Plaintiff's Transfer*

In April of 2023, approximately seven months after Plaintiff was removed from the CPE Program—but during the pendency of Plaintiff's present lawsuit—Plaintiff was transferred from Cheshire CI to MacDougall-Walker CI. *Id.* at 30–31.

According to Plaintiff, his transfer was related to a letter that was stolen off from his work computer, edited by the person or persons who stole it, and passed around the prison facility without his knowledge. *Id.* at 31, 50. At the time, Plaintiff was certain he did not write the entirety of the letter passed around because prisoners were raising issues to his attention based on statements Plaintiff said he did not and never would say. *Id.* at 50. Based on this letter and his personal use of a state computer, Plaintiff was charged with tampering with the safety and security of the prison. *Id.* at 31.

Plaintiff admits that he did in fact draft a letter addressed to Defendant Roach as an informal means of continuing an ongoing series of discussions Plaintiff had with her since her arrival at Cheshire CI, concerning the Honor Block and Honor Board. *Id.* at 33–35. The Honor Block is a section of Cheshire CI that is dedicated as a therapeutic block for older prisoners with long sentences to provide them with a rehabilitative space. *Id.* at 26. The Honor Block is modeled after another program housed at Cheshire CI called the "True Unit," which is a nationally recognized rehabilitative program run by the Vera Institute. *Id.* at 36–37. As part of the Honor Block program, Honor Block inmates formed a self-governing group that could manage Honor Block affairs. *Id.* at 33–34. This group was called the Honor Board. *Id.*

Plaintiff's issues with Defendant Roach and her management of the CPE Program and the Honor Block began with her arrival to the institution. *Id.* at 40–41. Another prison official, Captain Boyd, helped the inmates create the Honor Block before Defendant Roach's arrival. *Id.*

at 40.  Captain Boyd and the Honor Block inmates would meet in the sign shop—where Plaintiff worked as a graphic designer—and design the program by writing documents, providing feedback, and having an open, back-and-forth discourse about how to design a rehabilitative program for older inmates.  *Id.*  According to Plaintiff, Defendant Roach's approach was different; rather than fostering collaboration, she would simply tell Plaintiff he could leave the Honor Block if he disagreed with her views.  *Id.* at 41.

Sometime in early March of 2023, Plaintiff drafted a version of a letter addressed to Defendant Roach about his concerns with the management of the Honor Board and Honor Block. *Id.* at 32–35.  Plaintiff disagreed with Defendant Roach's decision to make Honor Board members permanent positions, rather than a rotating set of elected positions.  *Id.* at 59.  In fact, Plaintiff's decision to pen the letter was spurred by a conversation he had with Defendant Roach and three members of the Honor Board, in which he felt Defendant Roach provoked animosity among the inmates.  *Id.* at 34.  After this conversation, Plaintiff approached each individual inmate to discuss his issues with their roles on the Honor Board and to clear the air.  *Id.*  Only after these conversations with his fellow inmates did Plaintiff begin drafting a letter to explain his frustrations to Defendant Roach.  *Id.* at 35.  As part of the letter, Plaintiff specifically named between six and twelve members of the Honor Board and levied specific criticisms against them.  *Id.* at 52–53, 60–61.  After writing and reviewing his thoughts, however, Plaintiff thought better of sending the letter and decided, instead, to discuss his concerns with Defendant Roach in a face-to-face conversation.  *Id.* at 35, 70.

In explaining how the letter could have been taken off his computer without his knowledge (given that he declined to send it to Defendant Roach), Plaintiff testified that it was likely taken by another inmate in retaliation for his criticizing the Honor Board, which was "like the pearl of the

institution." *Id.* at 36.  Thus, it is Plaintiff's position that the inmates who comprised the Honor Board obtained his computer password, found this document criticizing the Board, edited its content, and then passed it around the institution to get Plaintiff in trouble.  *Id.* at 37–38, 79–80; *see also* Defs.' Exs. 14, 15 (two versions of Plaintiff's letter).  Plaintiff testified that the letter introduced as Defendants' Exhibit 14 is an edited and composite version of multiple documents—including some he had written over time—whereas Exhibit 15 is the version of the letter that he had considered sending to Defendant Roach.  ECF No. 149 at 38, 42, 73, 82–83.  In both letters, Plaintiff details his issues with Defendant Roach's leadership style, in particular taking issue with the fact that she kicked him out of the CPE Program and repeatedly "invited" him to leave the Honor Block program.  *Id.* at 41–42; *see also* Defs.' Exs. 14, 15.

Plaintiff testified that he did not believe that the letter posed any threat of safety or security to the prison, his fellow inmates, or himself.  *E.g.*, ECF No. 149 at 53, 58–59.  He stated that members of the Honor Block often criticize each other, *id.* at 52–53, 58–59, but that they are not "salivating at a chance to kill each other," *id.* at 59.  In Plaintiff's opinion, he was targeted by the Honor Board not because they were angered by Plaintiff's criticisms, but because his efforts to disband the Honor Board threatened their positions of power.  *Id.* at 59–60.  To Plaintiff, the content of the letter that he drafted was simply a continuation of his thoughts about the long-running conversation and debate that he was having with his fellow Honor Block inmates.  *Id.* at 75.  It was simply a part of the Honor Block culture to confront one another and hash issues out, rather than to let them fester, as Honor Block inmates were all older, housed together, and understood that they would be housed together for decades to come.  *Id.*  As Plaintiff explained: "[w]e've been in this block for many years.  We all know the personalities.  We know who's being

a jerk, and we know for the sake of being a jerk. . . .  So we know how to deal with each other, and we all have these criticisms of each other all the time."  *Id.*

Despite that Plaintiff did not believe the letters posed any security threat, Plaintiff was charged in a disciplinary report for tampering with the safety and security of the prison.  *Id.* at 42–43.  While the charges were pending, Plaintiff was taken to punitive segregation.  *Id.*; *see also* Disciplinary Report, Defs.' Ex. 12.  Plaintiff testified on cross-examination that he believed the disciplinary report was prepared in retaliation for his criticisms of the Honor Block and True Unit because he was charged with obstructing the investigating officer, even though he was not at the job site when the investigation took place and thus, in his view, could not have obstructed the investigation.  ECF No. 149 at 56.  After Plaintiff was taken to segregation, he prepared a handwritten statement wherein he explained his theory of retaliation by Honor Board inmates.  *Id.* at 43, 58; *see also* Inmate Interview Statement (Handwritten), Defs.' Ex. 11.  The handwritten document also explains that Plaintiff had prepared a handwritten draft of the letter he had considered (but ultimately declined) to send to Defendant Roach, which, to Plaintiff's mind, proved that the letter distributed to the other inmates and Defendant Roach could not have been prepared by him.  Defs.' Ex. 11 at 2–3.

On April 16, 2023, Plaintiff was released from segregation.  ECF No. 149 at 55.  Then, on April 19, 2023, he was found not guilty of the charges brought against him.  *Id.* at 44; *see also* Disciplinary Process Summary Report, Pl.'s Ex. 11.  Despite this finding of not guilty, Plaintiff had been held in segregation for the maximum amount of time he could have been punished for the infraction.  ECF No. 149 at 43, 57.

Shortly after he was found not guilty of the disciplinary charge, Plaintiff was transferred from Cheshire CI to MacDougall-Walker CI.  *Id.* at 44.  At MacDougall-Walker CI, Plaintiff works

as a meal cart server for $28 a month, whereas he was paid $30 a week for his graphic design job at Cheshire CI. *Id.* at 44–45. At MacDougall-Walker CI, Plaintiff cannot participate in the CPE Program's campus-like environment or become a mentor or teaching assistant. *Id.* at 46. Similarly, Plaintiff believes his chances at commutation have dwindled to essentially nil because of the benefits lost by virtue of the transfer, but also because he must now explain to the commutation board how he "got kicked out of school on the eve of [his] degree, how [he] lost [his] skill-building job," and "how [he] got kicked out of Honor Block under a disciplinary narrative." *Id.* at 46–48. He testified that he would not "insult" the commutation board by "going in front of them with what's going on with [him] right now." *Id.* at 48.

