# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ALPHONSO WHIPPER, | ) | 3:23-CV-27 (SVN) |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| GREEN et al, | ) | |
| *Defendants*. | ) | December 9, 2025 |

## RULING AND ORDER ON PLAINTIFF'S AND DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Sarala V. Nagala, United States District Judge.

Incarcerated Plaintiff Alphonso Whipper was a participant in the Wesleyan University Center for Prison Education ("CPE" or "CPE Program") at Cheshire Correctional Institution ("Cheshire") when on September 8, 2022, one half-credit short of getting his Wesleyan degree, he was asked to sign a form reiterating existing CPE Program rules (the "Form") to continue participating in the CPE Program. He refused to sign the Form, which triggered a series of allegedly retaliatory actions by Department of Correction ("DOC") officials and other inmates, culminating in Plaintiff's removal from the CPE Program and transfer to MacDougall-Walker Correctional Institution ("MacDougall"), where he is currently incarcerated.

Plaintiff has live claims against eight DOC employees: Defendants Correctional Officer Kenneth Green, Counselor Supervisor Mercilla Roach, Counselor Supervisor Melissa Santiago, Reentry Director and Counselor Supervisor Elisha Chornobry, Deputy Warden Carlos Nunez, Counselor Supervisor Scott Lang, Director of Population Management David Snyder, and State School Department Head Daniel Cambra (collectively, "Defendants"). His second amended complaint alleges two claims arising under 42 U.S.C. § 1983: Count One, which alleges retaliation for exercise of his First Amendment rights through both removal from the CPE Program and

transfer from Cheshire to MacDougall; and Count Two, which alleges conspiracy to retaliate for the exercise of his First Amendment rights. Plaintiff seeks partial summary judgment on the portion of Count One alleging retaliatory removal from the CPE Program. Pl.'s Mot. for Summ. J., ECF No. 259. Defendants oppose this motion and have filed a cross-motion for summary judgment as to both counts, which Plaintiff in turn opposes. Defs.' Mot. for Summ. J., ECF No. 260.

For the reasons set forth herein, Plaintiff's partial motion for summary judgment against Defendants is DENIED. Defendants' motion for summary judgment is GRANTED in part with respect to Plaintiff's retaliation via removal from the CPE Program claim in Count One and conspiracy claim in Count Two, and DENIED in part with respect to Plaintiff's retaliation via transfer claim in Count One.

## I.    FACTUAL BACKGROUND

The following facts, drawn from the parties' Local Rule 56 statements, are undisputed except as otherwise noted.[1]

The Court assumes the parties' familiarity with both the CPE Program and the Honor Block, given the Court's prior rulings in this case. *See generally Whipper v. Green*, No. 23-CV-27 (SVN), 2024 WL 3252333 (D. Conn. July 1, 2024) (order denying motions to dismiss) ("MTD Ruling"); *id.*, 2024 WL 3771786 (D. Conn. Aug. 13, 2024) (order on renewed motion for preliminary injunction) ("PI Ruling").

---

[1] The Court notes that Defendants did not file a Rule 56(a)2 statement with their opposition to Plaintiff's partial motion for summary judgment, as required under the Local Rules. *See* D. Conn. L. R. 56. As such, the Court will treat the facts in Plaintiff's Rule 56(a)1 statement as undisputed.

A.  <u>Plaintiff's Removal from the CPE Program</u>

Plaintiff was housed at Cheshire at various periods of time, including from July 2012 through November 2018, and from February 5, 2019, to April 24, 2023.  Pl.'s L.R. 56(a)2 St., ECF No. 263-1 ¶ 1; Pl.'s Location Log, Defs.' Ex. 1, ECF No. 260-3 at 1.  Since 2013, Plaintiff had been a student in the CPE Program; as of September 8, 2022, he needed only one-half credit to graduate with a degree from Wesleyan University.  Pl.'s L.R. 56(a)1 St., ECF No. 259-2 ¶¶ 2–3.

Defendants contend that prior to the fall semester in 2022, there had been "disruptions" and "unauthorized movement" of CPE Program students.  Defs.' L.R. 56(a)1 St., ECF No. 260-2 ¶¶ 2–5; *see also* Santiago Decl., Defs.' Ex. 8, ECF No. 260-10 at 1–2; Hanley Decl., Defs.' Ex. 2, ECF No. 260-4 at 1–3.  For example, according to Defendants, during the CPE Program 2022 summer session there was "various noncompliance with DOC rules," that included "unauthorized movement of students, loud and disruptive behaviors within the classroom, and other incidents of non-compliance."  ECF No. 260-10 at 1.  Plaintiff contests the foundational sufficiency of these allegations.  ECF No. 263-1 ¶ 2.  But as a result, newly appointed Defendant Counselor Supervisor Mercilla Roach created a new document for CPE Program participants to sign—the Form—which reiterated certain rules that Cheshire inmates were already independently required to follow.  ECF No. 259-2 ¶¶ 4–6.

On September 8, 2022, the CPE Program students gathered for a meeting ahead of the fall semester, at which a draft of the Form was presented and distributed to the students.  ECF No. 260-2 ¶ 6; Form Version 1, Defs.' Ex. 3, ECF No. 260-5 at 1.  The first version of the Form included eleven behavior-related rules pertaining to student movement, dress, classroom disruption, and bathroom use.  ECF No. 260-5 at 1.  These rules mirrored some of those found in the Cheshire Correctional Institution Inmate Handbook.  Cheshire Handbook, Defs.' Ex. 10, ECF No. 260-12 at 1–66.  Even though CPE Program participants were already required to follow all

the rules in the Form, Roach thought that requiring participants to sign the Form would be a helpful reminder of the rules.  ECF No. 259-2 ¶ 7.

The Form included a space for CPE Program students to sign their names and provide their inmate numbers.  ECF No. 260-5 at 1.  Defendants characterized the new document as a form acknowledging the rules; Plaintiff contests this characterization, arguing that it was in fact a waiver or agreement implicating the CPE Program participants' rights.  ECF No. 263-1 ¶ 7.  At various times, Roach described the Form as both an agreement and a waiver.  ECF No. 259-2 ¶ 5.

At the September 8, 2022, meeting, many CPE Program participants, including Plaintiff, refused to sign the Form.  ECF No. 263-1 ¶¶ 8, 10.  Following the students' refusal to sign the Form, the CPE Program was put on hold.  *Id.* ¶ 9.  On September 8 and over the following weeks, Plaintiff explained to Roach, Defendant Nunez, and others that he "did not see the purpose of a requirement that inmate-students sign a form to signify their agreement to follow the already-required Cheshire rules," and did not understand why he was being required to sign a "waiver" when he did not understand what he was waiving.  ECF No. 259-2 ¶ 11.

The Form went through two other iterations, with the second iteration adding the Cheshire letterhead, and the third and final iteration adding a twelfth rule related to when CPE Program participants could sign up for study hall and restricting their movement while in study hall.  ECF No. 260-5 at 2–3.  Plaintiff still refused to sign the Form, and as a result he was removed from the CPE Program on September 21, 2022, along with the other remaining seven inmates who had also refused to sign it.  ECF No. 259-2 ¶ 13; ECF No. 260-2 ¶ 11.

Following Plaintiff's removal from the CPE Program, he continued to assert his right to refuse to sign the Form and protest his expulsion—which Plaintiff alleges Roach was aware of—through the commencement of both internal grievance procedures, which were denied in

December 2022, and the filing of this lawsuit on January 9, 2023.  Pl's Add. Mat. Facts, ECF No. 263-1 ¶ 3–4.

B.  <u>Transfer from Cheshire to MacDougall</u>

On April 6, 2023, Roach became aware of a document allegedly written by Plaintiff concerning, among other topics, the Honor Block.  ECF No. 263-1 ¶ 12.  Defendants contend that the document had been circulated around to the inmates, while Plaintiff contests this allegation, stating that Roach was not aware of the circulation of the document until after she wrote an incident report about the matter six days later.  *Id.*; Roach Dep. Tr., Ex. E, ECF No. 263-7, at 27–30.

In that incident report, Roach stated that inmate Daniel Smith made her aware of a document that contained derogatory allegations against herself and other inmates.  Roach Rep., Pl.'s Ex. M, ECF No. 263-15 at 2.  Roach testified at her deposition that Smith did not provide her a copy of the document when he reported it to her.  ECF No. 263-7 at 15–17, 19; Pl.'s Add'l Mat. Facts, ECF No. 263-1 ¶ 5.  According to her incident report, Roach nonetheless proceeded to visit Defendant Lang in the shop where Plaintiff worked, and presented Lang with a copy of the document.  ECF No. 263-15 at 2.  Roach requested that Lang search Plaintiff's work computer to determine whether there was a copy of the document there.  ECF No. 263-1 ¶ 13.  On April 7, 2023, a document discussing multiple inmates was found on Plaintiff's shop computer.  *Id.* ¶ 14.

There are two versions of this document, one that was found on Plaintiff's work computer (hereafter, "Work Computer Version"), *see* Pl.'s Ex. O, ECF No. 263-17 at 33–42, and another physical copy that Plaintiff had in his possession in his cell (hereafter "Cell Version"), Pl.'s Ex. O, ECF No. 263-17 at 43–52.  Both versions are in the form of letters addressed to Roach.

The two documents differ in certain respects.  First, the Work Computer Version discusses the CPE Program, while the Cell Version does not.  *Compare* ECF No. 263-17 at 33 (Work Computer Version stating:  "[w]hen you came into the auditorium to respond to the student

backlash against the 'waiver,' I was actively resisting the destruction of our rights - *can you see that now? . . .* That document was imposing upon CPE students a narrative of *having to be reined-*in, when all that we had done was what we were allowed to do.") *with id.* at 43–52.   Next, the Work Computer Version bears a header at the top of each page listing March 2, 2023, as the last edited date for the document, whereas the Cell Version does not contain a header.   ECF No. 263-17 at 33–42.   Finally, while both Versions have separate paragraphs about several inmates who were originally involved in the Honor Board, the Work Computer Version contains more accusations against these inmates, such as accusing one of being "all con artist - NOT A MAN OF SUBSTANCE."   *Id.* at 37.   And, importantly, the Work Computer Version contains a more inflammatory description of inmate Smith, who is described as "an influential gang member."   *Id.* at 39.