B.   Defendant Roach

The next witness to testify was Defendant Roach. *Id.* at 84. Just as with Plaintiff, Defendant Roach's testimony covered nearly all events relevant to Plaintiff's claims. Defendant Roach started working at Cheshire CI on August 12, 2022, as a Counselor Supervisor and Unit Manager. *Id.* at 84–85. Prior to starting at Cheshire CI, Defendant Roach worked in other positions with DOC, but she had never before worked as a Counselor Supervisor. *Id.* at 85.

*1. Events Related to the September 8 Incident*

As part of her new duties, Defendant Roach was placed in charge of the programming for North Blocks 3 and 4; she also took over responsibility for overseeing the CPE Program sometime between her start on August 12, 2022, and the fateful meeting on September 8, 2022. *Id.* at 86–87. By the time of the September 8 meeting, Defendant Roach took over full responsibility of the CPE Program, with which she had become familiar based on her previous employment with DOC's Central Office. *Id.* at 87.

10

Defendant Roach prepared a supplemental incident report concerning the September 8 incident, which is dated October 16, 2022.  *Id*. at 93; *see also* Incident Report – Supplemental, Pl.'s Ex. 6.  The report stated that Defendant Green informed Defendant Roach that Defendant McGloin, who was formerly employed by Wesleyan, had said the form would not be passed out at the meeting.  ECF No. 149 at 94.  Defendant McGloin made this decision despite that, on September 7, Defendant Roach, Defendant McGloin, non-party Cislo, and Defendant Santiago held a virtual meeting at which it was decided that the form would be handed out on September 8.  *Id.* at 94–95, 106.  Defendant Roach could only recall that Defendant McGloin, generally, opposed the form and signature requirement; she could not explain the nature of his opposition.  *Id.* at 94–96.

Defendant Roach explained that the purpose of the form was to address recent noise complaints and frequent and short inmate movement between the school and prison, and to reiterate that CPE Program participants had to abide by the rules of United School District 1 ("USD-1"), the school district within which the CPE Program is housed.  *Id*. at 95–99.  The CPE Program was directly not run by USD-1 and its principal, Defendant Cambra, but Wesleyan was granted permission to operate out of the USD-1 school building.  *Id.* at 97.  As such, Defendant Cambra was the point person for complaints by other inmates and DOC staff about the CPE Program and its participants.  *Id.*  Defendant Cambra explained to Defendant Roach that CPE Program participants had to abide by USD-1 rules and regulations.  *Id.* at 97–98.

Defendant Roach testified that it was her idea to have the inmates sign a form addressing DOC staff concerns about CPE students being too loud and going in and out of the USD-1 building.  *Id*. at 98–99.  At least one DOC officer had complained about the noise level of the CPE Program participants.  *Id*. at 98.  Defendant Roach also stated that she received complaints about prisoner

movement, with students coming in "for one minute just to meet with the teacher and then leaving," which interfered with the prison's ability to account for the inmates at all times. *Id*. at 99. While Defendant Roach understood that the inmates were subject to the rules listed on the form and posted on the walls of the USD-1 building—regardless of whether the inmate signed a form acknowledging those rules—she felt it necessary to impose a signature requirement. *Id.* at 99–100. Her rationale was that she was new to the Program; that simply posting the rules had proved ineffective because inmates had been disruptive over the summer; and the Program had only recently returned to in-person learning after the COVID pandemic. *Id*. at 99–101. However, Defendant Roach admitted that she had personal knowledge of only one disruptive event over the summer, wherein she was called down to USD-1 about a noise complaint. *Id.* at 105–06, 115–16.

Defendant Roach disputed Plaintiff's testimony that he was threatened with expulsion if he refused to sign the form. *Id.* at 102. She clarified that inmates who refused to sign the form would be disenrolled from the upcoming semester, but could wait until the next semester to rejoin, so long as they agreed to sign the form before enrolling. *Id*. at 102. Thus, in essence, for as long as an inmate refused to sign the form, he was effectively expelled from the Program. *See id.*

Defendant Roach also confirmed Plaintiff's testimony that she was brought to the auditorium to discuss his complaints about the signature requirement. *Id.* at 106–07. After hearing Plaintiff's concerns about the signature requirement, Defendant Roach discussed the issue with Defendants Chornobry and Santiago, before leaving the auditorium without deciding whether she would in fact impose the signature requirement, as opposed to passing out the rules, posting them on the wall, or communicating them in some other way. *Id.* at 107–09. While Defendant Roach understood that Plaintiff was concerned with the wording of the form, she was not so concerned and identified it differently at various times, using the words "contract," "waiver," and

"agreement" somewhat interchangeably. *Id.* at 110–11. She also disagreed with Plaintiff's position that the CPE Program participants "waived" or gave up any rights by virtue of signing the form. *Id.* at 111–12.

Ultimately, on September 21, 2022, Plaintiff and seven other inmates declined to sign the form and were removed from the CPE Program pending their acquiescence to the rule. *Id.* at 113–14; *see also* Offender Work Performance & Program Removal/Refusal Form, Defs.' Ex. 9 at 8–9.

### 2. *Events Surrounding Plaintiff's Transfer*

Defendant Roach acknowledged that she and Plaintiff had a longstanding series of discussions about his removal from the CPE Program that culminated, in part, in his filing grievances and this lawsuit to seek reinstatement. ECF No. 149 at 117–18.

Sometime around April 6, 2023, an inmate shop co-worker of Plaintiff approached Defendant Roach and gave her the letter allegedly written by Plaintiff. *Id.* at 121. Defendant Roach then asked the shop supervisor, Correctional Supervisor Lang, if he could retrieve the computer-file version of the letter from the shop computer. *Id.* at 89–90. Defendant Roach did not know who had written the letter, but suspected it had been Plaintiff. *See id.* 121–22. She had also inferred that the document had been circulated to multiple inmates because more than five inmates approached her with concerns about it. *Id.* at 90. She estimated that, at most, theoretically 170 inmates could have seen the letter, but she did not know the exact number. *Id.* at 134, 136.

Defendant Roach disputed that her decision to direct Lang to investigate the origin of the letter allegedly written by Plaintiff had anything to do with Plaintiff's protest about the form and removal from the CPE Program. *Id.* at 118. While she could not recall whether she knew by April of 2023 that she was a defendant in this action seeking reinstatement into the CPE Program, she was aware of Plaintiff's continued efforts to file grievances to achieve reinstatement. *Id.* at 119.

Defendant Roach also admitted that the letters in question from Plaintiff's computer, in addition to addressing Plaintiff's issues with the Honor Board, also addressed the September 8 incident. *Id.* at 120–21.

Because an inmate had approached Defendant Roach about the letter, and because the letter mentioned this inmate by name, Defendant Roach believed it prudent to prepare a separation profile for Plaintiff and two inmates named in the letter. *Id.* at 122–24; *see also* Separation Profile, Defs.' Ex. 13 (signed by Defendant Roach on April 19, 2023). A separation profile initiates the process for transferring inmates after an incident. ECF No. 149 at 123–24. After a warden or deputy warden signs the profile, it is forwarded to DOC's Office of Offender Classification Population Management, which decides whether to transfer an inmate. *Id.* at 122–24. Defendant Roach played no role in determining who would eventually be transferred from Cheshire CI as a result of the separation profile. *Id.* at 124.

Defendant Roach testified that she initiated the profile despite not knowing if anyone, let alone Plaintiff, would be in danger as a result of the letter circulating. *Id.* at 124–25. It was her policy to initiate a separation order as soon as possible so as to get ahead of any potential harm. *Id.* at 139.

### C.   Correctional Supervisor Scott Lang

Following Defendant Roach's testimony, the Court heard from Correctional Supervisor Scott Lang. *Id.* at 140. Lang prepared the disciplinary report regarding the letter that circulated around the prison that Defendant Roach believed Plaintiff had authored. *Id.* at 141–42; *see also* Defs.' Ex. 12. In contradiction to Defendant Roach's testimony, Lang testified that he was informed by Defendant Roach that Plaintiff himself gave Defendant Roach the letter. ECF No. 149 at 143.