Following discovery of the Work Computer Version on Plaintiff's shop computer, Plaintiff was issued a disciplinary report and sent to segregation for misuse of his work computer.   ECF No. 263-1 ¶ 13–16.   As part of the disciplinary hearing process, Plaintiff alleged that he was not the author of the Work Computer Version of the letter with the additional inflammatory language, and that it was "apparent to [him] that i/m [Ian] Cooke is who is behind going onto [his] computer," removing and editing the document, and "dispersing it to sabotage [Plaintiff]."   Pl.'s Inmate Interview St., Pl.'s Ex. O, ECF No. 263-17 at 16.   Despite his reports of tampering, Plaintiff disputes that a proper investigation was ever conducted as to whether the document on his work computer was his, or if someone with access to his computer had edited the document to diverge from the physical copy he had in his cell.   ECF No. 263-1 ¶ 16.

Following a review, Plaintiff was found not guilty of the violation alleged in the disciplinary report.   ECF No. 263-1 ¶ 19.   Plaintiff contends that, nonetheless, he was required to

serve the "maximum amount of time that a prisoner could serve if found guilty," before he was eventually granted a hearing, at which the charge was dismissed.  May 23, 2024, P.I. Hearing Tr., Defs.' Ex. 4, ECF No. 260-6 at 43.

On April 19, 2023, Roach submitted a separation profile request for inmates Smith, Cooke, and Plaintiff, requesting that they be separated because of a "10 page document written by Inmate Whipper," which was submitted with the separation request.[2]  Separation Profile Request, Pl.'s Ex. O, ECF No. 263-17 at 30.  While the report makes reference to only one document, Roach appears to have submitted both the "document written by [Plaintiff]," and the Cell Version with the separation profile request.  *Id.* at 30, 33–52.  Plaintiff contests that the document, in either form, was the reason for the separation request.  ECF No. 263-1 ¶ 20.  Deputy Warden Nunez approved the separation request in the "unit administrator review and recommendation section." ECF No. 263-17 at 30.  After reviewing the materials, the Population Management unit, through Snyder, officially approved the request and implemented a separation profile between Whipper and Smith and Cooke.  ECF No. 263-1 ¶ 21.  Plaintiff was transferred out of Cheshire to MacDougall on April 25, 2023, and has remained there since.  ECF No. 260-3 at 1.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides, in relevant part, that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and

---

[2] While Roach's report references a single ten-page document, it appears that both the Work Computer Version and the Cell Version were included in the separation profile request that Defendant Roach compiled.  *See* ECF No. 263-17 at 33–42 (Work Computer Version); *id* at 43–52 (Cell Version); *see also* Snyder Tr., Pl.'s Ex. U, ECF No. 263-23 at 13 (discussing that Plaintiff's Exhibit O submitted for summary judgment is the profile incident report package Defendant Snyder received); 25–26 (in discussing the separation profile request, "There were two letters, then, right, not one? . . . there [are] two that are similar letters, yes.").  As both documents are ten pages, it is not clear which version Roach was referring to in the separation request, nor how the Cell Version came into her possession.  An incident report prepared by a non-party lieutenant states that, when Whipper was sent to segregation, "[a] paper copy of a similar, but more formatted draft of this 10-page letter was obtained from the North blocks, which may be the same which [inmate] Whipper wrote in his statement forms would be in his property and on his work computer."  *See* ECF No. 263-17 at 7.

the movant is entitled to judgment as a matter of law." A disputed fact is material only where the determination of the fact might affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). With respect to genuineness, "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden of establishing there is no genuine issue of material fact in dispute will be satisfied if the movant can point to an absence of evidence to support an essential element of the non-moving party's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The movant bears an initial burden of "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323. A movant, however, "need not prove a negative when it moves for summary judgment on an issue that the [non-movant] must prove at trial. It need only point to an absence of proof on [the non-movant's] part, and, at that point, [the non-movant] must 'designate specific facts showing that there is a genuine issue for trial.'" *Parker v. Sony Pictures Ent., Inc.*, 260 F.3d 100, 111 (2d Cir. 2001) (quoting *Celotex Corp.*, 477 U.S. at 324). The non-moving party, in order to defeat summary judgment, must come forward with evidence that would be sufficient to support a jury verdict in his or her favor. *Anderson*, 477 U.S. at 249. If the non-movant fails "to make a sufficient showing on an essential element of [their] case with respect to which [they have] the burden of proof," then the movant will be entitled to judgment as a matter of law. *Celotex Corp.*, 477 U.S. at 323.

In considering a motion for summary judgment, a court "must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Kee v. City of New York*, 12 F.4th 150, 158 (2d Cir. 2021) (citation and internal quotation marks omitted). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991).

## III.    COUNT ONE:  FIRST AMENDMENT RETALIATION

Count One of Plaintiff's operative complaint alleges two theories of First Amendment retaliation. First, Plaintiff alleges that he was retaliated against through his removal from the CPE Program for refusal to sign the Form that was presented to CPE Program students ahead of the fall 2022 semester. *See* Second Am. Compl., ECF No. 183 ¶ 107. Second, Plaintiff alleges that he was retaliated against by his transfer to MacDougall for continuing to protest his removal from the CPE Program through his use of the administrative remedy procedures and the filing of this lawsuit. *See id.* ¶ 108. For the reasons below, the Court denies Plaintiff's motion for summary judgment on the portion of Count One related to his removal from the CPE Program and finds there are genuine issues of material fact as to the portion of Count One related to his transfer to MacDougall. Thus, Plaintiff's partial motion for summary judgment is denied and Defendants' motion for summary judgment is granted in part and denied in part as to Count One.

Section 1983 creates a private cause of action against any person who, acting under color of state law, deprives an individual of his federally protected rights. *Rehberg v. Paulk*, 566 U.S. 356, 361 (2012). A section 1983 claim contains two elements:  "(1) the conduct complained of was committed by a person acting under color of state law; and (2) this conduct deprived a person of rights, privileges or immunities secured by the Constitution or laws of the United States."

*Greenwich Citizens Comm., Inc. v. Cntys. of Warren & Washington Indus. Dev. Agency*, 77 F.3d 26, 29–30 (2d Cir. 1996) (cleaned up) (quoting *Parratt v. Taylor*, 451 U.S. 527, 535 (1981)).  As the Court has previously found, Defendants do not dispute that they acted under the color of state law.  *See* MTD Ruling at *5.  Nor have they argued otherwise in their summary judgment papers.  Thus, the Court proceeds directly to the merits of Plaintiff's First Amendment retaliation claim.

To establish a First Amendment retaliation claim, a plaintiff must demonstrate:  "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action."  *Brandon v. Kinter*, 938 F.3d 21, 40 (2d Cir. 2019) (quoting *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004)).  The Second Circuit has "instructed district courts to 'approach prisoner retaliation claims with skepticism and particular care, because virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act.'"  *Dolan v. Connolly*, 794 F.3d 290, 295 (2d Cir. 2015) (quoting *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003)).

A.  Removal from the CPE Program

First, the Court concludes that Defendants are entitled to summary judgment on Plaintiff's First Amendment retaliation claim with respect to his removal from the CPE Program because the policy of requiring CPE Program participants to sign the Form reiterating existing applicable rules before being able to participate in the CPE Program was rationally related to the legitimate penological interest of safety and order.

The Court has analyzed this issue before—in the context of a motion to dismiss and most recently in the context of a preliminary injunction ruling—and previously determined that Plaintiff had sufficiently alleged a claim of retaliation by removal from the CPE Program at the motion to

dismiss stage, and had demonstrated a likelihood of success on the merits in his motion for a preliminary injunction. *See* MTD Ruling at *5–13; PI Ruling at *12–14. Having now reviewed the full record before the Court on summary judgment, however, the Court finds that while Plaintiff possesses a First Amendment right to refuse to sign the Form because it is protected expressive conduct, Defendants have sufficiently demonstrated a legitimate penological interest in safety and order that is rationally related to the requirement that students sign the Form. Thus, Defendants did not violate Plaintiff's First Amendment rights in removing him from the CPE Program because he refused to sign the Form.

Before advancing to the analysis, the Court addresses when the Form was introduced into the record. At oral argument, the Court expressed its belief that, at the time of the preliminary injunction hearing, the Form (the final and proposed versions) were not in the record. *See* Summ. J. Hr'g Tr., ECF No. 285 at 3–4. The content of the Form was also not directly analyzed in the Court's ruling on Plaintiff's renewed preliminary injunction request. Upon further review, the Court now recognizes that all versions of the Form were introduced as part of the evidentiary record in the preliminary injunction hearing. *See* Marked Ex. and Witness List for P.I. Hr'g, ECF No. 147 at 2. Despite this development, the Court's prior analyses of whether Plaintiff exercised protected activity when he refused to sign the Form in its motion to dismiss and renewed preliminary injunction rulings are not disturbed, for the reasons explained below. But additional evidence that is now part of the record precludes Plaintiff's First Amendment claim with respect to removal of the CPE Program. With this clarification, the Court proceeds to analyze Plaintiff's claims.

### 1. *The Right to Refuse to Sign*

First, the Court adheres to its previous finding that Plaintiff's refusal to sign the Form constituted protected expressive conduct under the First Amendment.

"While an individual is not stripped of all constitutional rights upon incarceration, an inmate's constitutional liberties are necessarily limited." *Burns v. Martuscello*, 890 F.3d 77, 86 (2d Cir. 2018). Thus, courts must "balance competing principles" to determine the burdens that can be placed on an inmate's constitutional rights. *Reynolds v. Quiros*, 25 F.4th 72, 83 (2d Cir. 2022). "A prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Burns*, 890 F.3d at 86 (internal citation omitted). This is a two-part inquiry. The Court must first consider whether Plaintiff had the right, even without consideration of his status as a prisoner, to refuse to sign the Form. *See id.* at 84–86 (addressing the scope of protected speech outside of the prison context). Second, the Court must consider whether a prison regulation may nevertheless impinge on a right that would otherwise be protected by the First Amendment because the regulation is "reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987); *see also Burns*, 890 F.3d at 86–87 (analyzing and applying *Turner* in a First Amendment retaliation case).