On April 6, 2023, Defendant Roach asked Lang to log into Plaintiff's computer to investigate whether the letter was stored there. *Id.* at 141–42. On April 7, 2023, Lang found the letter, which he determined to contain "an extremely large amount of libel information about inmates, staff and the facility itself." *Id.* at 143. Lang testified that the letter did not discuss the September 8 incident at all. *Id.* Lang later initiated a disciplinary report against Plaintiff, noting that Plaintiff's "personal" use of a state computer was grounds for termination and interfered with the safety or security of the prison. *Id.* at 144; *see also* Defs.' Ex. 12.

D.    Defendant Nunez

Defendant Nunez's involvement with the case was limited to the conversation that he had with Plaintiff about Plaintiff's concerns with the disputed documents. On September 21, 2022, Plaintiff was called to Defendant Nunez's office to discuss Plaintiff's objections to the signature requirement. ECF No. 149 at 147–48, 151. Defendant Nunez was familiar with Plaintiff from previous encounters. *Id*. at 148. Upon hearing that Plaintiff refused to sign the document concerning CPE Program school rules, Defendant Nunez called Plaintiff in for a conversation. *Id.* During this conversation, Defendant Nunez told Plaintiff that the form was changed to meet Plaintiff's concerns and that Plaintiff would not in fact sign away any rights if he signed the document. *Id.* at 148–51. Confirming Plaintiff's testimony, Defendant Nunez understood that Plaintiff refused to sign the form. *Id*. at 148. Defendant Nunez also recalled Plaintiff saying the phrase "some hills you gotta die on." *Id*. at 150. However, Defendant Nunez could not recall in words whether he told Plaintiff to weigh graduating now over waiting for the resolution of a potential lawsuit, but he does recall in substance communicating that point. *Id.* at 151–52.

E.    Wesleyan Volunteer Alexandera Cislo

Alexandera Cislo was the Program Manager in the Wesleyan CPE Program, in charge of daily operations when Plaintiff was removed from the Wesleyan CPE Program.  *Id.* at 155.  As Program Manager, Cislo supervised study hall, conducted limited academic advising, and answered questions about the long-term trajectory of the CPE Program.  *Id.*

Cislo recalled the September 8, 2022, meeting and implementation of a "waiver form."  *Id.* Prior to the meeting, Wesleyan staff were informed by DOC that DOC intended to implement a signature requirement, but not necessarily at the September 8 meeting.  *Id.* at 155–56.  Cislo first became aware of the signature requirement during a study hall session about a week prior, when a DOC counselor supervisor asked Cislo to distribute the form to the students for their signature.  *Id.* at 156–57.  Cislo expressed her opinion that the form should not be introduced because it employed unclear language and blurred the boundaries between DOC's role in administering custody and Wesleyan's role in administering education, and because the form seemed to do nothing but reiterate rules and regulations CPE participants were already required to follow.  *Id.* at 157–58.

Wesleyan and DOC staff did not meet about the signature requirement again until September 7, 2022, the day before the orientation meeting.  *Id.* at 159.  During this meeting, Cislo expressed concerns about who was going to introduce and then administer the forms and rules, the apparent lack of formality normally associated with official DOC documents, and about ambiguities that could arise from subjective determinations about rule enforcement, including the noise level.  *Id.* at 159–60.  At the time, Cislo was under the impression that the students had expressed tacit consent to the school unit rules listed on the form by virtue of using that space.  *Id.* at 160–61. As for DOC's rationale that the signature requirement was necessary to curtail unruly behavior from CPE Program participants during the summer session, the only "disruption[ ]" Cislo

16

could recall prior to the form being implemented was when a "relatively new officer" working in the school building came into a study hall to say that it was too loud. *Id.* at 161.

Cislo further testified that she worked with Plaintiff, and that he was a diligent student who enjoyed participating and who was interested in the governance, longevity, and welfare of the CPE Program. *Id.* at 154. Cislo also testified that Mr. Whipper had mentioned wanting to be a mentor, and that he would make a good mentor or teacher to some students. *Id.*

  F. <u>Defendant McGloin</u>

Defendant McGloin worked in various capacities at the Wesleyan CPE Program from February of 2018 to May of 2023. *Id.* at 165. He worked first as a Program Coordinator and then, in the fall of 2019, was promoted to the position of Academic Manager. *Id.* at 165–66. Defendant McGloin testified that as Academic Manager he interacted with Plaintiff, whom he found to be courteous and polite, intelligent, and enthusiastic. *Id.* at 166–67. Defendant McGloin also acknowledged the educational value in face-to-face interaction with other students and faculty while completing academic work. *Id.* at 171.

McGloin was not forewarned about the DOC's intent to distribute the form at the September 8, 2022, meeting. *Id.* at 167–68. Defendant McGloin was surprised that the DOC intended to distribute the form at all, as it seemed redundant in light of other rules applicable to prisoners. *Id.* at 168. Defendant McGloin believed DOC could not supply satisfying reasons for implementing the form and signature requirement and expressed his displeasure with DOC's actions during the September 8 meeting. *Id.* at 168–69.

Defendant McGloin remembered Plaintiff being reluctant to sign the form, and later learned that Plaintiff had been removed from the CPE Program because he refused to sign. *Id.* at 169. Defendant McGloin testified that DOC informed CPE staff that those inmates who did not

sign the form were to be removed from the Program; Defendant McGloin disagreed with this measure. *Id*. Following Plaintiff's removal from the Program for his refusal to sign the form, CPE staff had at one point discussed the possibility of Plaintiff writing a paper to earn his remaining half-credit. *Id*. at 169–70. Defendant McGloin eventually learned that Plaintiff had been transferred away from Cheshire CI. *Id*. at 170–71. He testified that he would have explored options for Plaintiff to complete his degree from another facility if he had known of the transfer, and if DOC was willing to facilitate such an operation. *Id*.

G.   Director of Offender Classification/Population Management David Snyder

David Snyder serves as the Director for Offender Classification, Population Management, Sentence Calculation, and Interstate Management for DOC. *Id*. at 174. In this position, Snyder reviewed the separation profile entered by Defendant Roach and decided to transfer Plaintiff. *Id*. at 175, 177.

By way of background on the separation profile system, separation profiles are documents generated by DOC officials after there has been an incident between people or groups of people at a correctional institution, and DOC staff at that institution have determined that it is necessary to transfer one or more of the inmates for safety reasons. *Id*. at 176. A separation profile is initiated by a staff member or officer and then sent up the chain of command until a captain, deputy warden, or warden either approves or disapproves of the proposed separation profile. *Id*. Then, with a recommendation to approve or deny the profile, the profile is then sent to Snyder's office for review. *Id*. at 176–77. His office then makes the final determination on whether to approve or deny the separation profile. *Id*. at 177. If the separation is approved, Snyder's office must decide which inmate or inmates to transfer. *Id*. at 177. Once Snyder has determined that a transfer is necessary, he testified both that he makes an "educated and informed decision." *Id*. at 180.

18

Plaintiff's separation profile came to Snyder sometime after April 20, 2023, but before April 25, 2023. *Id.* at 183; *see also* Defs.' Ex. 13 (recommended for review on April 20, 2023); Plaintiff's Transfer History, Pl.'s Ex. 17 (noting Plaintiff's transfer was effectuated on April 25, 2023). The report accompanying the separation profile was lengthy, as it contained both versions of the letters that Plaintiff had allegedly written, a summary from the supervisor as to the underlying incident, the supplemental reports generated as part of the investigation, including Plaintiff's handwritten statement, and the disciplinary report. ECF No. 149 at 177–78, 184–85, 200–01. Snyder testified that he did not rely on the disciplinary report when assessing the separation profile for Plaintiff. *Id.* at 185.