To start, Plaintiff's refusal to sign the Form—regardless of whether it substantively operated as a waiver or a compilation of existing rules—is constitutionally protected First Amendment expressive action. Previously, this Court found that Plaintiff had satisfied the first prong of the *Burns* analysis, because his "conduct was expressive and would have fallen within the ambit of First Amendment protection if engaged in by a non-incarcerated person." MTD Ruling at *5, 8. Although the Court could revisit this holding because application of the law of the case doctrine is discretionary, *see In re Crysen/Montenay Energy Co.*, 226 F.3d 160, 165 n.5 (2d Cir. 2000), it adheres to its prior holding.

Defendants contend that because the record reflects that the Form Plaintiff refused to sign did not waive any of his rights, Plaintiff's "expressive conduct of refusing his signature, becomes more of a disagreement with the existing rules themselves or their application to him as a student-inmate." ECF No. 260-1 at 13. This, Defendants argue, takes Plaintiff's expressive conduct from something "akin to a political protest for himself and other inmates," to "personal disagreement with requirement [sic] that he have to sign a list of already existing rules that already apply to the plaintiff." *Id.* Thus, according to Defendants, Plaintiff's refusal to sign the Form "is not a valid expression under the First Amendment warranting protection. *Id.* at 14. The Court disagrees.

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech . . . ." U.S. Const. amend. I. "As a general matter, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Ashcroft v. ACLU*, 535 U.S. 564, 573 (2002) (cleaned up) (quoting *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 65 (1983)). These rights include "both the right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977). As the Second Circuit has explained, "[t]o force a person to speak, and compel participation, is a severe intrusion on the liberty and intellectual privacy of the individual," which "presents a unique affront to personal dignity." *Burns*, 890 F.3d at 84–85 (internal citation omitted). Thus, as between compelled silence and compelled speech, "compelled speech is the more serious incursion on the First Amendment." *Id.* at 85 (citing *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 633 (1943)).

Expressive or symbolic conduct is protected speech under the First Amendment so long as the expressive conduct is "sufficiently imbued with elements of communication." *Spence v. Washington,* 418 U.S. 405, 409 (1974) (*per curiam*); *see also Virginia v. Black*, 538 U.S. 343, 358

(2003) (collecting cases). Yet courts "cannot accept the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea." *United States v. O'Brien*, 391 U.S. 367, 376 (1968). Whether conduct is sufficiently expressive to implicate the First Amendment depends on whether "[a]n intent to convey a particularized message was present, and [whether] the likelihood was great that the message would be understood by those who viewed it." *Texas v. Johnson*, 491 U.S. 397, 404 (1989) (alterations in original) (quoting *Spence*, 418 U.S. at 410–11). While the expression of a political point of view is a touchstone of the First Amendment, "[a]t the heart of the First Amendment lies the principle that each person should decide for himself or herself the ideas and beliefs deserving of expression, consideration, and adherence. Our political system and cultural life rest upon this ideal." *Turner Brod. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 641 (1994).

Defendants do not contest that refusal to sign a document can be protected First Amendment speech—or even that Plaintiff's refusal to sign was expressive conduct. They only contest that Plaintiff's refusal to sign *in this context* was protected expressive conduct. *See* ECF No. 260-1 at 13 ("[without a waiver of rights] plaintiff's expressive conduct of refusing his signature becomes more of a disagreement with the existing rules"). Defendants' argument, however, misses the crux of the issue—the inquiry into whether expressive conduct is protected speech does not turn on the function or content of the document the conduct is in reaction to, but on whether an "intent to convey a particularized message was present, and [whether] the likelihood was great that the message would be understood by those who viewed it." *Texas*, 491 U.S. at 404.

Plaintiff's intent to convey a message here was clear—his signature "is something [he] possess[es]," and to affix it to a document that he believed was "not a legitimate document . . . not connected to any administrative directive," and "had no authorization from any administrative

authority," was "a problem for [him]." Whipper Dep. Tr., Pl.'s Ex. A, ECF No. 263-3 at 6, 8. In refusing to sign the Form, Plaintiff acted with a clear intent to convey the message that he believed this new Form was unauthorized and redundant, and infantilized the CPE Program participants who were already bound by those rules; thus, he could not affix his endorsement, by way of his signature, to the Form. This intent was made clear to Defendants not just by Plaintiff's refusal to sign, but by his one-on-one conversations with Roach and Nunez where he discussed his concerns about the Form. *See* ECF No. 260-6 at 19–21, 23–24.

Further, Plaintiff's concerns about the Form—and his objection to it—was a matter of public concern for the CPE students. The other CPE Program participants were also already bound by the rules and faced the same consequences if they did not sign the Form. That numerous other students initially refused to sign the Form as well demonstrates that its signature requirement was a matter of common concern. ECF No. 263-1 ¶ 8. Moreover, as inmate Cooke testified, Plaintiff urged "some other students not to sign because they felt that they had more power that way as a collective." Cooke Dep. Tr., Pl.'s Ex. H, ECF No. 263-10 at 18. These discussions about collective power and a need to challenge a policy that impacted a group of inmates clearly shows the Form was a matter of public concern among the inmates. Thus, Plaintiff's refusal to sign qualifies as protected speech: he not only intended to convey a specific message—a principled objection to the need to sign a form containing rules that inmates were already required to follow—but that message was also clearly conveyed to Defendants.

Defendants attempt to argue that because the Form waived no rights, Plaintiff's refusal to sign is transformed from a message rooted in a matter of public concern for the CPE Program inmates to a private objection to the prison rules themselves. *See* ECF No. 260-1 at 13–14. True enough, the DOC's Form does not appear to waive any of Plaintiff's rights, in any of its variations;

it only reiterates the existing rules by which all CPE Program participants must abide.  *See generally* ECF No. 260-5 at 1–3.  But Plaintiff's mistaken assessment of whether the form constituted a waiver of any rights is immaterial.  *See Whitfield v. Spiller*, 76 F.4th 698, 709 (7th Cir. 2023) ("[W]e do not live in a country in which the only speech that is protected is speech that a Board of Censors deems true and accurate").  The record is clear that Plaintiff's refusal to sign was an intentional message based on a sincerely-held belief that the Form served no purpose and possibly even waived his rights in some respect.  The *accuracy* of this sincere belief does not change Plaintiff's intended message.  To use the well-known example, burning an American flag in protest of a policy is expressive conduct because it is intended to convey a *clear* message, not because it intends to convey an *accurate* message about the policy being protested.  Even if discovery has revealed that Plaintiff's message was inaccurate or based on an incorrect understanding, that does not change that Plaintiff's message clearly touched on what he and other inmates understood to be "matters of broad public concern."  *Burns*, 890 F.3d at 90.

Further, despite Defendants' contentions otherwise, it is clear that Plaintiff's message was sincere, and not just a personal objection to following the rules.  Plaintiff understood that, signature or not, he had to abide by the prison rules, and Defendants have not presented evidence suggesting otherwise.  ECF No. 260-6 at 24.  Plaintiff objected to affixing his signature as "a matter of principle," because he took issue with him or other prisoners needing to "sign something to say [they'll] obey [the rules in the agreement]," when they were already required to follow those rules.  *Id.*  In Plaintiff's own words, this was one of those "hills you got to die on."  *Id.*  For these reasons, the Court stands by its prior decisions and reiterates that Plaintiff's refusal to sign was expressive conduct protected by the First Amendment.

### 2. *Valid Penological Interest*

But while Plaintiff's expressive conduct is protected by the First Amendment, Defendants have sufficiently established that the policy of signing the Form to participate in the CPE Program is reasonably related to the valid penological interest of safety and order, to justify burdening Plaintiff's constitutional right. As such, Defendants are entitled to summary judgment on Plaintiff's First Amendment CPE Program removal claim.

The second part of the *Burns* analysis focuses on whether a prison may nonetheless burden an inmate's constitutional right because the policy or action at issue is rationally related to a legitimate penological interest. *See Burns*, 890 F.3d at 86–87. "[T]he Constitution sometimes permits greater restriction of such rights in a prison than it would allow elsewhere." *Beard v. Banks*, 548 U.S. 521, 528 (2006) (plurality op.). As noted above, in the incarceration context, an inmate holds "those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Shakur v. Selsky*, 391 F.3d 106, 113 (2d Cir. 2004) (quoting *Giano v. Senkowski*, 54 F.3d 1050, 1053 (2d Cir. 1995)).

Generally, courts rely on the factors described by the Supreme Court in *Turner* to evaluate whether a generally applicable prison policy or regulation may validly burden an inmate's First Amendment rights. *E.g.*, *Burns*, 890 F.3d at 86–87 (applying the *Turner* framework). The *Turner* factors include: (1) whether the policy or regulation is "reasonably related to legitimate penological interests"; (2) whether "there are alternative means of exercising the right that remain open"; (3) "the impact accommodation of the asserted constitutional right will have on guards and other inmates"; and (4) whether "ready alternatives" in prison policy that would accommodate the right exist, indicating that the policy is "an exaggerated response to [prison officials'] rehabilitation and security concerns." *Turner*, 482 U.S. at 89–91. Where the speech at issue is in response to a

"single incident" rather than a generally applicable policy, courts may still proceed under the *Turner* factors, applying only the relevant factors. *Burns*, 890 F.3d at 87.