After reviewing the separation profile package, Snyder determined that he would approve the separation profile because the letters attached to the report mentioned the names of multiple inmates and their roles as part of the Honor Block (though the profile only requested separation of Plaintiff from two other inmates). *Id.* at 178–79, 187. The separation was necessary because Plaintiff mentioned an inmate by name, putting him at risk of violent reprisal. *Id.* at 179. After approving the profile, Snyder determined that it was easier to transfer Plaintiff—and not any of the other inmates—because Plaintiff had no active separation profiles and because Plaintiff was the apparent author or source of the letter. *Id.* at 180. Snyder also considered the fact some of the inmates mentioned in the letter were not yet aware that they were discussed in it. *Id.*

Snyder testified that it would matter very little that Plaintiff was found not guilty of the disciplinary violation, or that another inmate or inmates may have stolen Plaintiff's letter, edited it, and distributed the letter to retaliate against Plaintiff. *Id.* at 185–86, 189–92. Snyder explained that even if one of the inmates in the separation profile initiated the incident, that he still would have transferred Plaintiff because he was the easiest to move. *Id.* at 190–92, 201. The transfer

19

decision was based solely on logistical ease.  *Id*. at 187–88, 191–92, 199.  Snyder also testified that there are procedures to remove a separation profile, in which all of the inmates involved would need to request that they wanted the profile removed, but that no such removal request has been received regarding Plaintiff.  *Id*. at 181.

## II.   PROCEDURAL HISTORY

Plaintiff initiated this action in January of 2023 with both a complaint and a motion for a preliminary injunction to "stop his suffering of the defendants' retaliation and, allow him to return to school immediately without any further hinderance [sic] or delay."  Mot. Prelim. Inj., ECF No. 6 at 1.  In April of 2023, while the motion for injunctive relief was pending, Plaintiff was transferred from Cheshire CI to MacDougall-Walker CI.  In January of 2024, the Court appointed Plaintiff *pro bono* counsel and set a schedule for supplemental briefing on the motion for a preliminary injunction, with the assistance of counsel.  *See* Order, ECF No. 79.  Approximately a week before the hearing on the motion, Defendants Cambra, Chornobry, and Santiago filed a notice that DOC and the CPE Program had agreed to allow Plaintiff to complete his studies in the Program remotely from MacDougall-Walker CI.  *See* Notice, ECF No. 94.  Following a hearing, the Court denied the then-pending motion for a preliminary injunction as moot, but allowed Plaintiff to renew the request for preliminary injunctive relief through counsel.  *See* Order, ECF No. 106.

Plaintiff, through counsel, renewed the motion.  ECF No. 112.  The renewed motion seeks the following relief:  (1) restoration of Plaintiff to full participation in the CPE Program, including the opportunity to continue to participate in the Program as a mentor or teaching assistant; (2) transfer of Plaintiff back to the Honor Block at Cheshire CI; and (3) restoration of the prison benefits and job Plaintiff held at Cheshire CI as of September 8, 2022.  ECF No. 112-1 at 12.

III.     **LEGAL STANDARD**

A preliminary injunction "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (citation omitted). "The purpose of a preliminary injunction is . . . to preserve the relative positions of the parties" pending final resolution on the merits. *N. Am. Soccer League, LLC. v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 37–38 (2d Cir. 2018) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)). A party seeking a preliminary injunction must establish:

> (1) a likelihood of success on the merits or sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the plaintiff's favor; (2) a likelihood of irreparable injury in the absence of an injunction; (3) that the balance of hardships tips in the plaintiff's favor; and (4) that the public interest would not be disserved by the issuance of an injunction.

*Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015) (cleaned up) (quoting *Salinger v. Colting*, 607 F.3d 68, 79–80 (2d Cir. 2010)).

A.      Mandatory or Prohibitory Injunction

First, the parties dispute whether Plaintiff seeks a prohibitory or mandatory preliminary injunction. The Court concludes that Plaintiff seeks a prohibitory preliminary injunction.

"The typical preliminary injunction is prohibitory and generally seeks only to maintain the status quo pending a trial on the merits." *Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*, 60 F.3d 27, 34 (2d Cir. 1995) (citation omitted). "A mandatory injunction, in contrast, is said to alter the status quo by commanding some positive act." *Id.* "[T]his distinction is important because [the Second Circuit has] held that a mandatory injunction should issue 'only upon a *clear* showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief.'" *Id.* (emphasis added) (quoting *Abdul Wali v. Coughlin*,

754 F.2d 1015, 1025 (2d Cir. 1985)).  A heightened standard is imposed for mandatory injunctions, in part, "because injunctions of those sorts tend to be particularly burdensome to the defendants subject to them." *JTH Tax, LLC v. Agnant*, 62 F.4th 658, 667 (2d Cir. 2023) (citing Wright & Miller § 2948.2).  "The 'clear' or 'substantial' showing requirement—the variation in language does not reflect a variation in meaning—thus alters the traditional formula by requiring that the movant demonstrate a greater likelihood of success." *Tom Doherty Assocs.*, 60 F.3d at 34 (citation omitted).  In addition, if the requested injunction is mandatory, the movant must "make a 'strong showing' of irreparable harm . . . , in addition to showing that the preliminary injunction is in the public interest." *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015) (citation omitted).

The Court concludes that Plaintiff has requested a prohibitory injunction, not a mandatory injunction.  The present controversy began when, after Plaintiff refused to sign the disputed form, Plaintiff was removed from the CPE Program.  Plaintiff's alleged constitutional injuries stem from this initial, inciting incident.  *See Whipper*, 2024 WL 3252333, at *9–10 (discussing adverse action).  In the context of a preliminary injunction request, "the 'status quo' is really the 'status quo *ante*' – that is, 'the last, actual, peaceable[,] uncontested status which preceded the pending controversy.'" *Daileader v. Certain Underwriters at Lloyds London Syndicate 1861*, 96 F.4th 351, 356 (2d Cir. 2024) (alteration in original) (quoting *N. Am. Soccer*, 883 F.3d at 36).  By seeking a transfer back to Cheshire CI and reinstatement into the Program—*i.e.*, full participation in the Program and its campus-like environment—Plaintiff seeks a return to the status quo *ante*:  he seeks no more than a return to his original position, before the events that prompted this litigation.  *See Doe v. Vassar Coll.*, No. 19-cv-9601 (NSR), 2019 WL 6222918, at *4 (S.D.N.Y. Nov. 21, 2019) (holding that status quote *ante* in case involving suspended college student was "the moment

before Plaintiff's suspension was imposed"); *see also Garcia v. Yonkers Sch. Dist.*, 561 F.3d 97, 107 (2d Cir. 2009) (referring to students continuing to attend school as the "status quo"). Thus, the Court applies the typical standard that applies to prohibitory preliminary injunctions, rather than the heightened standard that applies to mandatory preliminary injunctions.[1]

## IV.    DISCUSSION

The Court finds that Plaintiff has met his burden of establishing that preliminary injunctive relief is appropriate, with respect to his claim that he was unlawfully removed from the CPE Program in retaliation for exercise of his First Amendment rights. It cannot make the same finding with respect to his allegation of retaliatory transfer, for the reasons addressed below—though it finds that there are sufficiently serious questions going to the merits of this question to make them a fair ground for litigation. The Court also concludes that the balance of equities tips slightly, but not decidedly, in Plaintiff's favor. Finally, the Court notes that the public interest could be disserved by issuance of the full injunctive relief Plaintiff requests.

On balance, in light of the safety and security issues the DOC Defendants have proffered concerning Plaintiff's placement at Cheshire CI, the Court does not believe it should award equitable relief directing the DOC Defendants to transfer Plaintiff back to Cheshire CI without first allowing them an opportunity to correct the constitutional injury their actions have caused. In particular, there remains a key dispute as to whether it would actually be safe to return Plaintiff to Cheshire CI given the potential safety threat to him as a result of his naming various inmates in his two letters. Respecting the expertise of the DOC Defendants in managing the affairs of a state

---

[1] In any event, even if the Court were to apply the higher standard, for the reasons described below it would still find that Plaintiff has met his burden in establishing a clear likelihood of success on the merits and a strong showing of irreparable harm, with respect to his removal from the Program. *Actavis PLC*, 787 F.3d at 651 ("That conclusion," that the normal standard applies "is of little import in this case because [the plaintiff] has satisfied the heightened standard.").

prison, federalism and comity caution the Court to exercise its discretion to provide the DOC Defendants the opportunity to first remedy the constitutional injury in a manner consistent with the objectives of maintaining safety and security of the prison.  This outcome prevents the Court wading into the day-to-day operations of a state prison at this preliminary stage.