Previously, the Court analyzed the *Turner* factors as determining whether Plaintiff "relinquished" or "retained" a constitutional right in the prison context. *See* MTD Ruling at *8. Upon further review of the applicable caselaw, the Court is now of the view that the *Turner* factors function akin to a rational basis test, determining whether, in the prison context, officials can burden Plaintiff's *existing* constitutional right, rather than determining whether Plaintiff loses that right altogether in the face of a legitimate penological interest. *See Reynolds*, 25 F.4th 72 at 83 ("under this deferential standard, '[w]hen a prison regulation impinges on inmates' constitutional rights . . . '" (quoting *Turner*, 482 U.S. at 89)); *Burns*, 890 F.3d at 88 (summarizing previous cases concerning prison mail regulations and noting that a prisoner retains a First Amendment interest in their communications, but "the right is subject to significant limitation in light of countervailing interests within the correctional system"); *Kravitz v. Purcell*, 87 F.4th 111, 119 (2d Cir. 2023) ("[i]n the prison context, alleged violations of the right to free exercise are 'judged under a "reasonableness" test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights.'" (quoting *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349 (1987))); *Jones v. North Carolina Prisoners' Lab. Union*, 433 U.S. 119, 125 (1977) ("the needs of the penal institution impose *limitations* on constitutional rights, including those derived from the First Amendment") (emphasis added). Ultimately, the "governing standard is one of reasonableness," *Shakur*, 391 F.3d at 113 (internal citation omitted) , and "the burden of proof 'is not on the State to prove the validity of prison regulations but on the prisoner to disprove it.'" *Reynolds*, 25 F.4th at 83–84 (quoting *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003)). With this

understanding, the Court proceeds on its analysis of whether Plaintiff's First Amendment right may permissibly be burdened under *Turner*, and concludes that it can be.

First, the Court must take up the issue of whether all, or only some, of the *Turner* factors apply here. In their motion to dismiss Plaintiff's operative complaint, Defendants asserted that the Form was a generally applicable policy to all CPE Program participants, and thus all of the *Turner* factors were applicable. *See* Defs.' Mot. to Dismiss Am. Compl., ECF No. 119-1 at 8 ("plaintiff's conscious decision not to sign the form provided by DOC designed to ensure compliance with safety and security of the facility *by those in an educational program* . . .") (emphasis added). In their summary judgment briefing, Defendants have switched tactics and "now argue[] that the analysis in [*Burns*] is instructive on whether a strict adherence to the *Turner* factors should occur in this matter." ECF No. 260-1 at 15–16. Defendants attempt to characterize Plaintiff's refusal to sign the Form as "a single incident not multiple," and therefore argue that, as in *Burns*, certain of the *Turner* factors—specifically the second and third—are inapplicable. *Id.* at 16. This is incorrect.

First, Defendants misunderstand what was meant by single incident in *Burns*. There, the Court analyzed only certain of the *Turner* factors because the retaliatory prison action at issue—plaintiff's placement in involuntary protective custody after refusing to snitch on other inmates—was a single instance applying only to that inmate, not the result of any generally applicable prison policy. *Burns*, 890 F.3d at 87. In other words, what mattered in *Burns* was whether the alleged retaliation was pursuant to a generally applicable policy, or was a singular incident—not how many times the plaintiff there resisted. Here, the Form is unquestionably a general policy applicable to all CPE Program participants; in fact, its execution was a requirement before *any* inmate could participate in the fall 2022 semester. ECF No. 260-2 ¶ 9. Defendants' argument that Plaintiff's

refusal to sign the Form is properly considered one incident because his decision not to sign only carried a consequence one time, then, is irrelevant to deciding whether to apply all or some of the *Turner* factors.[3]   Because the Form is a generally applicable policy to all CPE Program participants, the Court proceeds as before, and analyzes whether the prison could properly burden Plaintiff's First Amendment right to expressive refusal to sign the form under all four of the *Turner* factors.   And applying all four *Turner* factors, the Court finds that the policy of signing the Form was rationally related to a legitimate penological interest in safety and security.

The first *Turner* factor analyzes whether the policy or regulation at issue is "reasonably related to legitimate penological interests."   *Turner* 482 U.S. at 89.   "The Supreme Court has explained that '[t]he first *Turner* factor is multifold' and requires proof that 'the governmental objective underlying the regulations at issue is [1] legitimate and [2] neutral, and that [3] the regulations are rationally related to that objective.'"   *Reynolds*, 25 F.4th at 84–85 (quoting *Thornburgh v. Abbott*, 490 U.S. 401, 414 (1989)).

Plaintiff does not contest that the penological interest, safety and security, is a legitimate and neutral one.   He does contest, however, whether the policy in question, signing a Form reiterating existing rules, was rationally related to the achievement of that penological interest. *See* Pl.'s Opp'n, ECF No. 263 at 9–15.   Defendants contend that prior to fall 2022, they had received reports of "disruptions and unauthorized movement" by student inmates.   ECF No. 260-2 ¶¶ 2–3.   Thus, according to Defendants, the Form was "rational [sic] related" to a valid penological interest in that it "remind[ed] the inmates [sic] students of the rules and directives after

---

[3] Even if Defendants' argument that only certain *Turner* factors are relevant were applicable, the Court is skeptical that Plaintiff's refusal to sign three different versions of a form, each of which was presented to Plaintiff for signature and thus presumably was intended to be final, was somehow a single incident solely because it was only the final version of the Form "that carried any consequence" and resulted in disenrollment from the CPE Program.  *See* ECF No. 260-5 at 1–3.

returning to in-person instruction after the global covid pandemic[.]" ECF No. 260-1 at 17. In other words, given alleged behavioral complaints from the summer of 2022 and the return to in-person teaching after a hiatus, the form was necessary to ensure the inmates complied with the existing rules.[4]

In support of their argument, Defendants have submitted two affidavits: one from Counselor Supervisor Melissa Santiago dated March 21, 2024 (the "Santiago Affidavit"), and one from former Cheshire Corrections Officer Deshanda Hanley dated May 15, 2025 (the "Hanley Affidavit"). *See* ECF No. 260-10 at 1–2; ECF No. 260-4 at 1–3. Plaintiff challenges each of these affidavits. The Court concludes that, while the Santiago affidavit does not sufficiently allege personal knowledge of the alleged behavioral issues that prompted the form, the Hanley affidavit does, and thus supports Defendants' claim that the requirement to sign the Form was rationally related to maintaining order and security in the prison.

To start, Santiago's affidavit does not appear to be based on her personal knowledge. Santiago's affidavit states that she "became aware" of "various non-compliance with DOC rules," that included "unauthorized movement of students, loud and disruptive behaviors within the classroom, and other incidents of non-compliance." ECF No. 260-10 ¶¶ 9–10. As Plaintiff points out, it is not clear from the affidavit whether Santiago actually witnessed any of the alleged behavioral incidents or otherwise had personal knowledge of the events.[5] ECF No. 263 at 13.

---

[4] Defendants also argue that "[b]y default, the fact that such rules and regulations [in the Form] already existed prior to being memorialized in the form at question is a strong indicator that they supported a legitimate penological interest." ECF No. 260-1 at 17. However, the issue here is not whether the rules themselves are reasonably related to legitimate penological interests, but whether the requirement to sign the Form compiling such rules furthered legitimate penological interests.

[5] "Rule 56(c)(4) requires that affidavits or declarations used to support or oppose a motion 'must be made on personal knowledge,' and 'set out facts that would be admissible in evidence[.]'" *Parks v. Blanchette*, No. 3:09-CV-604 (VAB), 2015 WL 1970526, at *1 (D. Conn. May 1, 2015). Santiago's assertion that she "became aware" of compliance issues may be insufficient to establish personal knowledge, and suggests that the source of her knowledge is hearsay. *See id.* (noting that the Second Circuit has held that "assertions made by a fact witness 'on information and belief' are insufficient under Rule 56").

21

Further, the Santiago Affidavit merely states that that there was "non-compliance with DOC rules," without any citation to which rules in particular were violated. ECF No. 260-10 ¶ 9. The Court must disregard conclusory statements in an affidavit submitted for summary judgment purposes. *McNally v. Stewart*, 618 F. Supp. 2d 168, 174–75 (D. Conn. 2009) (disregarding declarant's statements that certain by-laws and procedures were not followed at meetings without citation to any of the bylaws). Without any information as to what rules were violated, the Santiago Affidavit does not support Defendants' arguments that the rules selected for inclusion in the Form were those rules that the CPE Program students had recently violated or were rationally related to the goal of enforcing the established rules.

But the Hanley Affidavit does sufficiently establish the behavioral issues leading into the fall 2022 semester that prompted the Form. Hanley personally observed and overheard "loud disruptions during study halls and CPE classes," which "occurred almost every study hall during summer of 2022," and noted that "[u]nauthorized student-inmate movement was occurring, including students attempting to come and go with assignments to class; student [sic] attempting to come and go from study halls; and Wesleyan CPE staff dismissing students from class early." ECF No. 260-4 ¶ 5b–c. While Hanley's testimony again does not cite to any specific rules that were being violated, it does clearly describe her personal observance of numerous behavioral issues related to unauthorized movement and loud disruptions, which occurred "almost every study hall." *Id.* ¶ 5b. Aside from noting that the Hanley affidavit is dated almost three years after the incidents in question, Plaintiff has not put forward any evidence creating a genuine dispute of material fact about whether these disturbances actually occurred in the manner Hanley has posited.

Given these behavioral issues, Defendant Roach implemented the new policy of requiring all CPE Program participants to sign the Form to acknowledge existing rules before participating

in the Program. ECF No. 260-2 ¶ 7. From the copy of the Cheshire Correctional Institution Student Handbook in effect at the time of the incident, it appears that the rules contained in each version of the Form track rules in the handbook focusing on the same types of movement and noise disruption described in the Hanley affidavit, and Plaintiff does not argue otherwise. *Compare* ECF No. 260-5 at 1–3 *with* ECF No. 260-12 at 1–66. Implementing a new policy requiring CPE Program participants to read and affirm the application of rules that had recently been broken, while perhaps imperfect, is certainly a *reasonable* means by which to attempt to enforce rules that had recently and repeatedly been disregarded and, in turn, promote an interest in safety and security. *See Reynolds*, 25 F.4th at 88 (discussing how under the first *Turner* factor, the inquiry is "whether it was rational for DOC to believe that at least some [of the behavior at issue] in the prison facility could be prevented through the regulation"). Thus, Defendants have sufficiently established that the policy, signature of the Form, was rationally related to the legitimate penological interests of safety and security, in satisfaction of the first *Turner* factor.[6]

The second *Turner* factor, whether alternative means of expressing the right remain open, weighs in Plaintiff's favor. Courts examine "what 'other avenues remain available for the exercise of the asserted right.'" *Reynolds*, 25 F.4th at 92 (quoting *Turner*, 482 U.S. at 90). As the Court previously stated, in exercising his right to refuse to sign the Form, "Plaintiff had no alternative between speaking and not speaking." MTD Ruling at *9. While DOC administrative remedies and this lawsuit provide an alternative mechanism to challenge the *consequences* of Plaintiff's

---

[6] In its previous motion to dismiss ruling, the Court found that Plaintiff had, at that juncture, "adequately alleged that there is no rational connection between requiring an inmate to acknowledge the authority of DOC to enforce its rules where DOC already has authority to act regardless of any purported acknowledgement." MTD Ruling, at *8. However, the Court noted that it could not consider the material extraneous to the complaint that was submitted by Defendants, and clearly left the door open to ruling differently should discovery "support the DOC Defendants' argument that CPE Program participants had been especially disruptive in the months leading up to the September 2022 meeting, which prompted them to require the form." *Id.* Now, with the benefit of such evidence, the Court cannot find that Plaintiff has carried his burden and demonstrated the irrationality of the policy.

exercise of his right, there is no alternative means by which Plaintiff could have refused to speak, other than by refusal to sign. Thus, the second *Turner* factor is resolved in favor of Plaintiff.