A.    <u>Likelihood of Success on the Merits</u>

*1.  Removal from CPE Program*

To begin, Plaintiff has shown a likelihood of success on his First Amendment retaliation claim based on the DOC Defendants' removal of Plaintiff from the CPE Program after he protested the signature requirement.

"Consideration of the merits is virtually indispensable" in the context of an alleged First Amendment violation, "where the likelihood of success on the merits is the dominant, if not the dispositive, factor."  *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013) (citation omitted).  To establish a likelihood of success on the merits, a plaintiff "need not show that success is an absolute certainty.  He need only make a showing that the probability of his prevailing is better than fifty percent."  *Broker Genius, Inc. v. Volpone*, 313 F. Supp. 3d 484, 497 (S.D.N.Y. 2018) (internal quotation marks omitted) (quoting *Eng v. Smith*, 849 F.2d 80, 82 (2d Cir. 1988)).  If a plaintiff cannot demonstrate a likelihood of success on the merits of a claim, he may alternatively demonstrate "sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward" him.  *Ventura de Paulino v. N.Y.C. Dep't of Educ.*, 959 F.3d 519, 529 (2d Cir. 2020) (internal quotation marks and citation omitted).

Section 1983 creates a private cause of action against any person who, acting under color of state law, deprives an individual of his federally protected rights.  *Rehberg v. Paulk*, 566 U.S.

24

356, 361 (2012).  A section 1983 claim contains two elements:  "(1) the conduct complained of was committed by a person acting under color of state law, and (2) this conduct deprived a person of rights, privileges or immunities secured by the Constitution or laws of the United States." *Greenwich Citizens Comm., Inc. v. Cntys. of Warren & Washington Indus. Dev. Agency*, 77 F.3d 26, 29–30 (2d Cir. 1996) (cleaned up) (quoting *Parratt v. Taylor*, 451 U.S. 527, 535 (1981)).

To plead a First Amendment retaliation claim, a plaintiff must plausibly allege:  "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action."  *Brandon v. Kinter*, 938 F.3d 21, 40 (2d Cir. 2019) (cleaned up) (quoting *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004)).  The Second Circuit has "instructed district courts to 'approach prisoner retaliation claims with skepticism and particular care, because virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act.'"  *Dolan v. Connolly*, 794 F.3d 290, 295 (2d Cir. 2015) (quoting *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003)).

The Court finds that Plaintiff has established a likelihood of success on the merits of his First Amendment retaliation claim related to removal from the CPE Program.  As the Court explained in detail in its order on Defendants' motions to dismiss, Plaintiff has sufficiently alleged that he engaged in protected speech by refusing to sign the disputed form; that Defendants retaliated against him by removing him from the Program; and that Defendants did so precisely because he refused to the sign the firm—*i.e.*, because he had engaged in protected speech. *Whipper*, 2024 WL 3252333, at *5–13.  The Court agrees with Plaintiff that he may seek a preliminary injunction based on this removal-as-retaliation theory alone.

First, the DOC Defendants do not contest that Plaintiff may rely on his removal from the CPE Program as a theory of retaliation supporting his motion for preliminary injunction. The DOC Defendants' briefing is virtually silent on this issue, as they focus on whether Plaintiff may rely on his transfer as a theory of injury. *See* ECF Nos. 118-1, 152-1 (failing to argue that Plaintiff may not rely on his removal from the CPE Program). While the Court understands why the DOC Defendants opted to focus on the retaliatory transfer claim after the Court mooted Plaintiff's original motion for a preliminary injunction, Order, ECF No. 22, the Court's order on Defendants' motions to dismiss made it abundantly clear that Plaintiff has offered a theory of retaliation based on his removal from the CPE Program alone. *Whipper*, 2024 WL 3252333, at *5–13. Thus, the Court would have expected the DOC Defendants to have addressed this theory in their supplemental briefing, and they did not. In their briefing on the motion to dismiss, the DOC Defendants contested that Plaintiff's refusal to sign the form was protected activity and that he suffered an adverse action, but they did not dispute that they removed him from the CPE Program because he refused to sign the form. The Court held that Plaintiff had sufficiently alleged he engaged in protected activity and that removal from the Program was an adverse action. *Id.* at *5–11. As the DOC Defendants have offered no argument to the contrary now, their silence weighs in favor of finding that Plaintiff has met his burden in establishing a likelihood of success on the merits of his removal-as-retaliation claim.

Second, the evidence at the evidentiary hearing supports the finding that Plaintiff has established a likelihood of success on the merits. The record is replete with evidence that the DOC Defendants removed Plaintiff from the CPE Program because he refused to sign the disputed form. ECF No. 149 at 100–03 (Defendant Roach explaining why Plaintiff was required to sign the form or face removal from the CPE Program); *id.* at 169 (Defendant McGloin testifying that DOC

removed Plaintiff because he refused to sign); Aff. of Defendant Cambra, Defs.' Ex. 2 at 2 (explaining that Plaintiff and six other inmates who refused to sign were removed from the Program); Pl.'s Ex. 6 (explaining the same).  The DOC Defendants effectively concede that Plaintiff was removed from the Program for protesting the signature requirement and refusing to sign the disputed form.  Thus, Plaintiff has made a strong showing of likely success on the merits.

Based on the evidence in the record and the DOC Defendants' effective concession to Plaintiff's legal theory, the Court finds that Plaintiff has established that he is likely to succeed on his First Amendment retaliation claim based on his removal from the CPE Program.

### 2.  Retaliatory Transfer

While Plaintiff has satisfied the requirement of likelihood of success based on his removal from the CPE Program, the Court also addresses Plaintiff's theory that he was transferred out of Cheshire CI in retaliation for his continued protests, as this theory is relevant to his requested relief of transfer back to Cheshire CI, placement back in the Honor Block, and reinstatement to his previously-held position as a graphic designer.  As for this theory, Plaintiff has not met his burden of establishing that he is likely to succeed on the merits.  Plaintiff has, however, established the alternative option:  that there are sufficiently serious questions going to the merits to make them a fair ground for litigation.

As the Court explained in its order on Defendants' motions to dismiss, Plaintiff may pursue a First Amendment retaliatory transfer claim based on two theories:  (1) transfer in retaliation for his refusal to sign the disputed form and (2) transfer in retaliation for filing grievances and the instant suit.  Based on the record before the Court, Plaintiff cannot meet his burden in demonstrating that he is likely to succeed on his claim that the transfer was in retaliation for Plaintiff's initial or continued protests against the signature requirement.  Specifically, there

remain significant disputes as to whether Plaintiff's transfer was effected in response to Plaintiff's protests about the CPE Program, or in response to Plaintiff's grievances more generally about Cheshire CI and the Honor Block, or because of the safety concerns posed by the distribution of the letters attributed to Plaintiff.  Based on the record before the Court, it cannot conclude that Plaintiff has met his burden in demonstrating that he is more likely than not to succeed on the merits of his retaliatory transfer claim.

In particular, following the evidentiary hearing, it appears undisputed that Plaintiff did write at least one of the letters that made its way to Defendant Roach through another inmate, and that such letter made references to—at the very least—differences of opinion between Plaintiff and one or more other inmates.  Additional inmates also brought the letter to Defendant Roach's attention.  The Court recognizes that, in such a scenario, Defendant Roach would understandably be concerned that the letter created an unsafe environment for Plaintiff and the other inmates who worked and lived together.  ECF No. 149 at 121–22.  It was therefore reasonable for her to investigate, through Lang, whether Plaintiff truly was the source of the letter and to initiate the separation profile process.  The Court cannot conclude that Defendant Roach did so because Plaintiff failed to sign the CPE Program form some seven months earlier, or even because Plaintiff had continued to grieve his removal from the Program and filed the instant suit.  Instead, it appears Defendant Roach initiated the separation profile because she perceived a potential threat to Plaintiff's safety on account of the letter having been circulated within Cheshire CI.  Further, it was Director Snyder, not Defendant Roach, who ultimately decided to transfer Plaintiff to MacDougall-Walker CI.  *Id.* at 177.  Snyder also testified that Plaintiff being found not guilty of the disciplinary charge, if it had been considered, would not have impacted his decision to transfer Plaintiff.  *Id.* at 185–86, 189–92.  Therefore, Plaintiff cannot meet his burden of showing a

28

likelihood of success as to causation with respect to his retaliatory transfer allegations:  he has not demonstrated that his protected speech was a but-for cause of the transfer.  *See Whipper*, 2024 WL 3252333, at *10 (discussing but-for causation standard).