The remaining *Turner* factors support Defendants. On the third *Turner* factor, Plaintiff's refusal to sign the form and acknowledge the applicable rules could have caused a "ripple effect," requiring guards to be called away to resolve ongoing behavioral disturbances, similar to the ones that occurred almost daily leading into the fall 2022 semester. *Turner* 482 U.S. at 90. Further, Plaintiff's refusal to sign certainly had an impact on other CPE Program inmates, who, like Plaintiff, refused to sign the form on September 8, 2022. *See* ECF No. 263-1 ¶ 8. Indeed, Plaintiff sought to generate collective resistance to signing the form. *See* ECF No. 263-10 at 18. While a number of these inmates eventually signed the form, seven never did, which would only increase the likelihood guards would need to be diverted for any CPE Program-related behavioral disturbances. *See* Pl.'s Add'l. Mat. Facts, ECF No. 263-1 ¶ 1.

On the final *Turner* factor, whether ready alternatives existed to accommodate the right, the policy of requesting an inmate to reaffirm the existence of already applicable rules cannot be considered "an exaggerated response to . . . rehabilitation and security concerns." *Turner*, 482 U.S. at 91. While previously there were concerns that Plaintiff was being asked to waive certain rights when DOC officials already had the alternative of simply enforcing the existing rules, it is now clear that the form did not operate as a waiver, but merely a reaffirmation of rules that already applied. While there certainly may be questions about how effective the Form would be given its regurgitation of existing rules, merely requesting a reaffirmation of existing rules before participation in a voluntary secondary education program is not a particularly burdensome or exaggerated response to the behavioral issues reported in 2022, which created legitimate security concerns for the prison. The Supreme Court has cautioned that this factor "is not a 'least restrictive

alternative' test," and, further, Plaintiff has not pointed to an alternative method that "fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests." *Id.* at 90–91.

Thus, the Court finds that while Plaintiff has a First Amendment right to withhold his signature on a form reiterating existing prison rules, the *Turner* factors weigh in favor of finding that the form was reasonably related to Defendants' legitimate penological interest in safety and security, therefore justifying the burdening of Plaintiff's First Amendment right. Accordingly, the Court denies Plaintiff's partial motion for summary judgment and grants Defendants' motion for summary judgment as to the portion of Count One alleging a First Amendment claim of retaliation via removal from the CPE Program.

### 3. Qualified Immunity

Even if the *Turner* factors weighed in Plaintiff's favor, the doctrine of qualified immunity would nevertheless provide an independent ground on which to grant Defendants' motion for summary judgment with respect to Plaintiff's request for money damages for his First Amendment claim of retaliation via removal from the CPE Program.

The doctrine of qualified immunity shields governmental officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability while they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

The United States Supreme Court has established a two-pronged test governing the qualified immunity defense. "First, a court must decide whether the facts that a plaintiff has

alleged . . . or shown . . . make out a violation of a constitutional right." *Id.* at 232.  And under the second prong, "the court must decide whether the right at issue was 'clearly established' at the time of [the] defendant's alleged misconduct." *Id*.  The district court may decide which of the two prongs should be addressed first.  *Pearson*, 555 U.S. at 236.

A state actor's conduct "violates clearly established law when, at the time of the challenged conduct, 'the contours of a right are sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'"  *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (alterations omitted)).  Law is "clearly established" when, at the time of the officer's conduct, the "legal principle [was] sufficiently clear . . . in then-existing precedent." *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018). *See also Edrei v. Maguire*, 892 F.3d 525, 539 (2d Cir. 2018) ("And, because officers cannot have fair warning of rights that are not yet established, we look to precedent in existence at the time of the events.").  In other words, the rule "must be settled law," meaning "it is dictated by 'controlling authority' or 'a robust consensus of cases of persuasive authority.'"  *Wesby*, 583 U.S. at 63 (quoting *al-Kidd*, 563 U.S. at 741–42).  There need not be "a case directly on point, but existing precedent must have placed the . . . constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741.  By requiring the law to be clearly established to a particularized degree, qualified immunity "protects all but the plainly incompetent or those who knowingly violate the law."  *al-Kidd*, 563 U.S. at 743 (citation and internal quotation marks omitted).  "The matter of whether a right was clearly established at the pertinent time is a question of law."  *Kerman v. City of New York*, 374 F.3d 93, 108 (2d Cir. 2004).

Here, even if an application of the *Turner* factors determined that the policy of signing the Form was not reasonably related to a valid penological interest and thus Defendants impermissibly

26

burdened Plaintiff's First Amendment right, that right has not been clearly established.  As the Court previously stated, the determination of Plaintiff's right to withhold his signature in the context of a form required to participate in the CPE Program is "a matter of first impression." MTD Ruling at *7.  In determining whether a right has been clearly established, courts have been instructed to analyze the right with "a high degree of specificity," establishing its existence beyond a doubt.  *Wesby*, 583 U.S. at 63 (citation and internal quotation marks omitted).

While cases have found at a high level of generality that an inmate retains a right not to speak, *see Burns* 890 F.3d at 83–93, it cannot be said that Plaintiff's First Amendment right at issue here was "beyond debate."  *al-Kidd*, 563 U.S. at 741.  Recognizing this, Plaintiff argues that the Court should apply *Terebesi v. Torreso*, 764 F.3d 217 (2d Cir. 2014) and find that Plaintiff's right has been "foreshadow[ed]" by the circuit courts.  *See* ECF No. 263 at 42.  However, the cases Plaintiff cites in support of this argument are factually distinct and cannot properly be described as foreshadowing the specific right at issue here.  First, in *Lozada v. Weilminster*—a district court opinion—the First Amendment right to withhold a signature from a medical attention form was not addressed in the prison context, but rather in the context of emergency response and treatment following an accident.  92 F. Supp. 3d 76, 83, 98–101 (E.D.N.Y. 2015).  Second, *Burns* did not put the constitutional question beyond debate.  Although it addressed whether an inmate could be compelled to speak, it did so in an entirely different context than that at issue here—whether an inmate could be required to inform on fellow inmates, at prison staff's request.  And, as noted above, *Burns* addressed a single incident where the plaintiff refused the specific requests of individual guards; here, by contrast, the issue is Plaintiff's objection to a generally applicable policy.  Thus, the Court declines to find that *Lozada* and *Burns*, either independently or taken together, foreshadow the specific First Amendment right Plaintiff held here, and the limitations

that Defendants could place on that right in the prison context. Moreover, Plaintiff has not proffered any authority suggesting that any reasonable official would have known that requiring a student inmate to acknowledge existing prison rules in order to participate in a voluntary educational program would violate that inmate's constitutional rights, when the requirement was put in place to ensure prison order and safety.

Thus, even under the Court's holding that Plaintiff had a First Amendment right to withhold his signature from the Form, Defendants did not violate any clearly established right held by Plaintiff, and they would thus be entitled to qualified immunity on Plaintiff's retaliation via removal from the CPE Program claim, insofar as he seeks monetary damages.[7]

B.  Transfer to MacDougall

In Count One, Plaintiff also alleges a First Amendment retaliation claim based on his transfer to MacDougall for his continued protest of the Form through the prison's administrative remedy procedures and the filing of this lawsuit. Defendants have moved for summary judgment on this claim as well, which Plaintiff opposes. Because there are genuine disputes of material fact as to whether Plaintiff's continued protest over his removal from the CPE Program was the but-for cause of the alleged adverse action, Defendants' summary judgment motion is denied as to this claim with respect to Roach, but granted as to all of the other Defendants.

As an initial matter, the Court analyzes this claim as to only Defendants Roach, Nunez, and Snyder. Because no other Defendant was personally involved in this aspect of Plaintiff's retaliation claim, all remaining Defendants are entitled to summary judgment on this claim for this reason alone. A plaintiff seeking money damages under Section 1983 from a defendant in their

---

[7] "Qualified immunity shields the defendants only from claims for monetary damages and does not bar actions for declaratory or injunctive relief." *Adler v. Pataki*, 185 F.3d 35, 48 (2d Cir.1999). However, because Plaintiff's First Amendment claim for retaliation via removal from the CPE Program fails on the merits, Plaintiff's request for injunctive relief on this claim also may not proceed.

individual capacity must demonstrate "the defendant's personal involvement in the alleged constitutional deprivation." *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013). "The Second Circuit has defined 'personal involvement' to mean direct participation, such as 'personal participation by one who has knowledge of the facts that rendered the conduct illegal,' or indirect participation, such as 'ordering or helping others to do the unlawful acts.'" *Rivera v. Viger*, No. 3:21-CV-00470 (VAB), 2021 WL 3269095, at *3 (D. Conn. July 30, 2021) (quoting *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001)). This rule applies regardless of whether the individual is a supervisor or not. *See Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020). It is clear from the record that Plaintiff's actual transfer only involved three individuals: Roach, who compiled the separation profile request; Nunez, who approved the separation profile request; and Snyder, who authorized the transfer based on the separation profile request. ECF No. 263-17 at 30; ECF No. 263-23 at 40–41. As Plaintiff has not supplied evidence to suggest the personal involvement of any other Defendants in the alleged retaliatory transfer, all other Defendants are entitled to summary judgment on the retaliatory transfer portion of Claim One.