There are, however, sufficiently serious questions going to the merits to make Plaintiff's allegations of retaliatory transfer a fair ground for litigation.  Plaintiff argues that he had not embarked on a silent crusade, in that he personally confronted other inmates about their positions on the Honor Board and repeatedly discussed these issues with Defendant Roach, *see* ECF No. 149 at 75–76.  He further contends Defendant Roach seized on the opportunity presented by the letter to create a separation profile to remove Plaintiff from Cheshire CI in retaliation for his continued protests about the CPE Program.  In short, Plaintiff suggests Defendant Roach had it out for him ever since he protested about signing the form, and used the discovery of the letter as a pretextual reason to transfer him out of Cheshire CI.

There is support in the record for Plaintiff's position.  For instance, Defendant Roach testified that it is her standard practice to create separation profiles as quickly as possible after learning about a problematic incident.  *Id.* at 138–39.  For Plaintiff, however, she waited two weeks from learning about the letter before preparing the profile.  If it was Defendant Roach's sincere belief that Plaintiff's safety was threatened by the mere existence of the letter alone, then, consistent with her testimony, she should have prepared the separation profile as soon as she received the letter—or, at the latest, when the letter was shortly thereafter found on Plaintiff's work computer and she was certain he was its author.  There are also open questions as to the timing of Defendant Roach's separation profile coinciding with the finding that Plaintiff was not guilty of the disciplinary charge.  Plaintiff was found not guilty on April 19, 2023, Pl.'s Ex. 11, and Defendant Roach prepared the separation profile that same day, Defs.' Ex. 13.  If Defendant Roach

prepared the separation profile in response to the favorable disposition of Plaintiff's disciplinary charge, it could support Plaintiff's theory that Defendant Roach manufactured pretext with regard to the letter, in order to remove Plaintiff from Cheshire CI.

Furthermore, Plaintiff testified at the evidentiary hearing that he remained in segregation pending the adjudication of the disciplinary report for the maximum amount of time that he could have been penalized for the infraction for which he was later found not guilty.  ECF No. 149 at 43, 57.  The amount of time Plaintiff spent in segregation supports his allegations that the disciplinary charge and the threat of prison safety were pretextual, when the true intent was to punish Plaintiff as much as possible under the relevant regulations (even though he was later found not guilty).

Then, Plaintiff returned to general population for three days before being transferred out of Cheshire CI, even though Defendant Roach believed that the circulation of the letter could pose a danger to Plaintiff.  *Id.* at 55.  If her fear for Plaintiff's safety was truly genuine, it defies logic that he would have been placed in general population—where any upset inmate would presumably have been able to find him—for three days before the transfer.  Thankfully, there is nothing in the record suggesting any threats to Plaintiff's safety were made during this three-day period.

Finally, there are disputed questions as to the degree and extent of any safety risk to Plaintiff.  While Defendant Roach believed the separation profile was necessary to protect Plaintiff, Plaintiff himself does not appear fearful of his fellow inmates.  That there were no threats to his safety during his short time in general population before his transfer supports Plaintiff's position.

In sum, while the Court cannot conclude that Plaintiff has demonstrated a likelihood of success on the merits of his claim for retaliatory transfer, it can conclude that there are sufficiently serious questions on the merits of this issue to make it a fair ground for litigation.

B.     Irreparable Harm

Next, the Court finds that Plaintiff has demonstrated irreparable harm.

For purposes of a preliminary injunction, irreparable injury means "injury for which a monetary award cannot be adequate compensation." *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979) (citations omitted).  A party seeking preliminary injunctive relief "must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *JTH Ta*x, 62 F.4th at 672 (citation omitted).

As a general matter, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 636 (2d Cir. 2020) (quoting *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (per curiam)).  Indeed, as the Second Circuit has noted, "[b]ecause the deprivation of First Amendment rights is an irreparable harm, in First Amendment cases the 'likelihood of success on the merits is the dominant, if not the dispositive, factor.'" *Id.* at 637 (quoting *N.Y. Progress*, 733 F.3d at 488).  Violations of First Amendment rights are generally "presumed irreparable." *Tunick v. Safir*, 209 F.3d 67, 70 (2d Cir. 2000) (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)).

However, not all instances of past unconstitutional conduct constitute irreparable harm warranting a preliminary injunction.  While "the impairment of First Amendment rights can undoubtedly constitute irreparable harm, . . . it often will be more appropriate to determine irreparable injury by considering what adverse factual consequences the plaintiff apprehends if an injunction is not issued, and then considering whether the infliction of those consequences is likely to violate any of the plaintiff's rights." *Time Warner Cable of N.Y.C v. Bloomberg L.P.*, 118 F.3d

31

917, 924 (2d Cir. 1997) (citation omitted).  "[A]n ongoing constitutional violation more closely resembles irreparable injury than does a constitutional violation that was suffered in the past and which can be remedied only by money damages."  *Airbnb, Inc. v. City of N.Y.*, 373 F. Supp. 3d 467, 499 (S.D.N.Y. 2019) (alteration in original) (quoting *Hardy v. Fischer*, 701 F. Supp. 2d 614, 619 (S.D.N.Y. 2010)).

Although Plaintiff was removed from the CPE Program in the past, the injuries stemming from his inability to fully participate in the CPE Program—principally on-campus learning, loss of the ability to serve as a teaching assistant or mentor, and the downstream consequences on his application for commutation—are ongoing.  It would be very difficult to quantify the monetary damages that flow from these harms, were Plaintiff to succeed at trial.  *See Tom Doherty Assocs., Inc.*, 60 F.3d at 38 ("[I]rreparable harm exists only where there is a threatened imminent loss that will be very difficult to quantify at trial.").  Thus, Plaintiff's injury is more akin to an irreparable injury than it is to an injury that may be remedied only by monetary damages.

As both Plaintiff and Defendant Roach testified at the evidentiary hearing, the CPE Program's campus-like environment is one of its defining characteristics.  ECF No. 149 at 21, 99; *see also id.* at 171 (Defendant McGloin testifying that "there is value to face-to-face interaction with other students and faculty while completing one's academic work").  While the DOC Defendants offered Plaintiff the opportunity to complete his degree requirements by mail, Plaintiff has demonstrated why this remedy is inadequate to place him in the status quo *ante*.  Prior to his removal, Plaintiff was able to discuss his course work and studies with fellow students, Wesleyan volunteers, and Wesleyan professors in person.  A degree by mail is an inadequate substitute. Furthermore, upon completion of his degree requirements, he would have the opportunity to become a mentor or teaching assistant for other students in the CPE Program.  *Id.* at 46–47.

Although whether Plaintiff would actually become a mentor or teaching assistant is unknown, it is not so speculative as to defeat Plaintiff's irreparable harm argument. Indeed, Cislo testified that Plaintiff would make a good mentor to some students. Finally, the loss of the ability to mount a more promising application for commutation supports Plaintiff's position that he would suffer irreparable harm absent preliminary injunctive relief. At the evidentiary hearing, Plaintiff testified that when he was removed from the Program, he was preparing a commutation package that relied, in part, on his anticipated completion of his college degree and ability to participate as a teaching assistant or mentor with the CPE Program. *See id.* at 15, 47. Plaintiff had hoped to craft a commutation narrative around his successful completion of the Program and a subsequent leadership role as a mentor and teaching assistant, but has put off submitting an application because he (reasonably) believes that his current situation would not present a compelling case for commutation. *Id.* at 47–50.[2]

While the inciting incident and removal from the CPE Program occurred in the past, Plaintiff's injuries resulting from that First Amendment injury remain ongoing, and Plaintiff has demonstrated a strong likelihood of success on this claim. For these reasons, the ongoing nature of Plaintiff's constitutional injury weighs strongly in favor of finding that Plaintiff suffers an irreparable harm. *See, e.g.*, *Hardy*, 701 F. Supp. 2d at 619 (finding irreparable harm where plaintiffs alleged ongoing harm from an alleged Fourteenth Amendment due process violation); *Nat'l Rifle Ass'n of Am. v. Cuomo*, No. 1:18-CV-0566, 2023 WL 6037840, at *5 (N.D.N.Y. Sept. 15, 2023) (finding the same in the context of a First Amendment retaliation claim); *McKenna v.*

---

[2] To the extent the DOC Defendants argue that Plaintiff does not need immediate relief, the Court disagrees. Especially insofar as the DOC Defendants' actions have jeopardized Plaintiff's application for commutation, each day that their constitutional violation persists is a day that Plaintiff unnecessarily must wait to submit his application, which could have a direct impact on his liberty.