With respect to the elements of the retaliatory transfer claim, as discussed above, Plaintiff's continued refusal to sign the Form is a protected First Amendment activity. Further, Plaintiff's decision file a lawsuit and pursue his administrative remedies is also protected First Amendment activity. *See Espinal v. Goord*, 558 F.3d 119, 128–29 (2d Cir. 2009) (citing *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995)); *Dolan*, 794 F.3d at 294 ("it is well established that 'retaliation against a prisoner for pursuing a grievance violates the right to petition government for the redress of grievances guaranteed by the First and Fourteenth Amendments and is actionable under § 1983.'" (quoting *Graham v. Henderson*, 89 F.3d 75, 80 (2d Cir. 1996))).

Second, Plaintiff has also adequately alleged the adverse action prong of his transfer-based retaliation claim.  "An adverse action is defined as 'retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights.'" *Brandon*, 938 F.3d at 40 (quoting *Davis*, 320 F.3d at 353).  Transfer of a prisoner to another prison facility—even to another prison facility with comparable conditions—can rise to the level of an adverse action for purposes of a First Amendment retaliation claim.  *See Smith v. Levine*, 510 F. App'x 17, 21 (2d Cir. 2013) (summary order) (collecting cases).  While Defendants argue there was no "adverse action taken against the Plaintiff for any protected speech" with respect to his removal from the CPE Program, Defendants do not appear to contest that an allegedly retaliatory transfer to MacDougall *could be* considered adverse action (likely because they argue there was no retaliatory transfer at all).  ECF No. 260-1 at 19, 21 ("Plaintiff was transferred based on an incident that took placed [sic] on or about April 6, 2023, not for his protest to the CPE program.")

Thus, the Court examines the third element, causation.  The Court finds there are genuine issues of material facts that preclude summary judgment as to whether Plaintiff's First Amendment protected activity, or instead Defendants' concern for prisoner safety, were the catalyst for Plaintiff's transfer for MacDougall, with respect to Roach alone.

To plead causation in the First Amendment retaliation context, a plaintiff must allege "but-for" causation.  *Nieves v. Bartlett*, 587 U.S. 391, 399 (2019) (finding that causation in a First Amendment retaliation claim "must be a 'but-for' cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive") (citing *Hartman v. Moore*,

547 U.S. 250, 260 (2006)); *accord Handsome, Inc. v. Town of Monroe*, No. 23-711, 2024 WL 2747142, at *5 (2d Cir. May 29, 2024) (summary order).[8]

"Causation may be shown '(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of [others] who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant.'" *A.S. v. City Sch. Dist. of Albany*, 585 F. Supp. 3d 246, 269–70 (N.D.N.Y. 2022) (alterations in original) (quoting *Gordon v. N.Y. City Bd. Of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000)). "'Some of the facts often used to determine retaliatory motive may include (1) temporal proximity between the protected conduct and the alleged retaliatory act, (2) the prisoner's prior good disciplinary record, (3) a finding of not guilty at the disciplinary hearing, and (4) statements by the officials showing motivation.'" *Diaz v. Hanna*, No. 3:20-CV-1180 (VAB), 2021 WL 1600585, at *8 (D. Conn. Apr. 23, 2021) (quoting *Ramos v. Semple*, No. 3:18-CV-1459 (VAB), 2019 WL 2422875, at *2 (D. Conn. June 10, 2019)).

And temporal proximity between the adverse action and the protected activity may be sufficient on its own to establish a causal connection. *See Espinal*, 558 F.3d at 129 (concluding that six-month period between dismissal of a lawsuit and alleged retaliatory beating was sufficient

---

[8] The Court notes that, prior to the Supreme Court's decision in *Nieves*, there were diverging views as to whether the causation standard for a First Amendment retaliation claim was "but-for" or "substantial motivating factor." *See Rivers v. N.Y. City Housing Auth.*, 176 F. Supp. 3d 229, 245–47 (E.D.N.Y. 2016) (collecting cases and applying the substantial motivating factor test). The Court believes that *Nieves* has settled the debate and has effectively abrogated Second Circuit precedent describing the causation standard as substantial motivating factor. *Compare Handsome*, 2024 WL 2747142, at *5 (applying but-for causation test) with *Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999) (applying the substantial motivating factor test for section 1983 First Amendment employment retaliation case); *but see Specht v. City of N.Y.*, 15 F.4th 594, 605 (2d Cir. 2021) (citing *Morris*, 196 F.3d at 110, and applying substantial motivating factor test even after *Nieves*). Other circuit courts of appeal that have addressed *Nieves* have held that but-for causation is the applicable standard. *See, e.g.*, *Lemaster v. Lawerence Cnty., Ky.*, 65 F.4th 302, 309 (6th Cir. 2023) (applying but-for causation after *Nieves*); *Turner v. Williams*, 65 F.4th 564, 581 (11th Cir. 2023) (same); *Sanimax USA, LLC v. City of S. St. Paul*, 95 F.4th 551, 558–59 (8th Cir. 2024) (same); *Thompson v. Ragland*, 23 F.4th 1252, 1259 (10th Cir. 2022) (same); *Comm. on Ways & Means, U.S. House of Representatives v. U.S. Dep't of Treasury*, 45 F.4th 324, 340 (D.C. Cir. 2022) (same).

to infer causal connection).  "[T]here is no hard and fast rule for the amount of time that must pass before a causal connection is necessarily broken . . . ."  *Birch v. City of N.Y.*, 184 F. Supp. 3d 21, 32 (E.D.N.Y. 2016).  Specifically, in *Espinal*, the passage of only six months between the dismissal of the plaintiff's lawsuit and an allegedly retaliatory beating by officers, one of whom was a defendant in the prior lawsuit, was sufficient to support an inference of a causal connection because "[i]t [wa]s plausible that the officers waited to exact their retaliation at an opportune time . . . in order to have a ready explanation for any injuries suffered by [plaintiff-appellant]."  558 F.3d at 129.

The parties present two dueling theories of causation for Plaintiff's transfer:  one based on Plaintiff's protected First Amendment speech, and one based on maintaining prison security.  It is certainly possible that Plaintiff's transfer was based on legitimate security concerns resulting from the circulation of a document, written at least in part by Plaintiff, that contained provocative language directed at other inmates with whom Plaintiff regularly interacted.  But there are sufficient questions about whether, instead, retaliation by Roach for the exercise of Plaintiff's First Amendment rights was the but-for cause of his removal, and the safety concern was merely "a ready explanation."  *See Espinal*, 558 F.3d at 129.  Thus, Defendants' motion for summary judgment is denied as to the retaliatory transfer allegations of Count One as to Roach, but granted as to Nunez and Snyder.

### 1.  Defendant Roach

First, the Court acknowledges that both Versions of Plaintiff's document could raise legitimate safety concerns.  For instance, both Versions state that "Cooke has a problem with his integrity," and the Cell Version adds that "[h]e is extremely manipulative!"  ECF No. 263-17 at 41, 50.  Further, the Cell Version accuses Roach of "empower[ing] a hierarchy of very skilled con-artists."  *Id.* at 51.  Additionally, in the Cell Version, Plaintiff refers to "certain actions and

agendas" of Cooke that Plaintiff was "privy too [sic] . . . but would never disclose to any staff member; *prisoner protocol*." *Id.* at 50.  The Work Computer Version contains the added statement that inmate Smith is an "influential gang member."  *Id.* at 39.  Thus, taking these statements in either version of the Document on their face, a reasonable jury could conclude that Roach initiated a separation profile request between Plaintiff and inmates Cooke and Smith, resulting in Plaintiff's transfer out of Cheshire, in order to protect the safety of Plaintiff and other inmates who interacted with each other daily.

But there are also facts in the record from which a reasonable jury could conclude that Roach's alleged safety concern was merely a pretext for her true motive:  retaliation against Plaintiff for his protected speech.  First, there was temporal proximity between Plaintiff's protected activity and Defendant Roach's allegedly retaliatory action of initiating the separation profile that resulted in Plaintiff's transfer from Cheshire.  Plaintiff's protest of his removal from the CPE Program was not limited to September of 2022, but continued into 2023 via both the filing of an administrative remedy that was denied in December of 2022, as well as the instant action, which was filed in January of 2023.  *See* ECF No. 263 at 15; ECF No. 1.  Plaintiff further alleges that his lawsuit and continued challenge of his removal from the CPE Program was an open secret.  Plaintiff testified that he had "a lot of conversation[s] . . . about what retaliation is, what case law I knew . . . if it was something that the DOC could do," with others, including inmate Cooke, while preparing for this instant litigation.  ECF No. 263-3 at 19.  Plaintiff further stated that "in this . . . gossipy, slanderous environment . . . all these pieces [of his protest against removal from the CPE Program and the Honor Board issues] interact.  Everyone knows about it."  *Id.*  While Roach does "not recall" either way whether she had conversations with Plaintiff in March 2023 about his removal from the CPE Program, she does not contest that she "had plenty of

conversations with Whipper regarding the CPE program." ECF No. 263-7 at 59. Additionally, on February 22, 2023, Defendant Santiago emailed Roach a list of inmates who "refused to sign the participation agreement," despite being "given multiple opportunities to reconsider and sign the rules," which included Plaintiff's name. Santiago E-Mail, Pl.'s Ex. G, ECF No. 263-9 at 2. This email is evidence that Roach would have been reminded of Plaintiff's protest and continued refusal to sign the form at least well into February of 2023. As Roach initiated the transfer request a mere two months later, a reasonable jury could conclude, from temporal proximity, that she acted in retaliation for Plaintiff's continued protests about the Form and his removal from the CPE Program.