*Wright*, No. 01 CIV. 6571 (WK), 2002 WL 338375, at \*4–5 (S.D.N.Y. Mar. 4, 2002) (finding the same for an ongoing Eighth Amendment violation).

The DOC Defendants' cases in the school suspension and expulsion context are unpersuasive for two reasons.  ECF No. 152-1 at 19.  First, none of the cases cited by the DOC Defendants support the proposition that removal from a college program cannot be an irreparable injury when the removal involves a likely-to-succeed constitutional claim.  *See, e.g.*, *Vassar Coll.*, 2019 WL 6222918, at \*6 (finding no likelihood of success on the merits *or* irreparable harm in case brought under Title IX concerning temporary suspension of college student accused of sexual misconduct); *Caiola v. Saddlemire*, No. 3:12-CV-624 (VLB), 2013 WL 1310002, at \*2–7 (D. Conn. Mar. 27, 2013) (finding plaintiff failed to establish likelihood of success or irreparable harm on a Fourteenth Amendment due process claim); *Madej v. Yale Univ.*, No. 3:20-cv-133 (JCH), 2020 WL 1614230, at \*7, 18 (D. Conn. Mar. 31, 2020) (finding no irreparable harm or likelihood of success where student's graduation date was delayed by two semesters due to academic withdrawal).  Unlike the cases cited by the DOC Defendants, the instant case involves an essentially undisputed, ongoing First Amendment violation.

There is also a second reason that the DOC Defendants' cases are unpersuasive:  the plaintiffs in those cases were private citizens with alternative educational and professional opportunities available.  In the cases cited by the DOC Defendants, the courts found that the plaintiffs' injuries amounted to what was, effectively, a temporary suspension and accordant *delay* of educational opportunity, rather than *denial* of such opportunity.  *See, e.g.*, *Vassar Coll.*, 2019 WL 6222918, at \*6 (finding that plaintiff could not establish irreparable harm where injury amounted effectively to a suspension and plaintiff could potentially "obtain the credits required for graduation at another accredited university or take additional courses with Vassar over school

breaks to ensure that he obtains his degree on time"); *Montague v. Yale Univ.*, No. 3:16-cv-885 (AVC), 2017 WL 4942772, at *3–4 (D. Conn. Mar. 8, 2017) (holding that, where student could achieve reinstatement to school after expulsion, case was "analogous to suspension which can be remedied through monetary compensation"). Unlike typical college students, Plaintiff has no other opportunities to complete his education in a campus-like environment, except for participation in the CPE Program. Plaintiff cannot attend another university or take additional courses. Nor does Plaintiff's removal from the learning environment of the CPE Program constitute a mere interruption to his studies that may be taken up again later, given his transfer away from Cheshire CI.

Accordingly, for these reasons, the Court finds that Plaintiff has demonstrated irreparable harm resulting from his removal from the CPE Program.[3]

### C.      Balance of Equities and the Public Interest

Next, the Court must examine whether the balance of hardship tips in Plaintiff's favor and to what extent, and if the public interest would be disserved by issuance of the injunction. The Court finds that Plaintiff has established that the balance of the equities tips slightly in his favor with respect to his removal from the CPE Program. Thus, while the Court finds Plaintiff is legally entitled to a preliminary injunction based on Plaintiff's allegedly unlawful removal from the CPE Program, the Court cannot say the same of his request for preliminary injunctive relief based on his allegedly retaliatory transfer.[4]

---

[3] The Court notes that, to the extent Plaintiff seeks reinstatement into his job as a graphic designer at Cheshire CI, through which he earned significantly more money than he does in his current position as a cart server at MacDougall-Walker CI, monetary damages would be readily calculable if he were to succeed at trial. Therefore, he has not established irreparable harm as to his request to be transferred back to Cheshire CI into his former role as a graphic designer. Plaintiff's retaliatory transfer claim also fails for the additional reason described below: that he cannot show the balance of equities tips decidedly in his favor on this issue.

[4] As the Court explained above, where a plaintiff has established that he is likely to succeed on the merits of his claim, he need only establish that the public interest and the balance of equities tips in his favor. However, where a plaintiff has only established that sufficiently serious questions go to the merits and make them a fair ground for litigation, the

"Where the Government[5] is the opposing party, the final two factors in the [preliminary injunction] analysis—the balance of the equities and the public interest—merge." *Coronel v. Decker*, 449 F. Supp. 3d 274, 287 (S.D.N.Y. 2020) (citing *Planned Parenthood of N.Y.C., Inc. v. U.S. Dep't of Health & Human Servs.*, 337 F. Supp. 3d 308, 343 (S.D.N.Y. 2018)); *see also New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42, 58–59 (2d Cir. 2020) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009); *California v. Azar*, 911 F.3d 558, 575 (9th Cir. 2018)), *cert. granted*, --- U.S. ---, 141 S. Ct. 1370, 209 L. Ed. 2d 118 (2021).

As an initial matter, concerning Plaintiff's alleged constitutional injuries, "the public interest is best served by ensuring the constitutional rights of persons within the United States are upheld." *Coronel*, 449 F. Supp. 3d at 287 (quoting *Sajous v. Decker*, No. 18-CV-2447 (AJN), 2018 WL 2357266, at *13 (S.D.N.Y. May 23, 2018)); *see also Doe v. Univ. of Conn.*, No. 3:20cv92 (MPS), 2020 WL 406356, at *6 (D. Conn. Jan. 23, 2020) (noting the "public interest in avoiding violations of constitutional rights"). This is especially true where the plaintiff has established a clear likelihood of success on the merits. *See Paykina ex rel. E.L. v. Lewin*, 387 F. Supp. 3d 225, 245 (N.D.N.Y. 2019). As the Court has explained at length in both this order and its order on Defendants' motions to dismiss, Plaintiff has established a strong likelihood of success on the merits of his claim that he was removed from the CPE Program in retaliation for exercising his constitutional rights, and the case law is clear that the public interest is best served by vindicating and protecting those rights.

---

balance of the equities must tip decidedly in the plaintiff's favor. *See Benihana, Inc.*, 784 F.3d at 895 (citation omitted).

[5] The Court recognizes that the DOC Defendants are individuals, not the "Government" writ large. However, they are sued for preliminary injunctive relief in their official capacity, which renders this motion one effectively brought against the state. *See Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985) (recognizing that official-capacity suits are treated, "in all respects other than name," as suits against the governmental entity). Courts merge the balance of the equities and public interest factors in suits against government employees sued in their official capacity. *See, e.g.*, *Hernandez Aguilar v. Decker*, 482 F. Supp. 3d 139, 150 (S.D.N.Y. 2020); *Martinez-Brooks v. Easter*, 459 F. Supp. 3d 411, 448 (D. Conn. 2020).

On the other hand, the DOC Defendants have an important interest in maintaining "institutional order and security" and the proper "allocation of prison resources," *O'Lone v. Est. of Shabazz*, 482 U.S. 342, 350, 352 (1987), which includes the authority to transfer prisoners for the purpose of maintaining prison safety. "Courts must preserve prison officials' freedom to take appropriate action to ensure the safety of inmates and corrections personnel." *Proctor v. LeClaire*, 846 F.3d 597, 610 (2d Cir. 2017) (cleaned up) (quoting *Bell v. Wolfish*, 441 U.S. 520, 547 (1979)). "[T]he problems that arise in the day-to-day operation of a corrections facility are not susceptible of easy solutions. Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell*, 441 U.S. at 547 (citations omitted). In particular, the "decision where to house inmates is at the core of prison administrators' expertise." *McKune v. Lile*, 536 U.S. 24, 26 (2002) (citing *Meachum v. Fano*, 427 U.S. 215, 225 (1976)).