Likewise, there are questions of fact about how Roach learned about and came into possession of Plaintiff's document(s) and who initiated the idea of transferring Plaintiff in response, which bear on the credibility of various witnesses. Roach claims that she initiated her report and Plaintiff's move to segregation on April 6, 2023, once "[i]nmate Smith informed [her] that there was a typed up document by Inmate Whipper . . . addressed to myself speaking about offenders housed in North Block 3, North Block 5, and North Block 6." ECF No. 263-15 at 2. In an inmate statement dated April 13, 2023, Smith stated that he first asked Lang if Plaintiff had written a "10 page manifesto report including [Smith's] name attach[ed] to false information," and Lang apparently stated that "one of us"—meaning either Plaintiff or Smith—"might be moved," and that Smith notified Roach that same day "about the move and the false accusations." Smith St., Pl.'s Ex. N., ECF No. 263-16 at 2. Lang, for his part, denies that this conversation with Smith occurred. Lang Dep. Tr., Pl.'s Ex. J, ECF No. 263-12 at 40–41. And at his deposition, Smith repeatedly invoked the Fifth Amendment and refused to confirm or deny whether it was his signature attached to his alleged inmate interview statement that corroborated Roach's alleged

process of how she became aware of the document and the possibility of an inmate transfer.[9]  *See* Smith Tr., Pl.'s Ex. Q, ECF No. 263-19 at 14.

Moreover, Roach testified that when she arrived at Lang's office, she did not have a copy of the letter.  ECF No. 263-7 at 11.  Yet, in her incident report, she wrote that, upon her arrival at the shop, she "provided a copy of the document to Correctional Supervisor Lang."  ECF No. 263-15 at 2.  Roach testified that neither inmate Smith, nor Plaintiff (with whom she also met before or around the same time as going to see Lang), provided her with a copy—yet she apparently had a copy to provide to Lang.  *See* ECF No. 263-7 at 9, 13.  And Lang testified that Roach told him she had obtained it from Plaintiff.  ECF No. 263-12 at 14.

This evidence creates questions relating to the credibility of Roach (and, to a lesser degree, Lang and inmate Smith) with respect to how Roach actually learned about the document, when and how she obtained it, and how the idea to transfer Plaintiff from Cheshire came about.  The Court cannot make credibility determinations or weigh the evidence on summary judgment; these are jury functions.  *Proctor v. LeClaire*, 846 F.3d 597, 608 (2d Cir. 2017) (internal citation omitted).  An assessment of Roach's credibility is particularly significant here, since she contends she acted to protect inmate and officer safety, while Plaintiff contends she acted with retaliatory animus.

Additionally, Roach failed to convey the not-guilty finding on Plaintiff's disciplinary report as part of the separation request package.  Plaintiff was found not guilty of the charge of use of a work computer for personal purposes on April 19, the same day that Roach submitted the

---

[9] Plaintiff suggests, without directly arguing, that the Court should draw an adverse inference from Smith's invocation of his Fifth Amendment privilege.  *See* ECF No. 263 at 32 (citing *In re Ethylene Propylene Diene Monomer (EDPM) Antitrust Litig.*, 681 F. Supp. 2d 141, 153 (D. Conn. 2009)).  As there is sufficient evidence to establish a genuine dispute of material fact related to Plaintiff's retaliatory transfer claim without doing so, the Court reserves decision on the question of an adverse inference until trial.

separation profile for review.  *See* ECF No. 263-7 at 40.  Roach claimed not to know when Plaintiff's disciplinary hearing was completed, *id.* at 42, but the fact remains that he was found not guilty of the violation the very same day that Roach submitted the separation profile, and the result of the disciplinary hearing was not included in the separation request.   If the jury were to find Roach's apparent lack of knowledge of the timing not credible, it could draw an inference that her submission of the separation profile was connected to Plaintiff's being found not guilty of the violation related to use of the work computer to draft the document, which in turn could support Plaintiff's theory that she was driven by retaliatory animus to initiate the transfer request because of his complaints about his removal from the CPE Program.

Further, Roach denied that she was responsible for making any decision to supplement the separation profile when she came to learn of the not-guilty finding.  *See id.* at 41 ("[t]hat's not my decision").  But Defendants have not pointed to any evidence in the record precluding Roach from supplementing the profile with this information.  Indeed, Snyder testified that in conducting his review he relied only on "what was submitted to [him] in the package . . . [i]f it's not [in the separation profile], [he] d[id]n't have [it]."  ECF No. 263-23 at 19.  The separation profile was not signed by Nunez until April 20, and was not delivered to Snyder until April 21.  ECF No. 263-17 at 30.  Thus, there appears to have been time for Roach to have included information about the not-guilty finding as the package was proceeding through levels of review.  If she indeed did have the authority to update the profile, but she did not do so, a reasonable jury could conclude that she intentionally withheld information from Snyder to increase the chances that Plaintiff would be transferred—which could again support an inference that she acted with retaliatory animus.

Finally, Roach did not include an inmate interview for inmate Cooke with the separation profile, despite an apparent requirement under the administrative rules to do so.  *See* DOC

36

Administrative Directive ("A.D.") 9.9(5), Ex. X, ECF No. 263-26 at 4. As an initial matter, with respect to the applicability of A.D. 9.9, Plaintiff invokes A.D. 9.9(9)(c)'s language requiring that an "assessment of the inmate's or witness's credibility shall be included in the investigation" as evidence of DOC officials' failure to properly follow administrative procedure in transferring Plaintiff to MacDougall. *See* ECF No. 263 at 36–37. However, A.D. 9.9(9)'s investigation requirements appear to apply primarily when protective custody status, rather than a separation profile, is sought. *See* ECF No. 263-26 at 4. Thus, the investigation requirements of that section do not apply here where a separation profile was prepared. However, A.D. 9.9(5)'s initial investigation requirements, which apply generally when investigating risks of serious harm to an inmate, appears applicable here. Defendants do not argue otherwise.

Under A.D. 9.9(5), as part of the initial investigation, a supervisor "shall" interview the threatened inmate as well as "any other person who may have knowledge of, or be involved in the situation." *Id.* at 4. In Plaintiff's inmate statement on the document's distribution, he specifically refers to Cooke and that he suspected Cooke had been the one to distribute the letter to the other inmates. ECF No. 263-17 at 16. Despite this, and despite including Cooke as one of only three individuals in the separation profile, Roach never interviewed inmate Cooke. ECF No. 263-7 at 45. When asked why this oversight occurred, Roach simply responded "I don't know." *Id.*

In sum, this evidence raises genuine questions of material fact as to whether prisoner safety was the but-for cause of Plaintiff's transfer out of Cheshire, or instead whether Roach retaliated against Plaintiff for his refusal to sign the Form by initiating the transfer.[10],[11]

### 2. Defendant Nunez

Plaintiff does not provide any specific argument concerning whether Nunez allegedly retaliated against Plaintiff through the transfer. Nunez was involved in the discussions with Plaintiff about signing the Form, *see* ECF No. 260-6 at 23–24, but Plaintiff has offered no evidence connecting Nunez's approval of the separation profile to those discussions, or to Plaintiff's protected activity more generally. Thus, Nunez is entitled to summary judgment on the retaliatory transfer portion of Count One.

### 3. Defendant Snyder

While there are genuine questions of material fact as to the motivations behind Roach's decision to submit a separation profile recommendation, the same cannot be said for Snyder's approval of that request. Snyder testified that he had never discussed Plaintiff or his situation with Roach. ECF No. 263-23 at 11. And although Roach submitted both the Work Computer Version and Cell Version of Plaintiff's document to Snyder as part of the separation profile request, there is insufficient evidence from which a jury could conclude that Snyder understood the meaning

---

[10] In addition to the discussion above, and despite incorporating the entirety of the preliminary injunction transcript into the record for their motion for summary judgment, Defendants do not address any of the issues that the Court had previously identified in its preliminary injunction ruling, such as Roach's delay in preparing the separation profile until after Plaintiff was found not guilty of his disciplinary violation on April 19, 2023, and the fact that Plaintiff was released from segregation into the general population for approximately three days before the hearing on his disciplinary action took place—despite the alleged continued danger to his safety and the safety of others. *See* PI Ruling at *15.

[11] While it is true that Snyder made the ultimate decision to transfer Plaintiff, he did so based solely on the separation package prepared by Roach. *See* ECF No. 263-23 at 40 ("Well, you have to make a decision based on the package that's submitted to you by the facility correct? That is correct.") Defendants make no argument that Roach could not be liable for retaliatory transfer. Thus, the Court assumes, without deciding, that even though Roach was not the final decision maker for Plaintiff's transfer, she could be liable for retaliatory transfer because she was exclusively responsible for preparing the materials that were used to determine whether Plaintiff should be transferred and for initiating the transfer request.

of—much less acted in retaliation for—the references to "student backlash against the waiver" and "active[] resist[ance to] the destruction of [students'] rights" in the Work Computer Version of the document, given that Snyder and Roach never spoke about Plaintiff. *See* ECF No. 263-17 at 33. Further, it is not clear in the record that Snyder even fully appreciated the differences between the two versions, let alone the implications of the content in either. *See* ECF No. 263-23 at 26 ("I couldn't tell who wrote what or who did not write what.").

There is also no evidence to suggest that Snyder knew about Plaintiff's other protected activity of grieving his removal from the CPE Program or filing the instant lawsuit. While it is true that Snyder approves "85–90 percent of all Separation Profile Requests," and that he spent no more than twenty minutes reviewing the information Roach provided, ECF No. 263 at 35, Plaintiff has failed to demonstrate a genuine issue of fact about whether retaliation for protected activity was a but-for cause of Snyder's approval of the separation profile.

Thus, the Court finds that all Defendants except Defendant Roach are entitled to summary judgment on Plaintiff's retaliatory transfer claim in Count One.