The Court recognizes that granting Plaintiff's request for preliminary injunctive relief would require the DOC Defendants to transfer him back to Cheshire CI so that he can participate in the on-campus learning environment of the CPE Program. This would require a return transfer to Cheshire CI even if Plaintiff ultimately does not establish that Defendants transferred him from Cheshire CI in retaliation for First Amendment protected activity. The Court admits it is no simple task to weigh the interests of the public and Plaintiff in safeguarding the exercise of constitutional rights with the peculiar needs of a prison and the federalism concerns raised by issuing injunctive relief directed at state prison officials. Prisons, and those who live and work in them, must be kept safe, and the courts have long recognized that prison officials must be afforded great latitude in transferring inmates to the extent prison population management impinges on prison security and

safety.  *See Meachum*, 427 U.S. at 225.  The Court must weigh carefully the scope of Plaintiff's requested relief as against the needs of the prison environment.  *See Reynolds v. Quiros*, 25 F.4th 72, 83 (2d Cir. 2022).  If Plaintiff's theory is correct that his transfer was retaliatory and that the letter that was distributed to his fellow inmates actually posed little to no prison safety risk, then the Court's task would be simple:  the public has a strong interest in the vindication of constitutional rights, and the DOC Defendants would have little to no justification in opposing Plaintiff's transfer.  If, however, the DOC Defendants' theory is correct that Plaintiff's transfer was motivated by a safety risk, then the public interest and the balance of the equities would likely fall in the DOC Defendants' favor.

The difficulty presented by the Court's task is alleviated, somewhat, however, by the procedural posture and the record developed to date.  When a plaintiff has demonstrated a likelihood of success, the law is clear that he need only demonstrate that the balance of the equities tips in his favor and the public interest would not be disserved by issuance of the injunctive relief.  Plaintiff has clearly demonstrated a constitutional violation based on his removal from the CPE Program.  That Plaintiff has also identified serious collateral injuries stemming from his constitutional injuries—specifically, his ability to prepare a commutation package—that implicates his general liberty interests.  As to Plaintiff's claim of being removed from the CPE Program in retaliation for exercise of his constitutional rights, then, the Court finds that the balance of the equities tips slightly in Plaintiff's favor and the public interest is not disserved by the prospect of issuance of injunctive relief requiring that Plaintiff be fully reinstated to the CPE Program.  The Court does not make this finding lightly.  Only in serious, emergent circumstances should a federal court wade into the day-to-day operations of prison administration.  Federalism

and comity concerns command this respect.  However, it is the Court's duty to vindicate constitutional rights and to fashion appropriate equitable relief when and where appropriate.

As to his claim of retaliatory transfer, however, the calculus is different.  The Court cannot conclude that the balance of equities tips *decidedly* in Plaintiff's favor on this issue, as is required. *See Benihana, Inc.*, 784 F.3d at 895.  As noted above, prison administrators are faced with the difficult task of determining when and how to transfer an inmate for the safety of the prison environment.  In view of the understandable deference afforded to prison authorities in this realm, the Court is hard-pressed to find that the equities so heavily favor Plaintiff.

D.    <u>Affording Defendants an Opportunity to Rectify the Injury</u>

While the Court has found that Plaintiff has established the requisite elements for preliminary injunctive relief related to his claim of retaliatory removal from the CPE Program, the Court exercises its discretion in declining to issue Plaintiff's requested relief at this juncture because the Court believes it appropriate to first afford the DOC Defendants the opportunity to remedy the constitutional injury described herein.

"[I]ntrusive and far-reaching federal judicial intervention in the details of prison management is justifiable only where state officials have been afforded the opportunity to correct constitutional infirmities and have abdicated their responsibility to do so." *Taylor v. Freeman*, 34 F.3d 266, 269 (4th Cir. 1994); *accord Clark v. Quiros*, 693 F. Supp. 3d 254, 297 (D. Conn. 2023) (citing *Taylor*, 34 F.3d at 268).  Indeed, "[r]unning a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government." *Turner v. Safley*, 482 U.S. 78, 84–85 (1987).  For that reason, "[p]rison administration . . . has been committed to the responsibility of those branches, and separation of powers concerns counsel a policy of judicial

restraint.  Where a state penal system is involved, federal courts have . . . additional reason to accord deference to the appropriate prison authorities." *Id.* at 85 (citation omitted).

A federal court must strike a delicate balance when fashioning appropriate injunctive relief in the arena of prison administration.  The Supreme Court has cautioned that even when a court has found that a prison official has committed a constitutional violation, the court "may, for example, exercise its discretion if appropriate by giving prison officials time to rectify the situation before issuing an injunction." *Farmer v. Brennan*, 511 U.S. 825, 846–47 (1994); *accord Dockery v. Cain*, 7 F.4th 375, 379 (5th Cir. 2021); *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 219 (D.D.C. 2020); *Kosilek v. Maloney*, 221 F. Supp. 2d 156, 193 (D. Mass. 2002).  The discretion to delay fashioning injunctive relief preserves the important interests served by our federal system.  The Court preserves its interest in vindicating constitutional rights and ensuring injuries stemming from those violations are appropriately remedied.  Exercising such discretion also preserves the prison officials' interest in maintaining primary control over the safety and security of those who live and work in prisons.  Thus, in striking the proper balance between these two interests, the Court finds it appropriate to exercise its discretion to give DOC officials the opportunity to remedy Plaintiff's constitutional injury before the Court exercises its own equitable authority to order such relief.

The DOC Defendants should be afforded the opportunity to remedy the constitutional injury inflicted on Plaintiff by virtue of his inability to complete his education as part of an in-person, campus-like environment at Cheshire CI.  The Court will not enmesh itself in the day-to-day operations of the prison.  However, the Court also cannot abide constitutional violations.  Accordingly, the Court follows Supreme Court guidance suggesting that the DOC Defendants should be allowed an opportunity to rectify the constitutional violation before issuance of an injunctive order that could upset the careful balance between the federal judiciary and the state

prison system.   While the DOC and Wesleyan Defendants have already offered Plaintiff the opportunity to participate in the CPE Program by mail, this offer was made without the Court's finding that Plaintiff must be placed in his position status quo *ante*.   With the benefit of the insights provided by this order and the Court's order on Defendants' motions to dismiss, the DOC Defendants are hereby afforded a second opportunity to rectify Plaintiff's constitutional injury. Plaintiff must be placed back into his position into the CPE Program status quo *ante*.[6]   If the DOC Defendants do so, they will be afforded the freedom to manage their prisons without undue federal interference.

Thus, the Court, ultimately, denies without prejudice Plaintiff's request for preliminary injunctive relief.

## V.   CONCLUSION

For the reasons described herein, Plaintiff's renewed motion for preliminary injunctive relief is DENIED without prejudice.   By August 27, 2024, the parties shall file a joint status report with the Court documenting Defendants' efforts at placing Plaintiff back to the status quo *ante*— full participation in the on-campus, in-person learning environment offered by the CPE Program— pending final resolution of this matter.   Plaintiff may renew his motion for preliminary injunctive relief should the DOC Defendants fail to satisfactorily remedy the constitutional injuries described herein.

---

[6] For purposes of clarity, the Court has not found that Plaintiff must be returned to the Honor Block at Cheshire CI or to his position as a graphic designer there.   Rather, it finds that Plaintiff was unlawfully deprived of the opportunity to fully participate in the CPE Program and should be restored to that specific opportunity.   It leaves to the DOC Defendants the logistics of implementing that restoration.

**SO ORDERED** at Hartford, Connecticut, this 13th day of August, 2024.

_/s/ Sarala V. Nagala_
SARALA V. NAGALA
UNITED STATES DISTRICT JUDGE