### 4. Qualified Immunity

At oral argument, the Court questioned whether Defendants had raised a defense of qualified immunity with respect to Plaintiff's retaliatory transfer claim, given that such a defense was not explicitly raised in Defendants' briefing. *See* ECF No. 260 at 24–30; *see also* ECF No. 285 at 18–19. The Court remains skeptical that oblique references to Defendants acting reasonably, *see* ECF No. 260 at 29–30, properly invoke a qualified immunity argument. In any event, though, the factual disputes discussed above with respect to Roach's actions and motivations render summary judgment inappropriate for Roach on qualified immunity grounds as to Plaintiff's

39

retaliatory transfer claim.[12]  *See Eaton v. Estabrook*, 144 F.4th 80, 89 (2d Cir. 2025) ("pre-trial resolution of the defense of qualified immunity may be thwarted by a factual dispute") (cleaned up) (citing *Warren v. Dwyer*, 906 F.2d 70, 74 (2d Cir. 1990)); *Thomas v. Roach*, 165 F.3d 137, 143 (2d Cir. 1999) ("Summary judgment on qualified immunity grounds is not appropriate when there are facts in dispute that are material to a determination of reasonableness.").  "Retaliatory transfer has been 'clearly illegal' for decades." *Arriaga v. Annucci*, No. 23-CV-1941 (VB), 2024 WL 1743300, at *13 (S.D.N.Y. Apr. 23, 2024) (quoting *Meriwether v. Coughlin*, 879 F.2d 1037, 1046 (2d Cir. 1989)).  Thus, if the jury were to disbelieve Roach's proffered reasons for initiating the separation profile and instead conclude that she did so in retaliation for Plaintiff's continued protest of the Form, his filing of grievances related to his removal from the CPE Program, or the filing of this lawsuit, she would not be entitled to qualified immunity.  But factual disputes preclude resolution of that issue at this juncture.

## IV.  COUNT TWO:  CONSPIRACY TO COMMIT FIRST AMENDMENT RETALIATION

The Court grants Defendants' motion for summary judgment in full as to Count Two, Plaintiff's conspiracy claim.  Even drawing all inferences in Plaintiff's favor, he has not shown genuine disputes of fact concerning whether there was a conspiratorial agreement between two or more inmates and/or Defendants to survive Defendants' motion for summary judgment.

To prove a § 1983 conspiracy claim, a plaintiff must demonstrate:  "(1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999) (collecting cases).

---

[12] As the Court has granted summary judgment for Defendants Snyder and Nunez on other grounds with respect to Plaintiff's retaliatory transfer claim, it does not reach whether those Defendants would be entitled to qualified immunity on this claim.

"'[C]onspiracies are by their very nature secretive operations,' and may have to be proven by circumstantial, rather than direct, evidence." *Id.* (quoting *Rounseville v. Zahl*, 13 F.3d 625, 632 (2d Cir. 1994)). That said, "'complaints containing only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights are properly dismissed; diffuse and expansive allegations are insufficient, unless amplified by specific instances of misconduct.'" *Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 325 (2d Cir. 2002) (quoting *Dwares v. City of N.Y.*, 985 F.2d 94, 100 (2d Cir. 1993)). And even specific allegations of conspiracy are not sufficient to state a claim for conspiratorial violation of a plaintiff's rights, if the allegations are conclusory. *Morales v. City of N.Y.*, 752 F.3d 234, 237 (2d Cir. 2014) (*per curiam*) (collecting cases). Plaintiff must allege a "factual basis to support a meeting of the minds" to violate his constitutional rights. *Lewis v. Stango*, No. 3:22-CV-1248 (OAW), 2023 WL 4684666, at *5 (D. Conn. July 21, 2023).

Moreover, to advance a section 1983 conspiracy claim against state actors and a *private* actor, the complaint must allege facts demonstrating that the private actor "acted in concert with the state actor to commit an unconstitutional act." *Spear v. Town of West Hartford*, 954 F.2d 63, 68 (2d Cir. 1992). "Put differently, a private actor acts under color of state law when the private actor 'is a willful participant in joint activity with the State or its agents.'" *Ciambriello*, 292 F.3d at 324 (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152 (1970)).

Previously, the Court denied a motion to dismiss Plaintiff's conspiracy claim in his second amended complaint, but held that Plaintiff could not pursue a conspiracy claim against Wesleyan employees. *See* Order Denying Mot. to Dismiss, ECF No. 248. Plaintiff now opposes Defendants' motion for summary judgment by alleging that there is "substantial evidence that Defendants

conspired with non-DOC parties such as inmates (and Wesleyan) to harm Whipper in his exercise of his First Amendment rights."[13]  *See* ECF No. 263 at 40.

Plaintiff argues that there is sufficient evidence of a conspiracy to preclude summary judgment, but does not specifically allege who forms the conspiracy.  Rather, Plaintiff points to a series of events involving both inmates and DOC officials, without weaving together how these events show even a tacit agreement to deprive Plaintiff of his constitutional rights.  The Court reads Plaintiff's briefing to focus on the involvement of inmates Cooke and Smith as well as Roach.  *See* ECF No. 263 at 22–32, 38–40.  As analyzed above, based on Smith's statement, he brought Plaintiff's document to Roach's (and Lang's) attention and discussed the issue of an inmate being transferred as a result.  But there is insufficient evidence in the record from which a reasonable jury could conclude that Roach and Smith were somehow knowingly engaged in a concerted effort to violate Plaintiff's rights.

Plaintiff's strongest arguments lay with evidence suggesting inmate Cooke had the ability to tamper with documents on Plaintiff's computer and inmate Smith's deposition testimony. *Id.* at 25–32.  However, neither is sufficient to support a conspiracy.  First, whether inmate Cooke had the ability to, or even did, edit Plaintiff's document does not necessarily mean that he conspired with Roach to retaliate against Plaintiff for the exercise of his First Amendment rights.  Inmate Cooke testified that he was in the print shop on March 2, 2023, for at least some portion of the day, and thus it is possible he would have had opportunity to edit Plaintiff's work.  ECF No. 263-10 at 51.  But even assuming that inmate Cooke could or did edit the document, Plaintiff has

---

[13] At oral argument, Plaintiff's counsel confirmed that Plaintiff was not trying to sneak a conspiracy argument pertaining to Wesleyan employees in through the back door, but that it was hard to separate out the actions of Wesleyan from the general conspiracy at issue.  *See* ECF No. 285 at 54–55.  The Court takes this as confirmation that this reference to Wesleyan employees in Plaintiff's briefing was not an attempt to enlarge the conspiratorial circle past what the Court had previously found was plausibly pleaded.

provided no other evidence that he did so based on an understanding with Roach, or at her direction, or even because she tacitly allowed it. While it is true that Roach did not request inmate Cooke provide an inmate statement at the time of the incident, as apparently required under DOC procedure, this on its own is insufficient to support an inference that Roach and inmate Cooke conspired together to violate Plaintiff's First Amendment rights.

Plaintiff also cites to inmate Smith's invocation of the Fifth Amendment during his deposition as evidence of a conspiracy. During his deposition, Smith was asked whether he was asked to or made a deal with someone at Cheshire "that if [he] helped get Whipper transferred out . . . they would help you with your parole application," or whether he got "any assistance or help from Ms. Roach" as to his parole application. ECF No. 263-19 at 17. Smith refused to answer these questions, invoking his Fifth Amendment privilege. *Id.* As noted above, Plaintiff suggests, without explicitly arguing, that Smith's invocation of the right against self-incrimination can result in the drawing of an adverse inference against Defendants. *See* ECF No. 263 at 32. However, Plaintiff has not indicated against which Defendants an inference should be drawn, much less what the inference should actually be. *See Progressive Casualty Ins. Co. v. Monaco*, No. 16-CV-823 (VAB), 2017 WL 2873051, at *10 (D. Conn. July 5, 2010) (discussing the different inferences each party wished the court to draw). As Plaintiff makes no actual argument as to whether an adverse inference should be drawn, the Court does not address the question here. Thus, the Court concludes that Plaintiff has not sufficiently demonstrated genuine disputes of material fact for trial on his conspiracy claim.

Further, even assuming that a conspiracy existed between purely DOC employees, which Plaintiff has alleged even less clearly, the intracorporate conspiracy doctrine would act as a bar to Plaintiff's conspiracy claim. The intracorporate conspiracy doctrine "provides that 'officers,

43

agents and employees of a single corporate entity are legally incapable of conspiring together and thus cannot be held liable for conspiracy under § 1985(3) or § 1983.'"  *McDaniel v. City of N.Y.*, 585 F. Supp. 3d 503, 522 (S.D.N.Y. 2022), *report and recommendation adopted*, No. 19 Civ. 11265 (AT) (RWL), 2022 WL 874769 (S.D.N.Y. Mar. 24, 2022) (quoting *Blue v. City of N.Y.*, No. 16-CV-9990 (VSB), 2018 WL 2561023, at *9 (S.D.N.Y. June 4, 2018)).  While the Second Circuit has yet to clarify whether the doctrine applies to conspiracy claims under § 1983, *see McDaniel*, 585 F. Supp. 3d at 522 n.6, district courts within the Second Circuit have applied the theory to § 1983 claims, and specifically to § 1983 claims brought by inmates.  *See Schlosser v. Walker*, No. 3:20-CV-433 (WIG), 2020 WL 7324679, at *3 (D. Conn. Dec. 11, 2020) (collecting cases).

There is an exception to the incorporate conspiracy doctrine that applies when individuals are "pursuing personal interests wholly separate and apart from the entity."  *Id.* (quoting *Ali v. Connick*, 136 F. Supp. 3d 270, 282–83 (E.D.N.Y. 2015)).  While Plaintiff references this exception, *see* ECF No. 263 at 40–41, he does no more than "'simply alleg[e] that the defendants were motivated by personal bias against plaintiff,'" which is insufficient to establish that the exception applies here.  *Id.* (quoting *Vega v. Artus*, 610 F. Supp. 2d 185, 205 (N.D.N.Y. 2009)).  Thus, the Court holds that the intracorporate conspiracy theory doctrine acts as a bar to Plaintiff's conspiracy claim against solely DOC employees.

Defendants are therefore entitled to summary judgment on Count Two.

## V.    CONCLUSION

For the reasons described herein, Plaintiff's partial motion for summary judgment is DENIED.  Defendants' motion for summary judgment is GRANTED as to the First Amendment retaliation via removal from the CPE Program part of Count One as to all Defendants; GRANTED IN PART as to the First Amendment retaliation via transfer portion of Count One as to all

Defendants except Defendant Roach and DENIED IN PART as to Defendant Roach; and GRANTED as to Count Two as to all Defendants.

Plaintiff's First Amendment retaliatory transfer claim will proceed to trial against Defendant Roach. The Court will set a status conference to discuss the setting of a trial date and pretrial deadlines.

**SO ORDERED** at Hartford, Connecticut, this 9th day of December, 2025.

  */s/ Sarala V. Nagala*              
SARALA V. NAGALA
UNITED STATES DISTRICT JUDGE